**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **JOSEPH O. OBADARE,** ) | |
| ) | **CASE NO.:** |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **JURY TRIAL DEMANDED** |
| ) | |
| **LEAH A. CHRISTIAN, a.k.a. "ALIYAH MAHDI,"** ) | |
| ) | |
| **RASHAD J. GRANT, a.k.a. "RJ MAHDI,"** ) | |
| ) | |
| **ALKEBULAN DEVELOPMENT FUND, LTD,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ / ) | |

## COMPLAINT

Plaintiff, JOSEPH O. OBADARE, by and through his undersigned counsel, hereby sues Defendants, LEAH A. CHRISTIAN ("Aliyah Mahdi" or "Aliyah"), RASHAD J. GRANT ("RJ Mahdi" or "RJ"), and ALKEBULAN DEVELOPMENT FUND, LTD, and alleges the following:

## PRELIMINARY STATEMENT

1.      This action raises the textbook RICO theme: the infiltration of organized crime into legitimate businesses. Similarly, like most RICO fact patterns, the events are traceable to the Defendants' greed. But, on the instruments of racketeering, this Complaint sets itself apart in an unsettlingly way, through media "influencer" tactics, foreign-agent agendas, and the opaqueness of institutions in foreign countries. From a bird's-eye view, Defendants targeted Americans by releasing self-promoting online content that was calculated to induce "followers" to praise and even idolize them as visionaries. Next, once followers had been saturated with content, Defendants systematically defrauded those meeting certain criteria, one by one, and pressured them to invest

in "collective development" projects and (nonexistent) land rights, by paying entities that Defendants controlled. Finally, upon misappropriating victims' assets, Defendants attempted to conceal their actions by posting fake, choreographed imagery and capitalizing on informal, unauthorized land practices in Africa. Ultimately, the facts provide an ominous and modern assessment of the financial ruin that media personalities, when they abuse their "influence," can inflict on well-intentioned followers.

2.      This Complaint explains how Defendants, "RJ and Aliyah Mahdi," managed a multi-organization enterprise and integrated the above activities to advance their objectives, leaving behind a trail of felonies and hundreds of financially devastated American victims, including Plaintiff and other members of the African Diaspora. To date, the Mahdis have faced no meaningful accountability for their efforts to target and financially exploit the African Diaspora.

3.      At times, the events resemble a fictional drama, perhaps a limited series, about the unchecked narcissism and downfall of its key participants, instead of a real-world fact pattern. Unfortunately the sequence was real: an Ohioan's fabricated 2011 marriage and 2014 relocation; the "married" couple's use of online platforms for conducting political activities, as unregistered foreign agents; profit-motivated campaigns for mass "exodus" of Americans, their capital, and their expertise (including military expertise) to foreign countries; a man's obsession with enriching himself through the creation of "cities"; sophisticated cross-border schemes to defraud the African Diaspora, relying on obscure land registries and other information asymmetry; botched attempts to bribe rural-council members for land-usage rights; a securities-fraud side gig; the value transfer of proceeds and other property in Africa back into the U.S. through sham businesses and service-based laundering techniques, ***all spearheaded*** by an insurance salesperson working from a residence in Ohio and her self-identified public-figure, polygamist "husband," who remains in

hiding while teasing his imminent return.

4.      Notably, the presence of *only one* plaintiff in this unamended Complaint reflects a larger theme: most victims of Defendants' racketeering, although numbering in the hundreds and bearing substantial losses, have been intimidated and harassed into silence and inaction.

5.      Allegations in the Complaint are founded on diligent inquiry through a wide range of sources and methods. Those made upon information and belief are almost exclusively limited to facts peculiarly within the possession and control of the Defendants and/or those for which belief is based on factual information that makes inferences of the allegations plausible. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth in this Complaint after a reasonable opportunity for discovery.

6.      The most accessible and routinely cited sources, though, are publicly available videos in which Defendants participated. Except as otherwise noted, Defendants themselves posted the videos, directly or through an agent, on the "RJ Mahdi" YouTube channel. Mr. Mahdi controlled this channel at all times material, either alone or jointly. To simplify references, the below table assigns the videos abbreviated names:[1]

| Posting Date | Accessed | Title | Name in Complaint |
|---|---|---|---|
| 06/24/23 | 11/13/24 | **RJ Mahdi Clears The Air On Scamming Accusations & Ending Repatriation Services For Black Americans\*** | **RJ Fraud Denial** |
| 03/21/22 | 11/13/24 | **THE MAYOR WELCOMES MY AMBASSADORIAL DELEGATION** | **Alkebulan Reboot Announcement** |
| 08/17/21 | 11/12/24 | **ROAD TO ALKEBULAN (THE DOCUMENTARY)** | **Alkebulan Documentary** |
| 02/23/21 | 11/12/24 | **EXODUS RADIO (SPECIAL EVENT): CONSULTANT COMMENCEMENTS** | **Ex. Radio #15** |

---

[1] Of note, the table includes an "Accessed" field, which specifies the most recent date each video was accessed.

| 02/02/21 | 11/11/24 | **EXODUS RADIO Episode 14: REPATRIATION BEFORE GARVEY** | **Ex. Radio #14** |
|---|---|---|---|
| 01/26/21 | 11/11/24 | **EXODUS RADIO Episode 13: Making Money in Africa** | **Ex. Radio #13** |
| 01/12/21 | 11/12/24 | **EXODUS RADIO Episode 11: PROTECTING OUR COMMUNITIES** | **Ex. Radio #11** |
| 01/05/21 | 11/12/24 | **EXODUS RADIO Episode 10: HEALING OUR COMMUNITIES** | **Ex. Radio #10** |
| 12/22/20 | 11/13/24 | **EXODUS RADIO Episode 8: 2020 Year Recap** | **Ex. Radio #8** |
| 12/08/20 | 11/11/24 | **EXODUS RADIO Episode 6: COLLECTIVE ECONOMICS** | **Ex. Radio #6** |
| 12/01/20 | 11/13/24 | **EXODUS RADIO Episode 5: BUILDING RELATIONSHIPS** | **Ex. Radio #5** |
| 11/24/20 | 11/13/24 | **EXODUS RADIO Episode 4: SURVIVING THE GLOBAL RESET** | **Ex. Radio #4** |
| 11/17/20 | 11/12/24 | **EXODUS RADIO Episode 3: REACHING FAIR RESOLUTIONS** | **Ex. Radio #3** |
| 11/10/20 | 11/12/24 | **EXODUS RADIO Episode 2: IGNORANCE IS NO EXCUSE** | **Ex. Radio #2** |
| 11/03/20 | 11/12/24 | **EXODUS RADIO Episode 1: VOTE OR EXODUS** | **Ex. Radio #1** |
| 04/01/20 | 11/12/24 | **KING RJ MAHDI GIVES THE GAME ON INVESTING IN SENEGAL & THE REST OF AFRICA\*\*** | **Diversified Game** |
| 02/28/20 | 11/13/24 | **ALIYAH MAHDI SPEAKS: AA MOTHER OF 2 IN AFRICA** | **Alkebulan Promo from Akron** |

**\* African Diaspora News Channel, YouTube.**
**\*\* Diversified Game Podcast, YouTube.**

7.      In this Complaint, the degree of detail in the surrounding circumstances is often heightened to demonstrate the reasonableness of inferences and, in the context of securities and wire fraud, to satisfy Fed. R. Civ. P. 9(b). Ultimately, the RICO fact pattern spans at least two bribery attempts, unregistered foreign-agent activity, securities fraud (not as a RICO predicate), multiple variations of money-laundering offenses, cross-border land fraud schemes, and other

areas. These operations targeting Americans required careful and thorough disaggregation.

8.      When this Complaint refers to an "American," the term's meaning conforms to the definition of "United States person" in 26 U.S.C. § 7701(a)(30)(A) and its related guidance. In this Complaint, Americans generally include U.S. citizens and residents.

## AGENCY AND AUTHORITY

9.      The allegations in this Complaint may attribute transactions, statements, or actions of one or more persons to a specific legal entity, partnership, association in fact, and/or sole proprietorship. Unless expressly stated otherwise, such transactions, statements, or actions were authorized, ordered, communicated, effected, and/or done by the person or persons (a) while acting with actual or apparent authority of the principal(s); and (b) while acting within the course and scope of their duties, delegated authority, and/or management responsibilities for the principal(s).

## PARTIES, KEY RELATIONSHIPS, FORUM-STATE & U.S. CONTACTS

**The Obadare Family:**

10.      Plaintiff, Joseph O. Obadare ("Plaintiff"), is an individual and United States citizen who resides, and at all times material to this Complaint resided, in Baltimore, Maryland.

11.      Adebimpe A. Obadare ("Ade") is the spouse of Plaintiff and a United States citizen. Ade resides, and at all times material to the Complaint resided, in Baltimore, Maryland. Collectively, Plaintiff and Ade are referred to as the "Obadare Family."

12.      The Obadare Family comprises members of the African Diaspora.

**Leah A. Christian (Aliyah Mahdi) and her relationship to Ohio:**

13.      Aliyah Mahdi is an unmarried woman and United States citizen who resides, and at all times material to the Complaint resided, in Akron, Ohio.

14.      Specifically, Aliyah resides on property she owns at 1156 Dover Ave., Akron, Ohio

- 5 -

44320 (the "Dover Avenue Residence"). Aliyah acquired the Dover Avenue Residence by purchase on or around June 7, 2024.

15.     Before this purchase, Aliyah lived at multiple apartments in Akron within the last decade. However, during this period, she frequently visited her family for extended stays at 1169 Flanders Ave., Akron, Ohio 44314 (the "Flanders Avenue Residence").

16.     Aliyah is, and at all times material to this Complaint was, a member and the principal manager of Defendant Alkebulan Development Fund, Ltd (hereinafter, the "Shadow Bank"). Except as otherwise stated in this Complaint, she directed and managed the Shadow Bank's activities from its headquarters and principal place of business, in Akron, Ohio.

17.     Aside from the Shadow Bank, Aliyah has worked for over a year as an insurance agent, licensed by the Ohio Department of Insurance, in Akron, Ohio.

18.     Aliyah also performs doula services in Ohio. Based on information and belief, including review of her National Provider Identifier record, Aliyah's primary practice address is in Akron, Ohio.

19.     Except to the extent an allegation specifies otherwise, Aliyah's statements, actions, and financial transactions alleged in this Complaint were made or effected in Akron, Ohio.

20.     From 2015 through the end of 2022, both dates being approximate and inclusive (hereinafter, the "Performance Years"), Aliyah Mahdi attempted, primarily through social media posts and public statements, to mislead the public into believing that she had permanently relocated to Senegal with her claimed husband, RJ Mahdi, in 2014. For this purpose, the "public" excludes a close-knit group of Aliyah's family and friends.

21.     To this end, Aliyah made approximately ten short-term, isolated trips during the above-referenced period. On these trips, Aliyah staged and choreographed her purported day-to-

day life, business activities, and humanitarian initiatives in West Africa. Aliyah used videos of these staged events to reinforce the public's false image of her as an expatriate.

22.    Aliyah maintained the false "USA to Senegal" narrative in 2024, while residing and working as an insurance agent, doula, and financial-service provider in Akron, Ohio.

<u>Illustrative profile of the Ohio resident, updated February 2, 2024</u>.



23.    As of November 15, 2024, Aliyah Mahdi still represented herself as belonging to a repatriated family, which included RJ Mahdi, through the Shadow Bank's website: Alkebulan Development Fund, Ltd, *About Us*, <u>https://www.alkebulanfund.com/about-us</u> (last visited Nov. 15, 2024).

24.    However, Aliyah was never able to relocate to, or reside in, West Africa. Aliyah's Ohio residence during the Performance Years is based on information and belief, including but not limited to the following circumstances and events <u>during the Performance Years</u>: her regular work schedule at the Shadow Bank's principal office; her recurring participation in cultural events and group activities in Akron; her Ohio driver-license renewal; her close family ties in Ohio; her Ohio vehicle acquisition(s); and her accumulation of Ohio traffic points.

25.     In addition, at all times after forming the Shadow Bank, Aliyah undertook Ohio statutory-agent duties for the entity. Such duties required that, upon accepting appointment as agent, she continuously maintain presence in Ohio for service of process.

26.     Except for isolated and brief absences, Aliyah has complied with her statutory-agent duties, beginning in December of 2019, to remain in Ohio for accepting service of process for the Shadow Bank.

**Alkebulan Development Fund, Ltd (the Shadow Bank)**:

27.     The Shadow Bank is an Ohio for-profit limited liability company. Its principal place of business and its headquarters are at a residential property in Akron, Ohio. Aliyah Mahdi formed the Shadow Bank on December 14, 2019. A true and correct copy of its Articles of Organization and a Certificate of Good Standing, issued November 11, 2024, are attached at **Exhibit A**.

28.     On information and belief, at all times material to this Complaint, Aliyah held an interest in the Shadow Bank providing a share of approximately 50% in (a) profits/losses, (b) distributions, and (c) capital. Her interest further provided at least 51% of the share of routine management rights.

29.     The Shadow Bank has never had more than five employees.

30.     The Shadow Bank is a financial-services business and a financial institution. Its Akron-based operations focus primarily on three functions: (A) lending money and/or property to clients for relocation or investment in Africa (the "Lending Function"); (B) selling a repatriation-themed book authored by its founder;[2] and (C) providing financial and investment-advisory services (the "Other Investment Advisor" function). Aliyah controlled these three functions.

---

[2] Aliyah Mahdi, *The Repat Guide, 50 Startups for Repats in Africa* (February 2021). The book was published by a purported Senegalese entity named Mahdi Media Publishing.

31.     From January 1, 2020 through January 31, 2023, both dates being approximate and inclusive, the Shadow Bank also undertook specific promotional appearances and marketing assignments at the instruction and command of the (a) Alkebulan Development Group S.A. and/or (b) other persons outside the United States. Aliyah made these appearances and performed these assignments on behalf of the Shadow Bank. In these circumstances, the Shadow Bank still carried out its functions in Akron, Ohio. However, the above-noted principals managed, directed, and controlled the objectives by issuing orders to the Shadow Bank regarding their intentions.

32.     In addition, at all times material to the Complaint, Aliyah Mahdi and RJ Mahdi oversaw and jointly managed a system of value transfer (detailed in later paragraphs), which required careful and delicate coordination between the Shadow Bank and its offshore affiliate.[3]

33.     Finally, on or around June 1, 2023, the Shadow Bank began promoting and managing a club called "Exodus Club 2.0," which was united around the desire to expatriate out of the United States. This club was a successor to the prior "Exodus Club," which in turn ended around the time that Aliyah dissociated from the Made in Africa Project (all detailed later). Aliyah and RJ jointly manage the Exodus Club 2.0, which is based in Akron, Ohio.

*Closer look at the Lending Function*:

34.     On its website, the Shadow Bank has stated the following regarding the Lending Function's track record, which is less than five years old (boldface added):

> Our goal is to make moving and investing in Africa easier for you. Our organization **has provided over 22 billion in funding throughout the United States** for investments, real estate, retirement, relocation assistance, business endeavors and more. We focus heavily on community based initiatives to propel our communities forward! **Building on both sides of the ocean** are [sic] imperative to our economic success!

Alkebulan    Development    Fund,    Ltd,    *Alkebulan    Development    Fund    (homepage)*, https://www.alkebulanfund.com/home (last visited Nov. 11, 2024).

---

[3] Whether carried out through "under invoicing,"  billing for unperformed services, or otherwise, as described later.

35.     The Shadow Bank is not a "bank" as defined under 15 U.S.C. § 80b-2.

36.     Since its formation, the Shadow Bank has substantially grown its loan portfolio without relying on anything akin to bank deposits. It has done so with a loan-underwriting team comprising three or fewer employees. Furthermore, the Shadow Bank has not required collateral for loans issued to repatriating and investing clients.

37.     Even so, on its website, from approximately March 5, 2023 to present, it encouraged clients to "[s]ee if you qualify for our flex funding program where can receive [sic] a loan as little as $10,000- $400,000 USD to fund your relocation, investments, and other projects in Africa. Our funding provides you with the freedom to do so."

38.     Aliyah makes, and at all times material to this Complaint made, final decisions on all loan approvals of the Shadow Bank from its (Akron-based) headquarters.

39.     The Shadow Bank has attempted to differentiate itself in the "repatriation-financing" market. On its website, from approximately March 5, 2023 to present, the Shadow Bank has claimed it is "recognized as the one and only company that specifically caters to assisting the diaspora with generating funding to invest and relocate to the continent of Africa." Throughout the same period, its website has further stated that its "Exodus Club program has assisted families with investing in businesses like transportation companies, Airbnb's, real estate developments, service related businesses and more." Indeed, the Shadow Bank prides itself on having helped "thousands of families" in this regard.

*Closer look at the Other Investment Advisor Function*:

40.     Throughout its existence, the Shadow Bank, acting through Aliyah Mahdi and other agents, has regularly charged clients, including persons residing in the United States but outside of Ohio, for consultation and investment advice, including about the benefits of acquiring

investment contracts and other alternative-investment securities.

41.     Regarding the Other Investment Adviser function, Aliyah Mahdi has posted on her LinkedIn profile that her work for the Shadow Bank has included "Capital and Loan Consulting, Financial Advisory, Wealth Management, Legacy Planning." LinkedIn, *Aliyah Mahdi*, https://www.linkedin.com/in/leahchristian1 (last visited Nov. 11, 2024).

42.     On information and belief, including review of publicly accessible registries, neither the Shadow Bank nor any agent working on behalf of the Shadow Bank was registered as an investment advisor, or as an investment adviser representative, with the Securities and Exchange Commission (the "SEC") or any state securities regulator, as applicable, at any time material to this Complaint.

**RJ Mahdi: marriage, relationship with United States, context for jurisdictional allegations:**
*Generally*:

43.     RJ Mahdi is an individual and United States citizen. RJ resides in the United States. Hereinafter, when referenced collectively, RJ and Aliyah may be referred to as the "Managers."

44.     RJ Mahdi and Aliyah Mahdi are not and have never been married.

45.     In the last decade, the RJ Mahdi and Aliyah Mahdi have routinely represented themselves as married to the public.

46.     On January 26, 2021, RJ suggested his marriage to Aliyah began 2011. *See* Ex. Radio #13 at approx. 52:37.

47.     Additionally, RJ has recently stated that he practices polygamy. In this regard, RJ cites Aliyah as his "first" wife, who has a productive relationship with "Maya," the sister wife. RJ's philosophy of polygamy and marriage, *which is key to this Complaint*, is as follows:

> I think that, you know, like you say, marriage is sort of a business, and so, you know, just like in business, you find a partner that you can collaborate well with.

- 11 -

> You find a partner who you can, you know, have a mutual respect and a mutual honor for. I think it's the same in marriage, and so, you know, being, you know, a Muslim and, and, and [sic] being a part of our faith, to, you know, take more than one wife, I think that it was, it became a time when it was necessary, and it helps. It helps a lot. It helps with the mission at hand. It helps us to be able to share in the responsibilities and to, you know, boost and uplift each other and, you know, provide that, you know, that that stronger foundation, and so, yeah, I think, you know, I thank both of my wives for the support that they contribute to this ongoing mission. You know, we're all here for it, and we all look forward to building together, and as far as stands now it will only be two so no, no no additionals in the foreseeable future.

*See* Diversified Game video at approx. 22:16.

48.     During the Performance Years, RJ resided in Africa, primarily in Senegal.

49.     During the Performance Years, when RJ was not physically in West Africa, he generally stayed in Akron, Ohio, where he transacted in personal and business affairs.

50.     For most of his life, RJ has maintained family in Dekalb County, Georgia. However, during the Performance Years, particularly beginning in 2020, RJ avoided extended visits to Georgia because he feared he might be served legal process there, in child support and/or other proceedings.

51.     Throughout the Performance Years, RJ Mahdi was a general partner of the Made in Africa Project, which was a partnership conducting business both in Akron, Ohio and in Senegal (primarily in Dakar), as detailed in the later paragraphs. Since approximately January 31, 2023, he has owned the Made in Africa Project as a sole proprietorship, which he operates predominantly in Senegal but, on information and belief, also in Nigeria and in Akron, Ohio.

52.     During the Performance Years, RJ publicly referred to his contacts with, and presence in, the state of Ohio. In this regard, he often described Ohio as his prior residence. *See, e.g.*, Ex. Radio # 14 at approx. 14:34 (characterizing Ohio as "my last, uh, residence in the U.S."); Ex. Radio # 6 at approx. 7:47 (stating "my last year and a half, two years in the states I lived in

- 12 -

northeast Ohio, just outside of Cleveland, [in] Akron"); etc.

53.     RJ still regularly travels to Akron: (a) to monitor operations of the Shadow Bank affecting him financially, directly or indirectly; (b) to perform management functions for the Made in Africa Project; and (c) to visit Aliyah, his longtime friend and colleague. Thus, RJ continues to travel to Ohio to transact affairs.

*RJ in hiding*:

54.     But then, in or around January of 2024, federal law enforcement in Senegal issued an arrest warrant for RJ.

55.     RJ, upon learning of this most recent warrant, has generally remained (a) in hiding; (b) in de facto "legal sanctuaries" (including those within Senegal); and/or (c) in jurisdictions outside of Senegal. During the past year, on information and belief, RJ has travelled between Ohio and Africa. In Africa, he has stayed mostly in in Medina Baye, Senegal and in parts of Nigeria.

**OTHER KEY PERSONS, ASSOCIATIONS, RELATIONSHIPS IN MAHDI NETWORK:**

**The Made in Africa Project:**

56.     In 2014, the Managers created the Made in Africa Project (hereinafter, the "MIA Partnership" or "MIA"), which was a general partnership they formed in Akron, Ohio, under Ohio Rev. Code § 1776.22. This allegation is on information and belief, including based on the Managers' contemporaneous contacts and presence in Akron.

57.     Alternatively, the Managers formed MIA in Senegal around January of 2015. In this alternative, regardless of MIA's recognition (or lack thereof) under local law, the Managers agreed to and did, in fact, conduct MIA as a business and divide its profits equally between themselves.

58.     However, under both alternatives, in or around January of 2015, the Managers

established MIA's chief executive office and principal place of business in or around Dakar, Senegal.

59.    MIA's primary operating activities included marketing and "selling" real estate in Senegal; consulting and performing repatriation-assistance services; designing, promoting, and entering into investment contracts, joint ventures, and businesses for/with Americans; conducting tours in Senegal; hosting entertainment and other events to promote selected causes; and maintaining an "Exodus Club" and "Investors Club" for fee-paying members.[4]

60.    But MIA's activities were more expansive than this description suggests. MIA's open-ended business model allowed it to influence an ever-growing list of markets and industries. MIA repeatedly sought to identify or create, directly or indirectly, new opportunities for its repatriating (and outbound investing) American clients:

> Since 2014 Made In Africa Project has been a staple in helping the [African] Diaspora shop with, visit, invest in and relocate to Africa. [Its] efforts help entrepreneurs, angel investors and those looking for economic opportunities to connect with the continent in a variety of industries and across a plethora of platforms. This multifaceted exchange of commerce and communication helps us all to contribute collectively to the productive development of our Mother continent while developing economic sustainability for our families and communities.

*Made in Africa Project Investors Club Membership Program 2019*, https://webflow.com/, https://uploads-ssl.webflow.com/5d05634bc9e4d685cccf9178/5d38e3f17a00daba7eda1438_Investors%20Club%20MAHDARBY.pdf (last visited Nov. 12, 2024).

**Alkebulan Development Group S.A and Pape Ibrahim Lowe:**

*Generally*:

61.    Alkebulan Development Group S.A. (the "Offshore Affiliate" or the "CFC") is a

---

[4] The original investors-club concept, over time, spun off new variations and mini clubs, such as the "Exodus and Repatriation Investment Club." However, any changes to, or variations of, the original investors club and its implementation are immaterial to this Complaint. During MIA's existence, a separate and distinct "Exodus Club" was also offered, without an express "investment" component. As alleged in the Complaint, an "Exodus 2.0" later emerged, after the MIA Partnership collapsed, and this successor exodus club was managed and overseen by the Shadow Bank.

public limited company formed in Senegal. In Senegal's Trade and Personal Property Credit Register ("RCCM"), the Offshore Affiliate's public registration number is SN-DKR-2005-B-2962. The Offshore Affiliate shows █████3152 as its National Identification Number of Companies and Associations ("NINEA").[5]

62.     Pape Ibrahim Lowe ("Mr. Lowe") is an individual and United States citizen who resides in the state of Maryland. During the Performance Years, Mr. Lowe spent time in New York, where he has family; in Maryland; and in Africa, primarily Senegal.

63.     During the Performance Years, Mr. Lowe was a close friend and colleague of RJ.

64.     In or around 2019, and prior to the Offshore Affiliate's formation, RJ and Mr. Lowe formed the Alkebulan Developpement [sic] Group (the "ADG Precursor Entity") in Senegal as a Groupement Intérêt Economique, with respect to which RJ did not hold the protection of limited liability. In Senegal's RCCM, the ADG Precursor Entity's public registration number was and remains SN-DKR-2019-C-25472. Its NINEA was and remains █████1926.

65.     RJ and Mr. Lowe then formed the Offshore Affiliate on or around February 1, 2020.

*Legal and beneficial interests*:

66.     During the Offshore Affiliate's existence, RJ owned approximately 51% of the combined voting power and approximately 45% of the total value of all classes of its stock.

67.     During the Offshore Affiliate's existence, Mr. Lowe also owned shares in one or more classes of its stock.

68.     During the Offshore Affiliate's existence, Aliyah held a disguised interest in the Offshore Affiliate, as later detailed.

---

[5] Regarding Fed. R. Civ. P. 5.2(a)(1), RCCM and NINEA information is mostly accessible to the public. *See* *https://seninfogreffe.sn*. Even so, for certain functions, the NINEA is at least partially analogous to a taxpayer-identification number. In this Complaint, the full NINEA is not required to state any causes of action, and it is afforded the same treatment as a taxpayer-identification number in the United States.

69.     Aliyah also executed specific promotional assignments, remotely, at the instruction of the Offshore Affiliate. These services were performed individually by Aliyah and were thus separate from those carried out by the Shadow Bank.

*Real estate development, political activities, employed professionals*:

70.     From January 1, 2020 through January 31 2023, both dates being approximate and inclusive (hereinafter, the "Alkebulan #1 and #2 Eras"), the Offshore Affiliate was a registered real estate development company in Senegal.

71.     During the Alkebulan #1 and #2 Eras, the Offshore Affiliate was maintained primarily to maximize profit through the promotion of Senegalese government interests, including those of regional and municipal governments. To this end, the Offshore Affiliate's principal mission was the development a new city for repatriates, particularly disenchanted Americans. The city was envisioned by RJ, and the Managers marketed it to the public as "Alkebulan" and/or "Alkebulan City." In this Complaint, the purported city is also referred to as "RJ's American-Exodus City." As described in later paragraphs, the location of RJ's American-Exodus City changed around March 1, 2022.

72.     In this Complaint, unless it is stated to the contrary or readily discernible from the context, the actions undertaken, and the financial transactions effected by, the Offshore Affiliate were planned, designed, and carried out in partnership and consultation with MIA and/or the Shadow Bank. The three actively coordinated and integrated their services, operating in cycles through their complementary business models.

73.     To illustrate, for Americans interested in building a structure on Alkebulan land, the Shadow Bank could provide financing. In formalizing loans, the Shadow Bank pressured loan recipients to use loan funds to contract with the Offshore Affiliate for the construction. If

successful, the Shadow Bank thereby acquired a plausible reason to make substantial funds transfers (or *apparent* transfers), on behalf of debtors, to the Offshore Affiliate, without ever disbursing any funds to the debtors.

74.     Collectively, the Offshore Affiliate, MIA, and the Shadow Bank may be referred to as the "Alkebulan Enterprise."

**Mayor Papa Momar Ngom and Mayor Cheikh Sadibou Diack:**

75.     Papa Momar Ngom ("Mayor Ngom" or "Ngom") is an individual residing in the rural community of Ngogom, Senegal. Whenever referenced in or material to the Complaint, he was Ngogom's mayor.

76.     In Senegal's government and subdivisions, Ngogom is a rural community within the Bambey Department. This department is one of 45 in the country. The Bambey Department and two others make up the Diourbel Region, which in turn is one of 14 regions in Senegal.

77.     During the Performance Years, Mayor Ngom experienced significant financial distress. This allegation is on information and belief, including inference from African-media reporting about Mayor Ngom's financial difficulties and creditor-initiated legal proceeding(s).

78.     Around the middle of 2022, Mayor Ngom decided to enter Senegal's presidential race to be held on March 24, 2024. Mayor Ngom formally entered the race the following year and ended his campaign, unsuccessfully, around January of 2024.

79.     In or around January of 2024, Mayor Ngom was found guilty on the offense of breach of trust under Senegalese law. This event, although not *directly* tied to this Complaint's allegations, concerned dubious tactics that Mayor Ngom applied against creditor(s) to avoid payment. It underscores his desperate financial condition and vulnerability around this period.

80.     Acting as mayor of the Ngogom, Ngom oversaw the council charged with

administering Ngogom's land falling in Senegal's national domain to the extent consisting of designated "terroir zones" (hereinafter "territorial zones"). The council was responsible allocating and deallocating rights of use over such land. Although Senegal law nominally required certain external approvals for some usage-right decisions, these were virtually nonexistent in Ngogom at all times described in this Complaint. Regardless, Mayor Ngom exercised substantial and decisive power and legal authority over Ngogom's land allocations, in the context of Senegal's decentralized system.

81.     Mayor Cheikh Sadibou Diack ("Mayor Diack" or "Diack") is an individual residing in the rural community of Ndande, Senegal. Whenever referenced or material to the Complaint, he was Ndande's mayor.

82.     Ndande is a rural community within the Kébémer Department and Louga Region.

**Alioune Ndao and the Conduit Entity:**

83.     Alioune Ndao ("Mr. Ndao") is an individual and resident of Senegal. Mr. Ndao is a Senegalese citizen. Throughout 2022 and 2023, Mr. Ndao resided in or around Dakar, Senegal.

84.     Around the middle of 2022, Mr. Ndao decided to enter Senegal's presidential race to be held on March 24, 2024. Around the middle of 2023, Mr. Ndao notified the General Directorate of Elections in Senegal that he intended to enter the race. Mr. Ndao was not elected president of Senegal in 2024.

85.     Mr. Ndao is a candidate for parliament in Senegal for the election scheduled November 17, 2024.

86.     Solutions Sociales SARL ("Solutions Sociales" or the "Conduit Entity") is an entity in Senegal that RJ and/or Mr. Ndao formed as a Société à responsabilité limitée ("SARL"), which generally provides limited liability to its owners. The Conduit Entity was formed in or around

September of 2021. In Senegal's RCCM, the Conduit Entity's public registration number is SN-DKR-2021-B-17874, and its NINEA is ████7398.

87.     Upon information and belief, including facts later alleged regarding land-ownership claims linked to Mr. Ndao, RJ held a legal or beneficial interest in the Conduit Entity as well as access to, and/or partial control over, some of its assets after formation and at all times otherwise material to this Complaint.

**The TFG businesses:**

88.     TFG Official, Inc. ("TFG Official") is, and at all times material to the Complaint was, an unincorporated division of the Shadow Bank that Aliyah formed in consultation with RJ.

89.     TFG Official operates, and at all times material to this Complaint operated, exclusively in Akron, Ohio.

90.     Until its domain (tfgofficial.com) expired,[6] TFG Official claimed that it "brings together multiple distinct organizations, each dedicated to empowering women of all ages. Our mission is to collaborate, educate, and uplift women within our communities, bridging generational gaps and fostering self-awareness, self-esteem, and personal growth."

91.     Aliyah has never intended that TFG Official regularly and continually perform bona fide services to the public.

92.     Even so, Aliyah has posted online fake job openings for TFG Official to create the appearance that it performs such services. For instance, TFG Official posted an opening for a "Community Mentor," a "Community Event Planner," and a "Business Development Manager," which, among other duties, would "be responsible for identifying and cultivating new business opportunities" and "securing contracts with corporate and government clients."

---

[6] According to the Whois Domain Lookup function.

93.     TFG Capital is, and at all times material to the Complaint was, another unincorporated division of the Shadow Bank that Aliyah formed in consultation with RJ.

94.     TFG Capital operates, and at all times material to this Complaint operated, exclusively in Akron, Ohio.

95.     On its shared website with TFG Official (until the domain tfgofficial.com expired), TFG Capital claimed that it provided the following services, among others: (a)   "Financial Planning"; (b) "Retirement Planning"; (c) "Income Protection"; (d) "Legacy Planning"; (e) "Wealth Accumulation"; (f) "Credit Repair Solutions"; and (g) "Private Coaching Sessions," including "professional mentors from various fields . . . provid[ing] you with tailored guidance on how to invest your funds wisely." Indeed, "[w]hether you're considering business expansion, real estate ventures, or other investments, [TFG] mentors will help you make informed decisions." TFG Official further purported to offer "Personal Loans Assistance," in which its "team specializes in assisting you in obtaining personal loans up to $400k in unsecured funding." Such "assistance" is within TFG's broader category of the "Funding Consulting" supposedly offered.[7]

*TFG Capital's "Funding Consulting" Segment*



_____

[7] On information and belief, with respect to any $400,000 unsecured loans disbursed, the Shadow Bank issued them directly and without regard to its TFG Capital division.

96.     Aliyah has never intended that TFG Capital regularly perform bona fide services to the public.

97.     Again, however, Aliyah has posted online fake job openings for TFG Capital to create the appearance that it does performs services. Recent job postings have called for a "Funding Consultant," a "Financial Planner," and even an "Investment Advisor."

98.     Upon information and belief, based on publicly accessible registries and the proprietorship's unorganized form, neither TFG Capital nor any agent working on its behalf has ever been registered as an investment advisor, or as an investment adviser representative, with the Securities and Exchange Commission (the "SEC") or any state securities regulator, as applicable.

99.     On information and belief, including its absence of other industry-specific compliance measures, neither TFG Capital nor any affiliate of it has implemented a system of controls to meet obligations under the Gramm-Leach-Bliley Act. This absence underscores that TFG is devoid of substance, at least as it relates to services advertised to the public.

100.    Collectively, TFG Official and TFG Capital may be referred to as the "SBML Front."[8]

101.    Aliyah "formed" the SBML Front around the same time that she formed the Shadow Bank. However, the SBML Front increased its public visibility (e.g., through its website) in early 2023, when Senegalese law enforcement began to scrutinize RJ and when U.S. citizens began raising concerns about the accountability of funds they had paid to MIA, the Offshore Affiliate, and/or the Shadow Bank.

102.    The decision to create the SBML Front arose from an oral agreement between the Managers. On information and belief, the Managers formed the agreement shortly before Aliyah

---

[8] "TFG Media" is another member of the TFG family. However, it is not material to this Complaint.

created the Shadow Bank. To the extent this Complaint attributes, directly or indirectly, any actions or transactions to the SBML Front, such actions or transactions were adopted or made pursuant to this oral agreement. Through execution of the agreement, the Managers intended that the SBML Front achieve all objectives that this Complaint alleges the SBML Front did, in fact, achieve.

**Mahdi Media:**

103.    Mahdi Media is a sole proprietorship of RJ Mahdi. On information and belief, including that obtained from searching global business registries, Mahdi Media is unincorporated.[9]

104.    During the Performance Years, Mahdi Media directed and produced videos for MIA and the Offshore Affiliate, among other activities. The videos were primarily designed for social media and other online platforms for the purpose of inducing Americans to join "the Exodus," sell assets in American and purchase property in Senegal, and otherwise directly promote the political and public interests of Senegal and its government authorities.

## JURISDICTION, VENUE, AND EXTENT OF EXTRATERRITORIALITY

**Subject Matter Jurisdiction and Extraterritoriality:**

105.    This Court has subject matter jurisdiction over the action under 28 U.S.C. § 1331 and 18 U.S.C. § 1964. Plaintiff's claims founded on the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et. seq.*, present a federal question. Such claims are hereinafter the "RICO claims."

106.    Also, for Count V of this Complaint, this Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because Plaintiff's claims present a federal question and are brought to enforce liabilities and duties created by Chapter 2B of Title 15

---

[9] RJ has, on occasion, suggested to the American public that Mahdi Media is registered in Senegal and is, in effect, a renamed or successor to an entity he purportedly formed in 2014 named "I am Medina Baye." On information and belief, whatever the truth of this observation, Mahdi Media is currently in the form of a sole proprietorship.

of the United States Code together with the rules and regulations thereunder. Such claims arise under 15 U.S.C. 78j(b) and 17 C.F.R §240.10b-5 and are hereinafter the "Securities Fraud Claims."

107.    Also, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) for all state-law claims because they are so related to the above-noted claims, which fall within the Court's original jurisdiction, that they form part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367(a).

108.    To the extent any claim requires application of RICO to conduct that occurred in part outside the United States, it alleges predicate offenses whose statutes (a) expressly or affirmatively indicate they apply extraterritorially to the allegations; or (b) result in a permissible domestic application because conduct relevant to the statutory "focus" occurred in the United States.

109.    In the Securities Fraud Claims, the Complaint alleges violations of 15 U.S.C. § 78j(b) ("Section 10(b) of the Exchange Act") and 17 C.F.R. § 240.10b–5 ("Rule 10b-5") based on specific allegations of one or more domestic transactions. Each such transaction was domestic because Plaintiff incurred irrevocable liability, upon formation of the investment contract, *within the United States* to take and pay for the security. Similarly, Plaintiff made the required initial payments, by wire transfer, in exchange for his contractual interest(s) from the United States.

110.    Furthermore, although the Sixth Circuit has not adopted a supplemental "so predominantly foreign" inquiry (as the Second Circuit has), the Securities Fraud Claims, incidentally, *are not* so predominantly foreign as to be impermissibly extraterritorial. The following facts and circumstances support this assertion: (a) all relevant misrepresentations in connection with each security described in the Complaint were communicated, by wire, from one U.S. citizen to another U.S. citizen and were accessed within the United States; (b) such

misrepresentations were made partially in Senegal <u>and</u> partially in the U.S., in the latter case through statements Aliyah made, through her exercise of ultimate authority, from Akron, Ohio; (c) the misrepresentations made in Senegal were primarily communicated through application(s) and/or platform(s) controlled by American firms; (d) Plaintiff and similar victims were specifically targeted because they were part of the African Diaspora *residing in the United States*, and the market of potential investors for the relevant investment contract was exclusively, by design, in the United States; (e) the principal themes of Alkebulan City, which was inextricably linked to the investment contract(s), called for investors and customers to purchase securities because of their negative experiences in, and to divest from assets located in, the United States; Thus, although the Securities Fraud Claims may not depend on conduct praising or supporting the U.S., they are not predominantly foreign.[10]

**Personal Jurisdiction, including the "ends of justice" and reasonableness:**

111.    This Court has general personal jurisdiction over Aliyah Mahdi, who is domiciled in Akron, based on her contacts with the district and Ohio. She is the "initial" defendant for the RICO claims. *See Peters Broad. Eng'g, Inc. v. 24 Capital, LLC*, 40 F.4th 432, 438 (6th Cir. 2022).

112.    Under 18 U.S.C. § 1965(b), the "ends of justice," require that RJ Mahdi, residing and hiding in an unknown location, be brought before this Court. Based on the Complaint's allegations, the disputes underlying the RICO claims, which are inextricably linked to each other and to both Managers, cannot be fully resolved without this Court exercising jurisdiction over RJ. Adjudication of the claims relative to Aliyah Mahdi and the Shadow Bank, without more, would grossly distort the rights and obligations of the parties. It would leave critical factual and legal issues regarding predicate offenses on table, in the absence of  RJ Mahdi.

---

[10] Incidentally, the investment contract at issue was also premised on real property designed predominantly for Americans and even included certain American themes (to make the transition from the U.S. to Africa smoother).

113.    Furthermore, this Court is the sole court that can exercise jurisdiction over both Managers with respect to the RICO claims.

114.    Since approximately June 1, 2023, RJ has regularly transacted business in his management of the Shadow Bank's Exodus Club 2.0, which currently remains in effect and is based in Akron, Ohio. In this regard, RJ has performed management and club-specific functions in both Senegal and Ohio. Activity from Exodus Club 2.0 generates substantial revenue, which in turn inures to the benefit of RJ's disguised profit interest in the (Ohio-based) Shadow Bank.

115.    Also, as recently as 2023, RJ was working actively to restructure, manage, and integrate the Alkebulan Enterprise's operations in Ohio and those in Africa.

116.    Throughout the Alkebulan #1 and #2 Eras, RJ, through the Offshore Affiliate, regularly transferred funds received from Americans to the Shadow Bank. As described in this Complaint, he also intentionally targeted Americans through tortious acts giving rise to this action.

117.    More generally, RJ has purposely availed himself of the privilege of conducting activities, including those generating substantial Made in Africa and other revenue, within the United States and Ohio.

118.    This Court has personal jurisdiction over RJ Mahdi, based on his relationship with the United States and this forum, as described throughout this Complaint. For the specific claims in this Complaint, RJ Mahdi has maintained constitutionally sufficient minimum contacts at all times on and after the cause(s) of action arose.

119.    Based on RJ's conduct and relationship with the (a) United States, and (b) Ohio (Akron in particular), litigation in the forum is reasonable and foreseeable.

120.    The burden on RJ to appear in this specific Court is also trivial because, under the facts alleged in this Complaint, Akron is a "second home" to RJ.

121.    The burden on RJ to appear in any United States court, more generally, is also immaterial because RJ is a United States resident who has spent the past decade actively targeting Americans in his businesses and political activities. RJ has known litigation in United States court was foreseeable as it relates to the conduct described in this Complaint.

122.    For instance, before scrubbing its content, RJ and Aliyah operated and maintained MIA's website. The Managers targeted Americans, particularly those disillusioned with the country and its institutions. They designed and operated the website to establish commercial connections with American customers, donees, and investors. Indeed, the website went well beyond exchanging information between customer and host computer (although the website encouraged and also allowed for such exchange). It invited Americans to take the following actions through its specially designed functions, which required the repeated transmission of files over the internet:

(a) Purchase or "reserve" their purported title to land plots in Africa, in which the website substantially completed the approval process on the spot, formalized agreements, as well as accepted payment for the land;

(b) Enter into agreements and pay for individualized "training" (to become a "licensed Exodus Consultant") or other services;

(c) Symbolically buy a "brick" and thereby enter to win a "free home" in Africa; and

(d) Electronically transfer money as a donation, into account(s) controlled and managed by RJ, for the purpose of promoting mass exodus from the United States.

123.    Numerous Americans engaged in at least one of the above transactions on MIA's website during the Alkebulan #1 and #2 Eras. On information and belief, including inferences based on statements RJ has publicly made, more than 1,000 Americans have done so. Once Americans initiated the transactions, RJ immediately learned, and at all times thereafter knew, about their U.S connections.

124.    On or around March 25, 2023, RJ Mahdi scrubbed all content on the MIA website (by this time, Aliyah had dissociated from MIA). But he promptly adopted alternative, more

private channels through social media to actively vet customers and future victims.

125.    This judicial district has a compelling interest in adjudicating the RICO claims because the disputes are founded on transnational organized crime that originated from the district and that threatens to recur. Likewise, the United States has a compelling interest because of its need to address legal issues inherent in threats to Americans arising from the remotely engineered, foreign-source tactics at issue.[11]

126.    This Court also has general personal jurisdiction over the Shadow Bank, which is "at home" in the forum because it is an Ohio LLC with an Akron-based principal place of business.

**Venue:**

127.    Venue is proper in this judicial district under 18 U.S.C. § 1965(a) because of the following: **(a)** Aliyah, over whom this Court has personal jurisdiction, resides and transacts affairs in this district; and **(b)** the Complaint pleads the execution of a nationwide and intercontinental RICO scheme.

128.    Venue is additionally proper because RJ, over whom this Court has personal jurisdiction, transacts affairs in the district, and the Complaint pleads the execution of a nationwide and intercontinental RICO scheme.

129.    As applicable, venue is also proper under 15 U.S.C. § 78aa because at least one act or transaction constituting the relevant violation(s) in the Securities Fraud Claims occurred in the district. In addition, RJ transacts business in the district.

130.    As applicable, venue is also proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim(s) occurred in the judicial district. These included key transactions, communications, and other acts, as described in this Complaint, that

---

[11] These include, among other issues, the manner in which foreign-agent registration rules apply under the circumstances described in the Complaint.

advanced the actionable schemes, in their design and execution, as well as their underlying predicate offenses.

## GENERAL ALLEGATIONS

a.   **Background and lessons learned from Florida experiment**

131.   In 2012, the Managers resided in Pinellas County, Florida.

132.   Around this time, the Managers were disenchanted with their career trajectories.

133.   However, in or around the summer of 2012, the Managers recognized that, when working together, they could exert significant influence on the public, particularly through social media, and that such influence could be profitable.

134.   To this end, in or around the summer of 2012, the Managers designed a plan to enter into the business of marketing (e.g., including through social-media "influencing") on behalf of charities and philanthropic ventures.

135.   On July 9, 2012, the Managers formed Charitable Promotions LLC ("Charitable Promotions"), a Florida limited liability company, to execute the business plan. For this purpose, they filed articles of organization with the Florida Department of State.

136.   At this time, the Managers believed Charitable Promotions would allow them to amass substantial profits through their self-perceived social-media savvy.

137.   But the Managers devoted negligible time and resources to the Charitable Promotions governance and compliance functions, apart from filing the articles of organization.[12]

---

[12] The following was indicative of their lack of care: (a) they failed to register for a local license (e.g., business tax receipt in St. Petersburg); (b) they failed to disclose to the Pinellas County Property Appraiser any situs for non-inventory tangible personal property ("TPP"), by way of filing an initial TPP tax return; (c) they forwent applying for an EIN; (d) they listed the Gulfwinds USPS office in St. Petersburg, Florida (not a PO box – the office itself) for the entity's *physical address*; and (e) they abandoned the business in early 2023, upon failing to file an initial annual report. Under Fla. Stat. § 605.0714(1), the Florida Department of State administratively dissolved the Charitable Promotions on September 27, 2013.

138.    Ultimately, Charitable Promotions failed to produce income beyond a trivial level.

139.    Around the fall of 2013, upon reassessing their prior assumptions, the Managers reasoned they needed a different "story" for the public and potential clients. They believed a compelling sales pitch would allow them to directly market *themselves*—not others.

b.    **Managers find their niche: the MIA Partnership**

140.    The Managers ultimately formed MIA with the intention, among others, to monetize and profit from the promotion of Senegalese governmental interests.

*The MIA Pact, generally*:

141.    Around the time of MIA's formation, in or around 2014 or 2015, MIA adopted a partnership agreement that was oral and/or implied (the "MIA Pact" or "Pact"). MIA maintained and adhered to the Pact, without modification, at all times throughout the Performance Years.

142.    During MIA's existence, the Managers held equal financial interests, rights, and obligations in MIA, including with respect to shares of profit, loss, distributions, and capital.

*RJ's responsibilities under the MIA Pact*:

143.    Under the MIA Pact, RJ held rights to manage and control key areas of MIA's operations and investments, which were predominantly located in Senegal.

144.    For instance, under the Pact, RJ managed, controlled, and accepted responsibility for MIA's global business strategy; its selection of properties for real-estate services; its pricing and fees for such services; the subject matter of specific investment contracts; and the terms of such investment contracts. RJ also directed and controlled major marketing campaigns for land sales and investments.

145.    During the Performance Years, MIA enjoyed much success in "selling" land, mostly located within territorial zones in Senegal's national domain, to Americans. RJ routinely

assured Americans that such land was "easy" to purchase, and he encouraged them to purchase it even if they had no immediate need for it.

146.    In addition, under the Pact, RJ managed, controlled, promoted, and accepted responsibility for the touring department, which attracted Americans for tours in Senegal while also promoting the Senegal as a future home for Americans.[13]

147.    As RJ observed in Ex. Radio #2 at approx. 1:27:41, MIA maintained "a partnership with the Senegalese Agency for the Promotion of Tourism" during the Performance Years. RJ described it as a "a specific on-paper partnership that says that we can provide Diaspora assistance and travel."

148.    Under the Pact, RJ further accepted responsibility for preparing and filing any required foreign, federal, state, and local tax returns on behalf of MIA; maintaining its books and records; and preparing its budgets and forecasts and monitoring actual results relative to them.

149.    The MIA Pact also addressed African-government relations, which were essential to MIA's competitive advantage and success. Under the Pact, RJ controlled and managed all such relationships for MIA as well as its public-private partnerships. In this role, RJ frequently delegated actions to agents, including Aliyah, to perform on MIA's behalf in the United States, for the purpose of promoting U.S. "exodus" and divestment agendas.

150.    In Ex. Radio #1 at approx. 1:47:04, RJ Mahdi stated the following, which this Complaint accepts as true:

> Everybody on this call right now has sat down with government administrations, right. We, Made in African Project, we hold several government contracts, tourism with, you know, development. . . . We're sitting down with major leaders, right, trying to get things accomplished that'll make the pathway easy for others. Uh,

---

[13] The touring department generally provided services "on the ground" in Africa. Although this department's work was closely intertwined with the U.S.-based exodus *planning* services (detailed later), the two functions were discrete. They were distinguishable both in space (i.e., performed from different continents) and in time (touring services typically followed exodus planning services).

Shekinah Chinedu our [now deceased] attorney in The Gambia who's been lobbying the constitutional review committee in The Gambia for two years. I've been to Gambia twenty times in the past few years, met with Shekinah so many times. She's been to the National Assembly. She's had an audience in front of, uh, top leaders in the country.

151.    As he reinforced in Ex. Radio #3 at approx. 1:48:34, RJ, acting on behalf MIA, has "been acknowledged, accepted, co-signed by legitimate organizational structures here on the ground. We're talking about government administrations. We're talking about multinational companies. We're talking about, you know, [rural council] community leaders."

152.    Under the Pact, RJ also performed the investor screening function for potential land and investment clients. RJ believed MIA could identify targets by filtering followers (often, social media users) for two criteria: (1) those receptive to the Managers' self-promoting ("Mahdi followers"); and (2) of the Mahdi followers, those who had sufficient liquid assets to invest in "opportunities" that the Managers would market them.

153.    Once investors were screened and processed, MIA charged them flat fees or commissions when it "brokered" new investments. On occasion, MIA also required equity shares in the underlying businesses acquired by investors. Sometimes MIA itself became active in the businesses and performed management services for a fee. There was no universal model. *See* Diversified Game video at approx. 15:36.

154.    To promote investment opportunities, MIA appealed to the philanthropy of its followers concerning development in Africa, including foreign direct investment in Senegal:

Imagine what would happen if the millions of Africans in the Diaspora began investing exclusively in businesses on the African continent. We have found that there are countless opportunities available for entrepreneurs looking to invest in a multitude of industries with endless possibilities of growth. Now you can invest securely into the industry of your choice and begin building a financial legacy that contributes to the upward development of Africa!

- 31 -

Made in Africa Project, *Invest in Africa* (archived June 13, 2020),
www.madeinafricaproject.com/about-us.html
[http://web.archive.org/web/20200613224140/http://www.madeinafricaproject.com/about-us.html ]

155.    MIA also often enlisted RJ to pressure Americans to entrust the partnership with
their assets based on continually changing rationales, beyond philanthropy or profit motive.[14]

*RJ's limited reliance on MIA agents*:

156.    Although RJ managed the above-noted areas, he felt comfortable delegating certain
defined tasks while supervising and retaining control of them.

157.    During the Performance Years, particularly in and after 2020, Mr. Lowe acted as
an MIA agent, performing tasks that RJ assigned him. The tasks often, but not always, required
work that was physically performed in Senegal.

158.    In addition, during the Performance Years, RJ Mahdi, on behalf of MIA, actively
recruited Americans to (a) join the "exodus," (b) permanently relocate to Senegal, and (c) become
"MIA-licensed" repatriation consultants. The last step required that the candidates complete a
repat-consultant "training" program and pay MIA a fee.

159.    MIA then purported to grant the recruits "licenses," which authorized them to
perform exodus consulting work on behalf of MIA. For their hard work, MIA also granted them a
share of the proceeds from inducing and assisting other Americans to relocate to Senegal.[15]

160.    Delegation allowed RJ time to return to the U.S., including to Akron, Ohio, for
work trips and other functions during the Performance Years. He often combined business and

---

[14] *See, e.g.,* Ex. Radio #1 at approx. 1:20:26, in which RJ suggested that by investing in Africa (and employing MIA
as an intermediary), someone would improve conditions there and ultimately cause the U.S. and its government,
knowing of the improved conditions, to grant "protection" and "respect" to the investor. According to RJ, such investor
could ultimately receive "protection" comparable to that granted to "Asian Americans." In other words, if Americans
*must* remain in the U.S., Americans should *at least* protect themselves by investing in MIA.

[15] This should not be confused with the Offshore Affiliate's later expansion of this program. Under the newer version
of the program, the Offshore Affiliate offered applicants training to start their own "repatriate focused business."

vacation when he visited his friend Aliyah in the United States., taking the opportunity to create promotional videos for MIA,[16] conduct other MIA business, and/or attend special events.[17]

*Aliyah's responsibilities under the MIA Pact*:

161.    Under the Pact, Aliyah acted as MIA's agent in the United States for certain roles. For instance, she provided repatriation-planning services (the "Exodus-Planning USTB"), and she also completed administrative tasks, among other roles, throughout the Performance Years. Unless required to make a special appearance, Aliyah normally performed such roles in Akron, Ohio, by use of electronic devices. The Akron location ultimately minimized inconvenience and conflict with her Shadow Bank work schedule and related duties.

162.    The Exodus Planning USTB contributed to the repatriation of between 2,000 to 5,000 members of the Diaspora. This allegation is on information and belief, including inferences from Manager statements regarding the scale of MIA activities.

163.    MIA's Exodus-Planning USTB included, among other services, the following: (a) identifying future residences for American expatriates; (b) brokering agreements and negotiating discounts and/or other terms with local vendors in Africa; (c) serving other intermediary roles on behalf of clients departing from the U.S.; and (d) remotely monitoring the quality of third-party services and accommodations (including through client feedback).

164.    In carrying out the Exodus-Planning USTB, Aliyah held final say and authority over the nature and extent of its services and pricing, with no approval from RJ required. As agent of MIA, she also promoted the Exodus-Planning USTB through social media and/or MIA's

---

[16] Generally, with a more reliable internet connection in the United States.

[17] For instance, shortly before RJ went into hiding from law enforcement, he attended a 2022 awards ceremony at the United Nations Plaza in New York. There, "Rashad J. Mahdi" was honored as one of the "Most Influential People of African Descent" for "Higher Achievers of African Descent (Under 40) World pairing those in Diaspora with their counterparts in Africa," Business and Entrepreneurship Division.

website, until her dissociation from MIA in 2023.

165.    As a logical extension to overseeing the Exodus-Planning USTB, Aliyah also promoted and managed the (first generation) "Exodus Club," which was a club organized around the principle of expatriating from the United States.

166.    As partner, agent, and manager of MIA, Aliyah also performed administrative and financial responsibilities from Akron. These included, for example, the following: (a) paying recurring vendors, including from her individual bank account; (b) upon RJ's authorization, making other payments on behalf of MIA from her individual bank account (e.g., material operating, investing, and financing expenditures); and (c) upon limited consultation with RJ, managing and effecting all MIA's cryptocurrency transactions.

167.    Regarding this last category, in Ex. Radio #10 at approx. 4:16, RJ Mahdi, an enthusiast of cryptocurrencies as well as the Lumi (a digital currency), described how the initial crypto holdings arose. He omitted, however, that the holdings were primarily used and expended for non-investment purposes and that a share was held as assets of MIA:

> My wife, Aliyah, has, uh, has jumped in the markets. She jumped in a little while ago, so she caught some of those low, you know, prices, I think back when it was around ten thousand or something like that, um, but yeah, she, she's enjoying those benefits as well, so yeah, I wake up to her screams every day as well you know oh my god did you what Bitcoin did?

168.    Similarly, in Ex. Radio #1 at approx. 5:18, RJ observed that "my wife is invested. Aliyah is invested, and she's been watching it closely. She wakes me up every day with like these shockers of how much has gone up . . . [or] down." But, in reality, these are MIA assets.

*Joint responsibilities under the MIA Pact*:

169.    Finally, under the MIA Pact, RJ and Aliyah jointly managed certain operations. For instance, unless 2-person management would interfere with the above-noted roles, the Managers

jointly designed, implemented, and continually monitored the following: (a) joint ventures and special projects; (b) cross-promotional efforts (e.g., promoting Aliyah's book on behalf of the Shadow Bank at a YouTube event in which RJ was appearing on behalf of MIA and the Offshore Affiliate); (c) affiliate and related-party loans and other contracts; (d) MIA's international-trade operations and its export service, which included assisting Senegalese companies and American expatriates with export financing, regulatory compliance, and logistics; and (e) the investors club platforms, activities, choice of field trips, and pricing.

170.     Regarding the investors club, MIA sold "lifetime" memberships for approximately $1,000 each. *See, e.g.,* Ex. Radio #15 at approx. 1:17:00. However, MIA sold memberships with an "ADG upgrade" for around $5,000 each.

171.     With respect to MIA's international-trade operations, the export service was bolstered by connections within the United States, including "distributors in the U.S. [that], um, pledged to be able to help put [goods produced in Senegal] in major stores like Kroger, Albertsons, Walmarts [sic], and Publix kind of stores across the country." *See* Ex. Radio #10 at approx. 1:29:00 into video. Indeed, the export service has "shipped out tens of thousands of, you know, products around the world." *See* Alkebulan Documentary at approx. 37:44.

172.     In Ex. Radio #3, approx. 36:08 into the video, RJ Mahdi observed how MIA "employ[ed] hundreds of locals in various capacities" and described the scale of export operations:

> [MIA is] partnered with the national [Senegalese] postal service. We are the number one Diaspora-owned export company here. Uh, we ship out thousands of pounds of local goods around the world every year to retailers, who then sell them in the Diaspora, so we're a supplier, a distributor to those around the world who are now selling and carrying African products made by African tailors and artisans right here on the ground.

*MIA no longer enough for Managers*:

173.     In or around 2019, RJ formed a new idea: to build a city in Senegal for repatriates.

The Alkebulan City project was born. On information and belief, including RJ's repeated name-dropping and efforts to associate with celebrities, RJ was especially motivated to form Alkebulan City because of the contemporaneous planning for, and excitement surrounding, "Akon City."

**c.  The first version of Alkebulan City (Alkebulan #1)**

*Timeframe and terminology*:

174.  The "Alkebulan #1 Era" means the period beginning on January 1, 2020 and ending at the close of February 28, 2022.

175.  The "Alkebulan #1 Local Government Partner" means Mayor Diack or any other person or group of persons exercising sovereign de facto or de jure political jurisdiction over all or any part or subdivision of any of the following: (a) the Louga Region; (b) the Kébémer Department (within the Louga Region); or (c) Ndande or any other rural district or commune within either the Louga Region or the Kébémer Department. Each possible combination of person(s) or groups is an alternatively pled Alkebulan #1 Local Government Partner.

*Alkebulan, the promise and ostensible early success*:

176.  In the last quarter of 2019, RJ became convinced he could amplify his and Aliyah's influence through political activities, particularly among Americans receptive to "exodus" campaigns. Specifically, he believed he could promote and develop Alkebulan City, and he could use the Offshore Affiliate to reinforce the city's image as legitimate and authorized by the Senegalese government. The political activities and influence, he reasoned, would ultimately permit him and Aliyah to accumulate substantial wealth. According to his thinking, the city's appeal would *initially* induce approximately 100,000 people to relocate their residences or businesses to RJ's American-Exodus City.[18] This mass relocation, in turn, would provide the

---

[18] As alleged in later paragraphs, with respect to the "Exodus Alliance," RJ ultimately strived for 1 million people to repatriate within the 24 months. This larger exodus goal, however, was not specifically tied to Alkebulan.

Managers goodwill, a market for future services, and thus a reliable source of income.

177.    RJ described the collective impetus for Alkebulan in the Alkebulan Documentary, from approx. 1:15:00 to 1:19:30. He observed the aligned interests of American repatriates and the government(s) of Senegal to "**invest in a collective city.**" To this end, the Offshore Affiliate was "**building [this] collective project**" that was "**uh, about to acquire 600 hectares of lands so that [the Diaspora] can come in mass**." Regarding the land acquisition, RJ mentioned that "**right now we're actually setting up a mass land purchase deal**." In this Complaint, such purchase may be referred to as the "Mass Land Purchase," and the referenced 600-hectare site may be referred to as "Alkebulan #1 Land."

178.    In the same video segment, RJ clarified a key role of the Alkebulan #1 Local Government Partner relative to the Alkebulan #1 Land:

> [The Offshore Affiliate] started locating different sites[, and] eventually [it] designated a site in between Saint Louis and the Pink Lake, uh, 600 hectares of land, a little over a thousand acres of land, where a mayor is here and he has this decision to make: how do we develop, and who we develop with [sic], and so, you know, by God's grace we were able to create a partnership there.

179.    Then, reporting on the Mass Land Purchase, the documentary captured a "history-in-the-making" day, which was on or around June 1, 2020:

> [This is a] huge historic day [when the Offshore Affiliate] just signed [its] convention with the mayor, uh, right here in the Louga, Senegal area called Kébémer, right along the grand coast. We just signed a convention and partnership, over 600 hectares of land, to build Alkebulan.

180.    Finally, in this video segment, RJ committed to developing the Alkebulan #1 Land (which the Offshore Affiliate ostensibly just acquired in a "mass purchase") to render it suitable for resale to repatriates, for commercial and residential uses.

181.    The Managers took steps to ensure a wide range of media covered the purported Mass Land Purchase and the government's interest in developing Alkebulan #1 Land:

*Government Relations and the Mass Land Purchase:*
*"[W]e have secured land for the city of Alkebulan." – RJ and Aliyah Mahdi*



Photo and quotation from THE BLACK EXPAT, *Made In Africa: RJ & Aliyah Mahdi [Dakar, Senegal]* (last visited Nov. 12, 2024), https://theblackexpat.com/made-in-africa-rj-aliyah-mahdi-dakar-senegal/

182.    But, in reality, neither the purported Mass Land Purchase nor any contemporaneous agreement, "convention," or understanding with the Alkebulan #1 Local Government Partner included a purchase of the Alkebulan #1 Land, let alone a ***mass*** land purchase. Indeed, the Offshore Affiliate had not even obtained a guarantee that basic usage rights, under Senegalese law, would be *available* for purchase.

183.    Instead, on information and belief, the above-referenced "convention," in fact, evidenced a commitment of the following to cooperate on the development of Alkebulan #1 Land: the Alkebulan #1 Local Government Partner, the Offshore Affiliate, MIA, RJ, and Aliyah. This partnership and/or commitment was for the purpose of directly promoting local interests by recruiting skilled Americans and their assets to relocate to the area, where they could rent property to live or rely on informal and unauthorized customs to occupy property. The "convention" did not authorize or even contemplate the passage of title to Alkebulan #1 Land. It did, however,

authorize the Offshore Affiliate, MIA, RJ, and Aliyah to act as agents and representatives of the Alkebulan #1 Local Government Partner for certain promotional functions.

184.     Based on translated captions from the Alkebulan Documentary, the Alkebulan #1 Local Government Partner stated the following, in speaking to staffers and colleagues around the time the "convention" was formed:

> Their goal is to bring others who have gone abroad as well as African Americans to come build an inclusive city so that they can all come back and live in Africa. A big city. It will have a university, schools, an airport. It's going to have hotels, supermarkets, hospitals. Everything. A beautiful, new city . . . So hopefully we can push this along for them.

185.     Ultimately, the parties to the "convention" agreed to core objectives. However, there was no transfer of title, and there was no authorization granted for any enforceable development rights or collective usage rights.

*Alkebulan #1 Land in national domain and not subject to private ownership/transfer*:

186.     The Alkebulan #1 Land, in Senegal's Louga Region, primarily consisted of the country's groundnut-basin parts. Much of it was rural and was historically agriculture intensive.

187.     During the Alkebulan #1 Era, virtually all of the Alkebulan #1 Land (if not all) was in Senegal's national domain.

188.     Of the national-domain areas within Alkebulan #1 Land, almost all of it (if not all) was located in territorial zone(s) during this period.

189.     A rural council (the "Alkebulan #1 Rural Council"), which was led by Diack, was charged with administering Alkebulan #1 Land to the extent composed of territorial-zone plots. [19]

190.     During the Alkebulan #1 Era, such council was responsible for allocating and deallocating conditional, non-ownership usage rights over Alkebulan #1 Land in territorial zones.

---

[19] By definition, the Alkebulan #1 Rural Council is one of the alternative Alkebulan #1 Local Government Partners previously pled.

Such rights may be referred to as "Alkebulan #1 Land Usage Rights." Under Senegalese law, Alkebulan #1 Rural Council's authority did not extend to authorizing private ownership.

191. Alkebulan #1 Land Usage Rights could not, and they did not, provide an unqualified right to transfer. They could be revoked (or deallocated) on future decision or subjective judgment of the council, and they were generally available only to members of the local communities. Furthermore, the rights were subject to fluid local customs and practices. Basically, Alkebulan #1 Land Usage Rights carried virtually none of the rights associated with fee simple interests to which Americans are most familiar.

*RJ and Aliyah's misrepresentations to induce American victims to purchase nonexistent rights*:

192. On or around January 1, 2020, in contemplation of the Alkebulan #1 Land and the purported Mass Land Purchase, the Managers met for a conversation, either by phone or by protocol allowing real-time, peer-to-peer audiovisual exchange. During this meeting, the Managers willfully and knowingly devised a scheme to defraud Americans, or to obtain their money or property by means of false pretenses, representations, or promises (the "Alkebulan #1 Land Fraud Scheme").

193. Specifically, during the Alkebulan #1 Era, the Managers recognized that Senegal land records were opaque. They understood that title (a) was routinely disputed; (b) was not as accessible and as easily verifiable as in the U.S. (e.g., retrieving copies of official records from county-specific databases), particularly for Americans residing on a distant continent; and (c) was influenced by local politics, financial interests (unrelated to land productivity), and customary, informal practices outside the Senegalese legal system. Collectively, the circumstances in this paragraph are referred to as "Territorial Zone Chaos."

194. At all times during the Alkebulan #1 and #2 Eras, the Managers, having been

regularly advised by legal counsel, knew the nature and scope of the Alkebulan #1 Land Usage Rights, including all associated rights, obligations, and limitations they carried.

195.    At all times during the Alkebulan #1 and #2 Eras, the Managers knew the full extent of the Territorial Zone Chaos, including its prevalence over the Alkebulan #1 Land.

196.    According to the Alkebulan #1 Land Fraud Scheme, the Managers agreed that the Offshore Affiliate, MIA, and agents of each would actively spread and advertise misrepresentations ("Alkebulan #1 Misrepresentations") about the following: (a) the rights to Alkebulan #1 Land available to Americans for immediate "full title" purchase; (b) the Offshore Affiliate's development and ownership rights acquired from the Alkebulan #1 Local Government; and (c) the progression of ongoing development in Alkebulan #1 Land.

197.    Under the Alkebulan #1 Land Fraud Scheme, the Managers intended to deceive American victims by inducing their reliance on the Alkebulan #1 Misrepresentations. The Managers intended for the American victims, acting on such reliance, to purchase (nonexistent) private "title" to Alkebulan #1 Land plots.

198.    Under the Alkebulan #1 Land Fraud Scheme, the Managers intended for the American victims to pay money or other property in consideration for the purported plots. Although the Managers intended that the Offshore Affiliate would normally receive the payments, they designed a system of value transfer, later described, under which they shared the benefits of the unlawful gains equally.

199.    In devising the Alkebulan #1 Land Fraud Scheme, the Managers believed that Americans would not purchase (nonexistent) legal title to properties in Alkebulan #1 if they knew that the Alkebulan #1 Misrepresentations were false. Similarly, the Managers believed that Americans knowing these falsehoods would not otherwise transfer money or other property to the

Offshore Affiliate in order to "facilitate" acquisition of land-usage rights.

200. Although they *mutually* agreed to the overriding Alkebulan #1 Land Fraud Scheme, Aliyah consented to comply with RJ's scheme-specific orders.

201. Specifically, as part of the Alkebulan #1 Land Fraud Scheme, the Managers agreed that, for each "influence" operation, RJ would design the general means (e.g., the nature and timing of website or social-media posts and their general content) and the objectives (e.g., targeting particular individuals or groups).

202. Under the Alkebulan #1 Land Fraud Scheme, Aliyah agreed to execute on RJ's orders, both in her individual capacity (e.g., promotional appearances and interviews as RJ's "wife") and through her authority to act for the Shadow Bank and MIA, as needed. Aliyah's agreed relationship and role, relative to the Alkebulan #1 Land Fraud Scheme, described in this paragraph and the two preceding paragraphs may be referred to as the "Alkebulan #1 Land Fraud Agency."

203. In devising the Alkebulan #1 Land Fraud Scheme, the Managers agreed that the usual sequence for operations would entail the following key events:

> (a) For social media accounts and websites managed or controlled, in whole or in part, by RJ (in any capacity), RJ would issue instructions regarding content, theme, and targeted class of persons for each batch of Alkebulan #1 Misrepresentations. Aliyah, who the Managers recognized as the superior writer, would prepare, stylize, and publish or post the Alkebulan #1 Misrepresentations. However, RJ would perform both roles when he spoke on "Exodus Radio" and other live-streaming appearances.
>
> (b) Such misrepresentations would induce Americans to remotely "purchase" nonexistent Alkebulan #1 Land "title," from their devices in the United States. The American victims would also effect payment from the United States, primarily to the Offshore Affiliate, in consideration for their supposed plots.
>
> (c) Upon payment, the Offshore Affiliate would issue fabricated instruments of title to American victims or would otherwise take steps to cause the victims to believe they had, in fact, acquired specific plots in Alkebulan #1 Land.

204. On information and belief, the Managers began executing the Alkebulan #1 Land Fraud Scheme, consistent with their planning, in or around January of 2020 (i.e., before the Mass

Land Purchase). They continued to execute the scheme until approximately February of 2022.

205.    For those seeking to finance their Alkebulan #1 Land "purchases" from the Offshore Affiliate, Aliyah, acting as agent for the Shadow Bank, regularly approved loans. Often, the Shadow Bank did not *need* to transfer funds to the Offshore Affiliate, particularly given that the Offshore Affiliate did not itself need to expend funds for (phantom) property acquisitions. Regardless, on information and belief, including the Shadow Bank's statements of its lending history, the Shadow Bank enforced the terms of the "loans" against its American victims.

206.    The Managers believed American victims would not discover that the Alkebulan #1 Misrepresentations were false, at least in the short term. For instance, the Managers believed they could mostly avoid land disputes and conflicts by purchasing land *usage rights* at a later time, on behalf of the American victims, in (unauthorized) informal markets. These rights, they reasoned, would cost only a small percentage of what the Americans had paid for the land. RJ and Aliyah believed this would at least delay Americans' detection of their title defects, particularly given the opaqueness of Senegal's land registries.

*Misrepresentations as one piece of larger business plan, primarily to boost SN governments*:

207.    Even so, RJ and Aliyah were conflicted during the Alkebulan #1 Era. They genuinely intended to develop Alkebulan #1 Land, induce Americans to relocate there, and, in doing so, boost the local, regional, and national economies of Senegal. But, at the same time, they were drawn to the opportunity to enrich themselves through the Alkebulan #1 Land Fraud Scheme.

208.    Thus, the Alkebulan #1 Land Fraud Scheme represented just one segment of the Offshore Affiliate's broader business plan, which principally focused on promoting Senegalese governmental interests, including those of certain local governments, through the development a new city for repatriates. The primary functions in this larger business plan were the following:

(a) **Bona fide real estate development of Alkebulan #1 Land and exodus services:**
This included construction and other development activities for Alkebulan #1 Land (regardless of whether the occupants held usage or other rights); consulting for repatriates arriving in Alkebulan #1 Land from the U.S.; and other services to assist such repatriates transition from their lives in the U.S.

(b) **Accelerate the exodus from the United States:**
The primary means for carrying out this function included public appeals from the Exodus Alliance (the "Alliance"), which consisted of MIA, the Offshore Affiliate, and four other organizations. This Alliance was created around May 1, 2020. Its goal was to raise one billion U.S. dollars in 24 Months for the mass and immediate repatriation of the African Diaspora. Mass repatriation would serve to advance Senegalese governmental interests, and it further increased the Offshore Affiliate's future business. The Alliance's agenda was controlled predominantly by RJ, acting for himself, the Offshore Affiliate, and MIA.[20]

(c) **Manage the Alkebulan #1 Land Fraud Scheme**

(d) **Manage Non-Alkebulan Services:**
This part comprised other consulting services, investment tours, club memberships, non-Alkebulan development projects, and miscellaneous services.

*Business model required turbo-charged campaign for "physical" and "asset" U.S. "exodus":*

209.    During the Alkebulan #1 and #2 Eras, the Offshore Affiliate's business model relied on RJ's actual and apparent connections with, and its procurement from, Senegalese-government authorities. These included officials and politicians, including at community, regional, and national levels in Senegal.[21]

210.    Indeed, these relationships went beyond those with the Alkebulan #1 Local Government. The Offshore Affiliate worked with other Senegalese-government principals to develop exodus-themed projects. For instance, as noted by RJ, at approximately 1:20:00 into the Alkebulan Documentary, the Offshore Affiliate "took on [as one of its] new partners" a "veteran

---

[20] This Complaint does not treat the Alliance as an "enterprise" under 18 U.S.C § 1961(4).

[21] Senegal's Public Procurement Portal, in its limited functionality, does not appear to include any activity of the Offshore Affiliate. However, to a large extent, the types of relationships and agreements claimed by RJ would not necessarily be recorded in this portal.

advisor to the [then-]President of Senegal, who would go on to increase [the Offshore Affiliate's] portfolio considerably."

211.    During the Alkebulan #1 Era, the Managers continually assured their followers that RJ had carefully cultivated these connections over many years and that the relationships would prove indispensable to the development of Alkebulan #1 and other projects.

212.    According to RJ, such relationships even permitted the Offshore Affiliate and MIA to "provide, uh, repatriate townships throughout Senegal, uh, so we just acquired some new, uh, property here, uh, where we're gonna be building apartments and houses, etc." Ex. Radio #11 at approx. 16:41.

213.    The Offshore Affiliate's ability to curry favors and influence policies and practices in Alkebulan #1, however, depended on its ability to "produce" Americans and their assets—i.e., induce them to relocate to the area. In this regard, the Managers knew that there was a close and direct relationship between (a) the value of the Offshore Affiliate's government relationships; and (b) the "value" of Americans and their assets relocated to Alkebulan #1 Land.

214.    Understanding this dynamic, RJ, acting on behalf of each MIA and the Offshore Affiliate, intensified his campaign for U.S. "exodus" during the Alkebulan #1 Era.

215.    In directly promoting the public and political interests of the Alkebulan #1 Local Government Partner, RJ, acting for MIA and the Offshore Affiliate, regularly pressured Americans to relocate and invest in Alkebulan #1 Land. He also urged them to fund investment in the developing city, offering a wide range of projects and proposed ventures. The Offshore Affiliate offered to carry out "major" development projects, including those requiring foreign-government contracts and partnerships for public-works such as roads and bridges. *See, e.g.,* Ex. Radio #6 at approx. 33:13.

216.    During the Alkebulan #1 Era, RJ often alternated and diversified his arguments and themes for inducing Americans to relocate to Alkebulan #1 Land. He tailored his messaging throughout this period and targeted different classes of individuals, based on their philanthropy, fears or other emotions, or anything else he believed would influence them.

217.    For instance, RJ argued that Alkebulan would provide optimal food security and protection for doomsday hypotheticals. *See e.g.,* Ex. Radio #4 at approx. 51:30. He compared those deciding to remain in the United States to domestic abuse victims. *See, e.g.,* Ex. Radio #15 at approx. 1:03:22. RJ attempted to induce members of the United States Armed Forces to resign their posts and relocate out of the U.S. *See, e.g.,* Ex. Radio #15, approx. 1:47:05 (encouraging members to "start coming back home now" and  to "bring home your skills in defense and law enforcement and military, etc. too. Bring those skills home right. And you don't have to just do it by going into the military here, right . . .  but perhaps you can come and be a military contractor or be a participant a trainer."). He raised the lesser-known threat of malicious American dentists, who, harboring political agendas against their patients, might be "playing in your mouth while you're unconscious." *See, e.g.* Ex. Radio #11 at approx. 1:44. For parents and their college-age children, RJ encouraged exodus by playing up the threat of "Eurocentric colleges in America that's gonna narrow your mentality down, uh, and whitewash you, and then steal you into their own, uh, businesses and, uh, and uh, organizations." *See, e.g.,* Ex. Radio #6, at approx. 1:57:16. On the other hand, RJ reminded Americans that, for those with younger children, the Offshore Affiliate had a "community center" for repatriate "kids," providing them an "outlet" to "play some games." *See, e.g.,* Ex. Radio #5 at approx. 1:20:00. The above is a small subset of the hundreds of exodus-themed appeals RJ employed on behalf of the Offshore Affiliate and MIA.

218.    But often, RJ, acting for MIA and the Offshore Affiliate, felt obligated to remind

Americans, as he did in Ex. Radio #6 at approx. 1:25:26, about "the whole scope" of "exodus":

> Uh, exodus is not just our, our physical exodus from the West. Uh, we also have to exodus our assets from the West. We also have to exodus our, our, our [sic] organizations, our companies our formations from the West.

219.    During the Alkebulan #1 Era, RJ also promoted development opportunities to Americans based on the "100-year development plan," filed with Alkebulan #1 Local Government Partner. For example, in Ex. Radio #6 at approx. 1:48:52, RJ expounded the possibilities:

> There is a 100-year development plan, a plan that includes agriculture that includes tourism, education, medical, city administrations, utilities, real estate development, amusement parks, everything, everything that we need to, to operate and sustain. It's built into that project input from dozens of other people around the world, all of which are skilled, uh, highly in their in their fields, uh, and so that SA corporation is one that can be used for those of you who come in as partners or members, etc. to build out micro projects on the ground, uh, if you want to invest in infrastructure and roads, if you want to go out and get some government contracts to build, uh, pipelines or mining sites or, uh, these other kind of great development projects we, we built out that [the Offshore Affiliate], got it licensed, certified to carry these kind of large projects.

220.    According to RJ's account, by January of 2021, the pace of exodus-themed investment (managed by the Offshore Affiliate and MIA) was surging. For instance, in Ex. Radio #11 at approx. 43:00, he hyped the ongoing development in Alkebulan #1 Land as follows, before pivoting to soliciting donations for MIA.

> As we continue to build this exodus out, new resources are coming to us every day. Um, you know, we made a huge step in development when we, you know, crossed the line of SA corp here in Senegal, and now even the development companies here on the ground are coming to us and saying "Hey, we heard you guys are, you know, developing this. We want to put this there. We want to bring a commercial center. We want to build an apartment neighborhood. We want you to develop this land over here for us. We got another land for you here." And it's now, it's like the resources are pouring in. Uh, if you'd like to share those resources, if you want to connect with the continent, if you've been trying to go about this journey, um, tap in with us madeinafricaproject.com. Join the exodus. Uh get involved, get [sic] make a contribution.

221.    Aliyah, acting on behalf of the Shadow Bank, actively worked during the Alkebulan

#1 Era to approve "exodus" financing to members of the U.S. African Diaspora seeking to repatriate and/or invest in Senegal. This work extended beyond the Alkebulan #1 Land Fraud Scheme and included, for instance, financing for travel and short-term lodging.

222.    On the other hand, upon RJ's instruction and order, Aliyah also appeared *individually*, at events controlled or hosted by RJ. Often, these appearances were intended to advance the Offshore Affiliate's agendas for exodus-acceleration and American-transition. *See, e.g.,* Ex. Radio #11 at approx. 18:06.

223.    Over time, numerous media sources, relying on anecdotes that the Managers had provided them, reported that Alkebulan #1 Land and the Mass Land Purchase were not only accelerating American exodus, but they were boosting foreign direct investment to the area. One news organization, without performing due diligence or independent review, described the city's potential industrial heft, by observing that "[t]he city named Alkebulan boasts major industries such as manufacturing, tourism and education and agriculture while vowing to create tens of thousands of jobs and businesses for returnees in partnership with locals." It further echoed RJ's observation that "Alkebulan city has the local government's full support and the theme is collective development." BKQ NEWS, *Are Today's Rappers The New Leaders of Black America?* (October 20, 2020), https://bkqnews.medium.com/are-todays-rappers-the-new-leaders-of-black-america-d60e8f200075.

*Actions and statements intended to directly advance Alkebulan #1 Land Fraud Scheme*:

224.    During the Alkebulan #1 Era, the Offshore Affiliate carried out the Alkebulan #1 Land Fraud Scheme. The Offshore Affiliate, acting through the Managers, ramped up its marketing on social media accounts and website(s) controlled by the Managers. It offered to sell Americans territorial-zone plots in Alkebulan #1 Land, assuring Americans they would receive "full title" to

the land. *See, e.g.,* Ex. Radio #11 at approx. 1:23:32 ("For sure you can own your land. Uh, we

can facilitate that. **We have land as low as two thousand dollars**.").

225.    RJ regularly sought to assuage Mahdi Followers' concerns about purchasing land

in a foreign country while still residing in the United States (e.g., without inspecting the land first).

The following is an example, from Ex. Radio #8 at approximately 1:51:02:

> If you're purchasing land on the continent from a distance, it is possible. Um, don't
> let anybody tell you that it's impossible to purchase land that you haven't visited or
> seen. Um, that's not true. What's, what's [sic] impossible or what's difficult, um, is,
> or what's risky is doing that with people who aren't credible, uh, people who aren't,
> you know, licensed, or people who don't have the particular, uh, credentials to do
> so, so don't let anybody tell you that it's impossible to purchase land from a distance.
> Uh, we've sold people a ton of land from a distance. Um, we've given people deeds
> you know for years.

226.    During the Alkebulan #1 Era, MIA contributed the Offshore Affiliate's agendas.

For instance, it regularly released newsletters to advance the Alkebulan #1 Land Fraud Scheme,

Senegalese government interests, and other Offshore Affiliate and MIA work. An example is

attached at **Exhibit B** (the "Exodus Report, Vol. 32"). The Exodus Report, Vol. 32 is fully

incorporated into this Complaint, including with respect to the relationships concerning

"Presidential Advisor and development expert Mr [sic] Muhammad Ndiaye" (whose mention was

also regular feature in RJ-affiliated content), the acceptance of applications for Alkebulan #1, and

the cross-promotion of Aliyah's repat guide.

227.    On information and belief, Aliyah released Exodus Report, Vol. 32 for circulation

in the United States, while acting in Ohio, pursuant to the Alkebulan #1 Land Fraud Agency, even

though she also reported on non-Alkebulan matters. [22]

228.    In performing her responsibilities for the Alkebulan #1 Land Fraud Scheme, Aliyah

---

[22] Based on, among other things, the designated email address, the attribution of the report to "admin," and the
Managers' prior patterns and individual skillsets.

regularly spoke, from Akron, Ohio, to media outlets about Americans' legal right to "own" Alkebulan #1 Land.

229.    In doing so, Aliyah consistently omitted that substantially all, if not all, of Alkebulan #1 Land was unavailable for private ownership.

230.    Furthermore, she often pressured Americans to buy their Alkebulan #1 Land plots soon by warning, expressly or through implication, that the price would surge in the near future. For instance, she offered the following guidance about the price range.

> The property in Senegal is not on a lease when you buy it is all yours. **The price range of land in [territorial-zone] Alkebulan falls between $2,000 to $10,000, and people are rushing towards buying as of increasing demand.**

Lesotho Properties, *Here are the guidelines for buying home in Africa (African Real Estate)* (February 12, 2022), https://www.myproperty.co.ls/guidelines-buying-home-africa-african-real-estate/?__cf_chl_tk=YUoDZmODDGVwrHKYcTwQgJh6ixvQKI2UzlZRqQ5Hfhk-1729783342-1.0.1.1-ZupI_UfxfRWFD8ixtu4aN29tvcxo8S8_6MUHMuYFpRA (in turn, quoting undated, earlier interview with Black Enterprise) (boldface added).

231.    Aliyah also created videos and social media content for her Alkebulan #1 Land Fraud Agency during this period. One example was the Alkebulan Promo from Akron, which she created approximately three months after forming the Akron-based Shadow Bank and accepting the statutory duty to accept service of process in Ohio. Although uncomfortable with the order and the falsity of the planned content, Aliyah performed. She created the video, which was executive directed by Mahdi Media, under specific instructions and criteria relayed by RJ. She recorded part of it in Senegal, during one of her appearances there, but, on information and belief, she posted it to YouTube afterwards, upon her return to Akron, Ohio.

232.    In the video, apart from elaborating on her purported life in Senegal, she promoted Alkebulan and encouraged potential repatriates to "put [their] time, focus, money, and energy into" the city. She emphasized the city could "create jobs" and "educational opportunities." In the

background, text appeared stating, among other things, that Alkebulan was "a 600 hectare repatriate city project in Senegal" and that "[c]urrently 1400 main residential plots have been made available for reservation ahead of groundbreaking."

233. Under the Alkebulan #1 Land Fraud Agency, Aliyah also created her a web docuseries titled "The Real Homes of Africa." Aliyah described the relationship between the series and Alkebulan #1 Land as follows:

> The series falls directly in alignment with our goal to build Alkebulan, a city for repatriates to return to here in Senegal. We will display homes available for purchase from local developers and private owners. It will show local interior design, and viewers can get a feel for how they can furnish their homes.
>
> We have many clients who decide to move to Africa, but they want to bring their entire house from America with them. This method and thought process can become very costly and timeconsuming [sic]. Everything you need to design your home is here, and if it isn't it can be created.

Mitti Hicks (writer at Travel Noire), *INSIDE 'THE REAL HOMES OF AFRICA' SERIES SHOWCASING THE GLAM LIFESTYLE OF WEST AFRICA* (March 10, 2020), https://travelnoire.com/real-homes-africa-series-senegal.

234. Through the docuseries, in which she toured upscale homes, Aliyah intended to imply a (false) equivalence and give the impression that Americans could purchase inexpensive plots in Alkebulan #1 Land and, with a just little help from the Offshore Affiliate, live in luxury.

235. As another medium, the Managers used the Offshore Affiliate's website (the "alkebulan.city site"), which has since been scrubbed, to promote Alkebulan #1 Land and accept applications to purchase its plots. This website was created on or around October 2, 2020 and was registered in the United States. The alkebulan.city site also advertised for the Offshore Affiliate's exodus consulting and other services. On information and belief, Aliyah posted this website content pursuant to the Alkebulan #1 Land Fraud Agency.

*See* Alkebulan Development Group, *Building Tomorrow (homepage)* (archived Mar. 5, 2021),

https://alkebulan.city/ [http://web.archive.org/web/20210305040251/https://alkebulan.city/].

*The army of lawyers and other professionals at the disposal of Offshore Affiliate and Managers*:

236.    But the Offshore Affiliate did not solely rely on Aliyah, the Shadow Bank, or MIA. During the Alkebulan #1 Era, when speaking about the "100-year development plan," RJ routinely emphasized that the Offshore Affiliate had *both* a "partnership with the [Senegalese] government" and a long-term commitment from "skilled professionals around the world." *See, e.g.,* Ex. Radio #3 at approx. 41:10.

237.    Accordingly, during the Alkebulan #1 Era, the Offshore Affiliate employed legal and technical professionals, including those recruited from or working within the United States.

238.    In Ex. Radio #5, approx. 1:51:50 into video, RJ explained why the Offshore Affiliate, RJ, and Aliyah required "a consortium of professionals, all vested in the development of the [Alkebulan] city" before the Mangers could oversee its development: "[M]yself, my wife, our inner team, we understood that there's no way in hell that we can build a city by ourselves. We understood that we don't know enough."

239.    On information and belief, during the Alkebulan #1 Era, lawyers employed by the Offshore Affiliate regularly provided the Managers multi-jurisdictional legal guidance, including advice regarding their actions, political activities, and influence campaigns within or directed toward the United States. To a lesser extent, the Managers also received such advice from attorneys, including U.S. attorneys, affiliated with or employed by other Alliance organizations.

d.    **Other Offshore Affiliate projects**:

240.    During the Alkebulan #1 Era, the Offshore Affiliate introduced a series of interdependent projects. These projects were "really high level." Ex. Radio # 6 at approx. 1:15:49.

241.    In December of 2020, RJ, acting on behalf of the Offshore Affiliate and MIA,

teased two projects taking shape and their close relationship with Alkebulan #1 Land and the Mass

Land Purchase:

> We are building Alkebulan this year for those of you who are looking to move back to the soil. Uh, we have a 600 hectare in land space here in Senegal that we at Made in Africa Project, Alkebulan Development Group, and our partners are building for the return of Diaspora, uh, so that's what we're focusing on this year, uh, is just mainly building our city. **Uh, we just acquired two new, uh, land spaces here in Senegal. We're going to be announcing those as well and how they will work interconnected with our Alkebulan City, but, you know, around the clock that's what we're doing here.** Like, when we're not, uh, talking to you guys here, uh, we're literally like in development talks all day. Um, we're sitting down with developers, sitting down with people who are bringing in agri-business projects, um people who are opening up hotels, guest houses, uh, restaurants, beauty salons, beauty schools. Uh, we've got folks going into all sorts of business right now.

Ex. Radio #8 at approx. 1:40:12 (boldface added):

_The Dakar Exterior_:

242.    Aside from the Mass Land Purchase, the Offshore Affiliate claimed to complete

other land "purchases." In Ex. Radio #11 at approx. 1:15:07, RJ stated that the Offshore Affiliate

had completed the following purchase (the "Dakar Exterior") (boldface added):

> [W]e just signed a additional [sic] in addition to our major Alkebulan deal, an additional 28 hectare land deal, um, just outside the city of Dakar. So Dakar is a city of six million people here in Senegal. . . . And six million people in one city is a lot, so Dakar has invested in this expansion and, uh, suburban build-up, **and now we just bought 28 hectares, um, right in the middle of that sprawl area**, uh, already paved roads surrounding this, this 28 hectares [sic], already developing community, uh, already a highway, a brand-new highway that's less than about two years old that leads right up to the land site. Uh, it is about five minutes from the coastline, the Grand Coast in Senegal, so you're right near the beach side. It's also about 10 minutes from the Pink Lake, uh . . . a huge tourist attraction and beautiful marvel of nature, uh, and so this land we now have a development partnership deal where you can come in. You don't have to worry about finding a builder. You don't have to worry about who's going to build etc. There's already a developer. There are apartments available there. Homes are available. Uh, you can buy your land and your house all in one.

243.    On January 11, 2021, the Offshore Affiliate also posted to the Alkebulan City

Facebook account[23] about "our newly acquired 28 hectare land site just at the edge of Dakar [i.e., the Dakar Exterior]. The land is full title and ready for residential and commercial development. Email AlkebulanTeam@Gmail.com for purchase and financing info." Then, on January 18, 2021, the Offshore Affiliate further posted the following to this same account:

> We have multiple land spaces available for immediate full title purchase and construction. Just outside Dakar minutes away from beaches, new highways and tourist locations. Communities are surrounded in paved roads, new street lights, safe environment to start a new life. Click the link in our bio to apply to own a home, apartment or commercial space in these quickly developing communities!

244.    The Offshore Affiliate also used the alkebulan.city site to boost excitement for the Dakar Exterior. *See, e.g.,* Alkebulan Development Group, *Building Tomorrow (homepage)* (archived Mar. 5, 2021), https://alkebulan.city/ [http://web.archive.org/web/20210305040251/https://alkebulan.city/] (promoting "[o]ur much smaller Alkebulan II development . . . located just outside Dakar in Kuer Massar 10 minutes from Pink Lake.")

245.    MIA, through Aliyah, released the Exodus Report, Vol. 32, which also promoted the Dakar Exterior and other MIA and Offshore Affiliate projects and services.

246.    On information and belief, including based on the Managers' division of work on the separate (but comparable) Alkebulan #1 Land Fraud Scheme, RJ issued general instructions for the Dakar Exterior social-media and website posts. The instructions addressed the content, theme, and targeted class of persons (e.g., African Diaspora in the U.S. seeking suburban homes but also access to Dakar). Aliyah then prepared, stylized, and posted the content.

247.    The Offshore Affiliate had not, in fact, acquired title to the Dakar Exterior, whether at the time of these posts or thereafter. It thus could not transfer title to plots in the Dakar Exterior.

---

[23] Throughout the Alkebulan #1 and #2 Eras, the account was managed or controlled, in whole or in part, by RJ, as owner-manager of the Offshore Affiliate and in any one or more of his other capacities described in this Complaint.

In addition, the Offshore Affiliate could not, in earnest, imply that development of these properties would follow the above descriptions because the Offshore Affiliate neither owned the Dakar-Exterior properties nor held specially allocated development rights for the area.

248.    The following may be referred to as the "Dakar Exterior Misrepresentations": (a) the express representations that the Offshore Affiliate had acquired the Dakar Exterior and could, as owner, sell "full title" to its plots; and (b) the implied representation that the Offshore Affiliate could assure development according to the family-friendly descriptions in the Dakar-Exterior social media posts and Ex. Radio #11.

*The Transitional Property*:

249.    During the Alkebulan #1 Era, another significant project that the Offshore Affiliate designed and undertook was the Pink Lake Exodus House (the "Transitional Repat Property" or "TRP"). This project contemplated the Offshore Affiliate's (a) purchase of farmland property near Senegal's Lac Rose ("Pink Lake"), approximately 22 miles northeast of Dakar; and (b) construction of extended-stay apartments on the property for members of the Diaspora. The TRP, upon its planned completion, was intended to provide members of the Diaspora a relaxed and nurturing environment to gradually transition from life and trauma in the West.

250.    On May 21, 2021, in an instant message ("RJ's 5/21 IM") transmitted by WhatsApp Messenger, RJ messaged Plaintiff and Ade, in a group chat, the following regarding the TRP:

> Peace Joseph and Ade. We have been keeping this under wraps for a while but we are about to purchase and launch our extended stay transitional property for repatriates. Its located near the Pink Lake and sits on a 2 hectare farm. There are already 2 partial structures complete and we have a full build out plan. I'd like to offer you all first consideration as an investor in the property which at its full capacity of 38 rooms is projected to earn about $550,000 per year. We are looking for only 7 investors at 100k each. The ROI is 10% annual (about 50k per year.) Please review the following presentations and let me know if you're in.

251.    These presentations addressed planning for the TRP, including office, residential,

and community spaces; a wellness center; a gift shop and snack bar; a mini lab and clinic for healing sessions; a central meeting space; a classroom; and a swimming pool, among other accommodations and services. Copies of such presentations (the "TRP Presentations") were attached to RJ's 5/21 IM. They are also attached to this Complaint at **Exhibit C**, which is fully incorporated into the Complaint. The TRP Presentations were prepared and sent to Plaintiff in connection with his and/or Ade's potential investment.

252.    On behalf of the Obadare Family, Ade responded within the group chat to RJ's 5/21 IM later that same day. She stated that she and Plaintiff would review the TRP Presentations and would respond further by the following Monday with any questions.

253.    Before reviewing the TRP Presentations in depth, Plaintiff and Ade were generally intrigued by RJ's 5/21 IM but had reservations. Specifically, they believed that success of the TRP would be interdependent with that of the nearby Alkebulan #1 Land and the Dakar Exterior. They recognized the three projects were complementary. Indeed, the projects had a sequential logic: potential occupants of the TRP would likely, as a preliminary matter, seek assurance that they could ultimately obtain property in, and relocate to, Alkebulan #1 Land or the Dakar Exterior. Without these longer-term prospects, the Obadare Family assumed interest in the TRP would diminish. Equally critical, they recognized that TRP occupants would often include family and friends of residents of Alkebulan #1 Land and/or the Dakar Exterior (e.g., TRP occupants being family members taking first steps in their own repatriation journeys). The close contacts and circulation of positive word-of-mouth among the properties' residents would be critical.

254.    The Obadare Family understood that the occupancy and demand for each of the three projects would be inextricably linked.

255.    Upon receiving RJ's 5/21 IM, the Obadare Family had not been fully apprised of

the prospects for the Alkebulan #1 Land or Dakar Exterior. They thus required a better understanding of these projects and their likelihood of success before committing to the TRP. The observations, relationships, reservations, and need for further inquiry described in this paragraph and the two immediately preceding paragraphs may be referred to as Plaintiff's "Related-Property Demand Reservations."

256.    Between May 21, 2021 (after RJ's 5/21 IM) and May 25, 2021, both dates being approximate and inclusive, Plaintiff and Ade discussed a possible TRP investment.

257.    During this timeframe, the Obadare Family reviewed the TRP Presentations, in depth, to assess whether the Related-Property Demand Reservations had been addressed.

258.    In the TRP Presentations, Plaintiff reviewed the document titled "Exodus House Investment Opportunities," including the statement that  an investor would earn "**[a]pproximately $40k-$50k annual ROI by the 5th year of operation.**" (Boldface added). This statement may be referred to as the "ROI Statement."

259.    The ROI Statement was not disaggregated by activity or business function.

260.    Also, the ROI Statement was unaccompanied by cautionary language. More generally, the TRP Presentations were devoid of any disclosure of risks that assumptions underlying the ROI Statement were uncertain or, more generally, that the resulting ROI itself was uncertain (other than by use of the word "approximately"). Indeed, there was no mention of any investment risk whatsoever.

261.    On information and belief, several months prior to RJ's 5/21 IM, the Offshore Affiliate and the Shadow Bank agreed the latter would promote the TRP and provide financing for individuals staying there.[24] However, on such information and belief, the entities agreed that the

---

[24] Based on, among other circumstances, their complementary business models and unified objectives; the Shadow Bank's dominance in the repatriation-financing market; the apparent absence of collateral requirements for Shadow

Offshore Affiliate would guarantee payment of TRP-occupant debt and would, as necessary, exercise subrogation rights against occupants. As another condition unique to the project, the Shadow Bank insisted that it assume the authoritative role (for which the Shadow Bank would also receive an agreed-upon fee) for preparing any forecasts, projections, or other analyses bearing on the TRP. Because they had an interest in the TRP's success, the Shadow Bank and Aliyah, a self-identified finance professional, sought to oversee such analyses.[25] Thus, the Shadow Bank exercised control over the work described in this paragraph, in contrast to certain other functions cited in this Complaint.

262.    Upon information and belief, including the premises cited in the preceding paragraph (and its footnote), Aliyah, acting on behalf of the Shadow Bank, was the "maker" of the ROI Statement because she held ultimate authority over it. This authority extended to the estimated annual range of "$40k-$50k" and the direction that the statement be communicated to the Obadare Family in the TRP Presentations. On information and belief, she developed the ROI Statement based primarily on inputs that she controlled and prepared herself.

263.    In the alternative to the two immediately preceding paragraphs, RJ held ultimate authority over the ROI Statement, including its content and the direction for it to be communicated to the Obadare Family in the TRP Presentations. Furthermore, in this alternative, RJ controlled and prepared all information relating to the estimate's inputs, which he used in turn to create develop the ROI Statement.

---

Bank loans; the timing of statements made on Exodus Radio regarding the project; the cash flow implications and flexibility afforded to the Managers in their value-transfer system (later described); and inferences upon review of Exodus Report, Vol. 32.

[25] Although the Managers employed a system of value transfer that, as later described, generally aimed to equalize their combined shares of profit from the Offshore Affiliate and the Shadow Bank, the Managers still took interest in potential cross-border "liquidity" or "settling" events, upon which funds transfers could be predicated (e.g., payments on guarantees for TRP-occupant debt).

264.    On behalf of the Obadare Family, Ade eventually messaged RJ on May 26, 2021, in a group WhatsApp chat, which included Plaintiff and RJ. This message occurred after her and Plaintiff's review of the TRP Presentations and the couple's discussions about the potential investment. In the message, she requested a "phone call to discuss" questions that she and Plaintiff had, noting their "questions [were] mostly regarding the ROI and the feasibility of the outlined milestone dates."

265.    On May 26, 2021, shortly after Ade's request for a phone call, Plaintiff, Ade, and RJ participated in a three-way phone conference (the "5/26 Conference").

266.    During the 5/26 Conference, Plaintiff and Ade expressed their Related-Property Demand Reservations. They also observed that the ROI Statement represented an impressive return for investors, and they raised the statement for further discussion.

267.    During the 5/26 Conference, RJ indicated that the ROI Statement had been prepared methodically and was based on assumptions, including continuous operation at "full capacity" (approximately 38 units), that were virtually certain to materialize. Regarding the "full capacity" assumption, the call participants then discussed a wide range of matters. They devoted much discussion, though, to other assumptions required to sustain a repatriate-demand that was consistent with the ROI Statement.

268.    On the issue of demand, RJ made two key exodus-themed representations during the 5/26 Conference:

(a) RJ stated that the Offshore Affiliate had already, in its short lifespan, received over 4,000 applications from members of the African Diaspora who were seeking to relocate to Africa and participate in one or more of the Senegalese projects that the Offshore Affiliate was proposing (the "4,000-Application Representation."); and

(b) RJ stated that the Offshore Affiliate had already accumulated a substantial "wait list" among the circle of individuals who knew about the TRP (the "Wait-List Representation.")

- 59 -

269.     During the 5/26 Conference, RJ also responded to the Related-Property Demand Reservations by referring to the Mass Land Purchase (of Alkebulan #1 Land) and the "acquisition" of the Dakar Exterior. RJ suggested these developments guaranteed an ongoing market for the TRP, consisting of members of the Diaspora seeking to repatriate in a gradual and relaxed environment. He mentioned that the effect of these land acquisitions and partnerships would be soon amplified because the African Union had agreed to support and promote the Alkebulan #1 Land project and the Dakar Exterior, as development initiatives. On this point, RJ further stated that Alkebulan work opportunities and a weekly "shuttle" to Alkebulan would be amenities made available to occupants. Collectively, the representations in this paragraph are referred to as the "Related-Property Appeal with African-Union Support Representation").

270.     During the 5/26 Conference, RJ also described terms for the proposed contract.[26]

271.     During the 5/26 Conference, RJ also stated there were two to four other investors, bound under investment contracts, committed to the TRP (the "Other Investor Representation").

272.     On or around May 31, 2021, RJ sent Plaintiff and Ade a document that, at the time, was titled "EXODUS HOUSE FULL PROJECT PLAN." RJ sent this document via attachment on WhatsApp group chat. The document, which purported to include a "feasibility plan" (including a "property analysis" and "market analysis") may be referred to as the "TRP Full Project Plan." A copy of the TRP Full Project Plan is attached at **Exhibit D**.[27]

273.     On information and belief,[28] Aliyah prepared and held ultimate authority over the TRP Full Project Plan, including her direction that it be communicated to the Obadare Family in

---

[26] The proposed terms of the contract were generally consistent, although not identical, with the final agreement later executed between Plaintiff and the Offshore Affiliate. Such final agreement is attached under a later paragraph.

[27] The TRP Full Project Plan appears to state a variation of the 4,000-Application Representation, except attributing the applications to MIA (not the Offshore Affiliate).

[28] Including the premises previously noted with respect to the role of Aliyah and the Shadow Bank in the TRP.

the above-noted group chat. On information and belief, she developed the TRP Full Project Plan based primarily on inputs she controlled and prepared herself.

274.    In the Alternative, either Brandi Sloan, an employee of the Offshore Affiliate, or RJ prepared the TRP Full Project Plan. However, under this alternative, RJ held ultimate authority over the TRP Full Project Plan, including through his direction that it be communicated to the Obadare Family in the above-noted group chat.

275.    The TRP Full Project Plan lacked information on governance or management of the partnership.

276.    Such plan also failed to specify the basis of accounting that the partnership would use. It also omitted the key components making up the definition of "operation profits," which is the measure ultimately included in the investment contract.[29]

277.    Under the TRP Full Project Plan, each investor's share of "profits" would be fully distributed each year.

---

[29] Subsequent to construction and other initial "project cost," this "operation profit" measure initially appeared to exclude from its calculation all operating and other expenses, whether arising from depreciation, repairs, maintenance, or otherwise. The plan, perhaps, intended to convey this by stating "[t]here will be no management fees associated with Exodus house since the property will be owned and managed by ADG." Thus, the Offshore Affiliate and/or RJ, as partners, would be allocated 100% of an undefined class of property-specific expenses. This conclusion may also be inferred from the estimated "profit" equaling the estimated (gross) "rental income." (This would, incidentally, raise the question of how/where the expenses *would be* recorded and the nature of the Offshore Affiliate's interest, particularly given the TRP sat on a territorial zone not subject to private ownership. It would also raise the question of whether project-level profits would, for some reason, be computed differently for each investor.) It is conceivable that, by only calling for seven "investors" (i.e., excluding RJ and/or the Offshore Affiliate), the plan contemplated that (a) 30% of the "operation profits" (apparently synonymous with gross rental income); and (b) 100% of the above-noted class of expenses, would flow to the Offshore Affiliate and/or RJ. And perhaps these disparate sources were expected to break even. But this interpretation is challenged by the absence of any estimated revenue or expense, whatsoever, for the "ancillary" operations, including the shuttle service, the wellness shop, the agricultural sales, the "Pink Lake Salt & Healing Products," the "Memorial Benches," the "Memorial Trees," etc. Indeed, regarding the "Pink Lake Salt & Healing Products," based on the prior TRP Presentations, one could **"[i]nvest $20k USD in the salt operation on the property for a 20% ROI or $50K USD for 30% ROI in 6 months."** This operation, in turn, was included within the larger project, thereby implying the profits would also flow to the larger class of TRP "investors." The profit sharing for these operations is not apparent from the TRP Full Project Plan, which only states "Potential Ancillary Income to help drive higher annual revenue will come from the Exodus House gift shop, cafe, kids club, wellness center, housekeeping, and laundry."

278.    In the TRP Full Project Plan, the representations in the "Exodus House rental income analysis," including the values associated with individual units (individually and in the aggregate), may be referred to as the "Rental Income Representations."

279.    In the TRP Full Project Plan, key representations in the "Financial Analysis" section include the stated or implied "unit" cost assigned to each class (i.e., row) of property. Also, in the TRP Full Project Plan, the "Staffing Organizational Chart" and its surrounding text provided that payroll or other expense for six staff members would fully be allocated to the Offshore Affiliate, since the property would be "owned and managed by ADG." The representations in this paragraph may be referred to as the "Cost Representations."

280.    In the TRP Full Project Plan, the following "strength" of the TRP was represented as a fact in a SWOT analysis: "Support from international donors under the Emerging Senegal Plan, in particular the IMF with its Economic Policy Coordination Instrument." This statement is referred to as the "ESP Representation."

281.    Each representation in the following list may be referred to separately, in the singular, as a "Transitional Property Representation": the ROI Statement, the 4,000-Application Representation, the Wait-List Representation, the Related-Property Appeal with African-Union Support Representation, the Other Investor Representation, the Rental Income Representations, the Cost Representations, and the ESP Representation. Collectively, the above-listed representations may be referred to as the "Transitional Property Representations." Alternatively, "Transitional Property Representations" may mean each possible combination of two or more of the above-listed representations.

282.    At the time the ROI Statement, the Rental Income Representations, and the Cost Representations were made to Plaintiff, they were grossly inaccurate and lacked any remotely

objective, let alone reasonable, basis in fact. The Rental Income Representations were founded on pricing assumptions (not to mention occupancy assumptions) that were detached from the reality of most expatriates' budgets, and they further indicated, when read in context of the larger plan, that the resulting rental income equaled "operations profit," without any expense (even expense relating to ancillary gift shop or other operations). Furthermore, the cited "Project Costs" were not based on any reasonable estimate, quote, or reliable method for determination. Even the "finishing touch" expenses lacked cursory research as to their sufficiency and accuracy in cost. Also, Offshore Affiliate had further not budgeted or planned for six employees, fulltime or otherwise, to work onsite for the TRP. It held no intention to assign six employees to work at the TRP.

283.     At the time the representations cited in the preceding paragraph were made to Plaintiff, the Managers knew they were grossly inaccurate and lacked any remotely objective factual basis. They disbelieved such representations themselves. Additionally, they knew that six employees would be insufficient to staff the lengthy list of "Amenities" in TRP Full Project Plan. Also, the Managers further knew that the assumptions represented to "support" such representations were false (to the extent based on historical fact) or lacked the slightest probability of occurrence (if forward looking).

284.     The 4,000-Application Representation, the Wait-List Representation, and the Related-Property Appeal with African-Union Support Representation were false when made to Plaintiff. In fact, the application quantity was misstated by at least 1,000. There was no bona fide "wait list," of even one person. Also, the African Union had not agreed to support and promote the Alkebulan #1 Land and the Dakar Exterior, and the other representations regarding these properties were fabricated. In addition, the Managers knew these realities and the circumstances in this paragraph at the time representations were made to Plaintiff

285.    The Other Investor Representation was false when made because there were no other committed investors, let alone any under investment contract, at the time. Indeed, there never were any other investors, even after the representation. At the time the representation was made to Plaintiff, the Managers knew these circumstances, and RJ attempted to perpetuate the Other Investor Representation all the way into the fall of 2023.

286.    The ESP Representation was not only false when made (i.e., the representation being stated as a historical fact), but the Managers knew that the Offshore Affiliate would not qualify for this type of funding and would not seek it. Also, the Managers knew these circumstances at the time of the representation was made to Plaintiff.

287.    Finally, the Managers knew *at the time* the Transitional Property Representations were being made to Plaintiff that they were, in fact, being made to Plaintiff.

288.    Because of the interdependence detailed in the Related-Property Demand Reservations, among other factors, there was a substantial likelihood that a reasonable investor would consider each of the following to be important in deciding whether to invest in the TRP, and such investor would also view each of the following as significantly altering the total mix of information available: (a) the Transitional Property Representations; and (b) each Transitional Property Representation.

289.    Such reasonable investor would recognize that each Transitional Property Representation is fundamental to the project's appeal and could substantially affect its short-term viability, competitive advantages, liquidity, and its long-term outlook for revenue.

290.    Upon information and belief, Plaintiff executed an investment contract for the TRP (the "TRP Investment Contract"), as the final signer, on or around June 11, 2021, while he was in

Maryland.[30] Neither RJ nor Aliyah was a party to the contract, and Plaintiff does assert contractual claims in this Complaint. A copy of the TRP Investment Contract, including its terms for the right to a "10% of operation profits" interest, is attached at **Exhibit E** and is fully incorporated into this Complaint.

291.    Plaintiff further signed an invoice created by RJ relating to the TRP Investment Contract, on or around July 12, 2021. The invoice's intent was to minimize scrutiny of the transaction by Plaintiff's bank. A copy of the invoice is attached to the Complaint at **Exhibit F**.

292.    After executing the TRP Investment Contract, Plaintiff paid the Offshore Affiliate the contractually required $100,000, through four approximately equal installments. Plaintiff paid the first three installments (totaling $75,000) in July and August of 2021, from his account maintained in Maryland with Bank of America, and he paid the remaining $25,000 in or around November 12, 2021. The total amount paid pursuant to the contract and described in this paragraph is referred to as the "TRP Contractual Sum."

293.    On or around February 14, 2022, at the request of RJ, Plaintiff increased his TRP interest by purchasing it and paying approximately another $25,000 to the Offshore Affiliate. Immediately prior to the payment, Plaintiff and the Offshore Affiliate, by and through RJ, orally agreed that the terms of the TRP Investment Contract would govern the rights and obligations associated with this new payment. In this regard, Plaintiff's interest in all rights afforded under the contract increased by approximately 25%. The additional payment described in this paragraph is referred to as the "Additional TRP Contractual Payment," and the TRP Contractual Sum and Additional TRP Contractual Payment are collectively referred to as the  "Full TRP Investment."

---

[30] Information and belief is in part based on Plaintiff's recollection and inferences from contemporaneous instant messages. Plaintiff lacks access to the full "envelope" providing information on the signatures, which omit date fields.

e.    **Foreign corrupt practices: when a failed bribery scheme torpedoes everything**

> "You didn't know what you was doing. You didn't know the proper path to take. You didn't know the proper people to get in bed with."
>
> "It's not what you know. It's *who you know* . . . in Senegal."
>
> RJ Mahdi, December 8, 2020, Ex. Radio #6, approx. 1:37:05 and 29:14.

294.    The Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1 *et seq.* is referred to as the "FCPA" in this Complaint.

295.    The "Usage-Rights Bribery Scheme " (or alternatively, the "URB Scheme") means a specific set of circumstances described in this paragraph and the paragraphs in this section that follow. Upon information and belief,[31] all events making up the URB Scheme occurred between February 15, 2022 and February 28, 2022, both dates being approximate and inclusive. This period of time may be referred to as the "URB Scheme Window."

296.    During the URB Scheme Window, MIA was a "domestic concern" under 15 U.S.C. § 78dd-2(h)(1)(B) because it was a partnership that, as previously noted and based on information and belief, was formed in Ohio, under Ohio Rev. Code § 1776.22. Thus, it was organized under the laws of Ohio. Similarly, MIA was a "United States person" under 15 U.S.C. § 78dd-2(i)(2) based on the foregoing.

297.    During the URB Scheme Window, the Shadow Bank was a "domestic concern" under 15 U.S.C. § 78dd-2(h)(1)(B) because it was a limited liability company that was formed and organized under the laws of Ohio. It was further a "domestic concern" by virtue of its principal

---

[31] Founded on, among other things, the timing of Alkebulan #2 activities (later described); the nature of the Alkebulan #1 Land Fraud Scheme and the inevitability of near-term detection by American victims (regarding their lack of title); the apparently abrupt cessation of relations between RJ (and affiliated parties), on the one hand, and Mayor Diack and the applicable rural council, on the other; the timing of RJ and Aliyah's apparent discontinuation of interest in the TRP; the timing of the Additional TRP Contractual Payment; and the receipt and timing of RJ's unusual offers to American victims to "trade in" their Alkebulan #1 Land for Alkebulan #2 Land (later described).

place of business in Akron, Ohio. Similarly, the Shadow Bank was a "United States person" under 15 U.S.C. § 78dd-2(i)(2) because it was an Ohio limited liability company.

298.    During the URB Scheme Window, each of the following was a "foreign official" under 15 U.S.C. § 78dd-2(h)(2)(A): Mayor Diack, each member of the Alkebulan #1 Rural Council, and any other potential Alkebulan #1 Local Government Partner. In this regard, each was an officer or employee of a "foreign government or any department, agency, or instrumentality thereof." Specifically, each official exercised sovereign de facto or de jure political jurisdiction over (a) the Louga Region; (b) the Kébémer Department (within the Louga Region); and/or (c) Ndande or any other rural district or commune within either the Louga Region or the Kébémer Department. Alternatively, for any listed person who was not, in fact, a "foreign official" under the preceding sentence, such person was a "foreign official" because he/she acted "in an official capacity for or one behalf" of one or more of the named political jurisdictions. Each potential foreign official described in this paragraph, as alternatively pled, is referred to as the "Target."

299.    In the design and execution of the URB Scheme, RJ acted under his authority as an agent and manager of MIA.

300.    In the design and execution of the URB Scheme, Aliyah acted pursuant to RJ's instructions and under her authority as an agent for MIA, and she further acted under her authority as an agent and manager of the Shadow Bank.

301.    On information and belief, in the week prior to the URB Scheme Window, RJ (in Africa) and Aliyah (in Akron, Ohio) communicated, at least once, by one or more of the following: SMS; instant message; email; phone; direct message through online platform(s); protocol allowing real-time, peer-to-peer audiovisual exchange; or virtual-meeting platform permitting real-time audiovisual interaction. During and through their conversation(s), the Managers knowingly and

willfully agreed to the URB Scheme. The Managers' objective was to negotiate an arrangement in which the Target would, in effect, sell Alkebulan #1 Land Usage Rights in territorial zones to the Offshore Affiliate, on behalf of Americans, outside the formal legal system. In this regard, the Managers believed that, by acquiring these rights, they could mitigate or conceal the absence of title conveyed to American victims under the Alkebulan #1 Land Fraud Scheme, such as by avoiding local land disputes.

302.    During the URB Scheme Window, the Managers knew, based on advice from counsel, that the contemplated mass purchase of territorial-zone usage rights would be unauthorized and corrupt. They understood that, under Senegalese law, there were specific criteria (e.g., based on land productivity) and guidelines required to inform deliberations over territorial-zone allocations, including those over Alkebulan #1 Land. The Managers intended to circumvent these criteria and guidelines. That is, the Managers intended to induce the Target to misuse his/her official position to grant these rights according to the Managers' requests. Knowing that the planned mass purchase would be improper and wrongful, the Managers nonetheless intended to carry out the URB Scheme to advance their concealment aims. Accordingly, in planning and executing the steps of the URB Scheme, the Managers held corrupt intentions.

303.    Pursuant to the URB Scheme, the Managers sought to avoid acting directly on behalf of the Offshore Affiliate, believing this would lessen scrutiny of their proposal.

304.    However, the Managers believed that MIA, the Shadow Bank, and the Offshore Affiliate would all benefit significantly from the URB Scheme. The Managers designed and carried out the URB Scheme to retain business for all three. For MIA, the Managers intended to retain investor-club membership fees by avoiding a crisis of confidence among the membership. Similarly, for the Shadow Bank, the Managers intended to retain their financed clientele and avoid

backlash regarding debt incurred for nonexistent property rights. Finally, for the Offshore Affiliate, the Managers intended to avoid or delay detection; to minimize the demand for refunds from American victims, including those entangled in local land disputes; and critically, to prevent competition from entering the market for developing the land at issue. Furthermore, the Managers sought to protect the reputation and business model of all three. Thus, the Managers planned and executed the steps of the URB Scheme in order to evade the general land-allocation deliberations and for other business purposes.

305.    Upon information and belief, in planning URB Scheme, the Managers agreed to the following steps:

(a) In or around the URB Scheme Window, Aliyah would travel to Senegal to meet RJ ("URB Step #1").

(b) The Managers would approach either the Target or an intermediary who regularly maintained close contact with the Target ("URB Step #2").

(c) If they were able to meet with the Target, RJ and Aliyah, individually and collectively, would offer to pay the Target a lump sum or series of installment payments. For the offer, the payor(s) would be a combination of MIA and the Shadow Bank. The source of the assets would be proceeds from the Alkebulan #1 Land Fraud scheme and other sources, including proceeds from lawful gains. The form and means of payment would be varied to minimize risk ("URB Step #3a").

(d) If they were only able to meet with an above-noted intermediary, RJ and Aliyah, individually and collectively, would request that the intermediary communicate the same information (from URB Step #3a) for the Target's consideration ("URB Step #3b").

(e) In exchange for the above payment(s), the Managers would require that the Target, through its official acts or decisions, cause specified land usage rights to be allocated to designated Americans, who had previously "acquired title" to the plots under the Alkebulan #1 Land Fraud Scheme. If this was not unilaterally feasible by the Target, the Managers would instead require that the Target use his/her influence over the rural council or other relevant decision-making body to effect the allocations.[32] Regardless, the Managers would thus require that the Target suppress any legally required rural-council or other deliberations concerning the appropriateness of the allocations. ("URB Step #4")

---

[32] The Managers would not disclose the purchased allocations to the Americans unless a dispute arose.

306.     During the URB Scheme Window, the Aliyah knowingly and willfully executed URB Step #1.

307.     At this point, after their planning discussions and upon completion of URB Step #1, the Managers had already made use of a means or instrumentality of interstate (and international) commerce to advance the URB Step #1, including by Aliyah's travel from Ohio to Senegal for this purpose. In any event, under 15 U.S.C. § 78dd-2(i)(1), MIA and the Shadow Bank were "United States persons" subject to alternative jurisdiction without regard to such means or instrumentality of interstate commerce.

308.     During the URB Scheme Window, the Managers then knowingly and willfully executed URB Step #2, physically meeting the Target or an intermediary who regularly maintained close contact with the Target.

309.     During the URB Scheme Window, the Managers then knowingly and willfully attempted to execute URB Step #3(a) or, if applicable, URB Step #3(b). The Managers fully communicated the offer, including the payor(s), form, means, and timing of payment(s) consistent with URB Step #3(a) or, if applicable, URB Step #3(b). In addition, if applicable, the Managers requested that the intermediary communicate the same information to the Target. Also, if the Managers met solely with the intermediary, they held firm beliefs, at the time of their communications to him/her, that the intermediary's compliance with the instructions was substantially certain to occur.

310.     However, on information and belief, the Target or intermediary rejected the URB Scheme offer.

311.     On information and belief, the Target ceased conducting business with RJ, Aliyah, the Offshore Affiliate, MIA, and the Shadow Bank subsequent to the URB Scheme offer. The

Target declined to continue any partnership, symbolic or otherwise, with any of them.

312.     Around the time that the URB Scheme failed, the Offshore Affiliate ceased promoting Alkebulan #1 Land and the Dakar Exterior. It decided to reprioritize and identify new areas for development outside of the Target's sphere of influence.

313.     However, although he intended to abandon the TRP as well, RJ, acting on behalf of the Offshore Affiliate, continued to promote the TRP for the purpose of deceiving Plaintiff and Ade into thinking the project would remain active.

**f.     The rebooted Alkebulan, moved to Ngogom:**

*Timeframe and terminology*:

314.     On or around February 28, 2022, Mr. Ndao, a friend and colleague of RJ, introduced RJ to Mayor Ngom.

315.     On or around March 1, 2022, the Offshore Affiliate identified a "new" Alkebulan (i.e., Alkebulan #2), which would be located in Ngogom, Senegal, whose mayor at that time was Mayor Ngom.

316.     Specifically, the Offshore Affiliate identified a target site in Ngogom for Alkebulan #2 (the "Alkebulan #2 Land"). Like the Alkebulan #1 Land, the Alkebulan #2 Land primarily consisted of the country's groundnut-basin parts. Much of it was rural and was historically agriculture intensive. In total, Alkebulan #2 Land spanned approximately 1,000 hectares.

317.     The "Alkebulan #2 Era" means the period beginning on March 1, 2022 and ending at the close of January 31, 2023.

318.     In this Complaint, the "Alkebulan #2 Local Government Partner" means Mayor Ngom or any other person or group of persons exercising sovereign de facto or de jure political jurisdiction over all or any part or subdivision of any of the following: (a) the Diourbel Region;

(b) the Bambey Department (within the Diourbel Region); or (c) Ngom or any other rural district or commune within either the Diourbel Region or the Bambey Department. Each possible combination of persons or groups is an alternatively pled Alkebulan #2 Local Government Partner.

319.    On March 21, 2022, RJ posted the Alkebulan Reboot Announcement to inform Americans the following, among other things: (a) the location of Alkebulan #2 Land; (b) that Mayor Ngom had offered "resources to build special economic zones" for the land; (c) and that the Offshore Affiliate and MIA had entered a new public-private partnership, this time with the Alkebulan #2 Local Government Partner. The Alkebulan Reboot Announcement did not mention Alkebulan #1 or the circumstances causing its collapse.

<u>RJ's assertion of "special economic zones"</u>



320.    The Alkebulan Reboot Announcement showed an event organized by the Alkebulan #2 Local Government Partner for MIA and the Offshore Affiliate to mark the beginning of the above-noted public-private partnership. Upon RJ's instruction, Aliyah travelled to Ngom to attend the event with RJ. Aliyah attended as (a) owner-manager of the Shadow Bank, which in turn was acting pursuant to pre-established duties it was performing for the Offshore Affiliate; and (b) MIA partner, under instructions from RJ (who managed foreign-government relations at MIA).

The MIA Hero's Welcome & Aliyah, RJ, and Mayor Ngom in Alkebulan Reboot Announcement



*Alkebulan #2 Land in national domain and not subject to private ownership/transfer*:

321.     During the Alkebulan #2 Era, virtually all of the Alkebulan #2 Land (if not all) was in Senegal's national domain.

322.     Of the national-domain areas within Alkebulan #2 Land, almost all of it (if not all) was located in territorial zone(s) during this period.

323.     The applicable rural council ("Alkebulan #2 Rural Council") overseeing Alkebulan #2 Land, led by Ngom, was charged with administering the Alkebulan #2 Land in territorial zones.

324.     Mayor Ngom and each member of the Alkebulan #2 Rural Council was a "foreign official" under 15 U.S.C. § 78dd-2(h)(2)(A).

325.     During Alkebulan #2 Era, such council, which is one of the alternative Alkebulan #2 Local Government Partners previously pled, was responsible for allocating and deallocating

conditional, non-ownership usage rights over Alkebulan #2 Land in territorial zones. Such rights may be referred to as "Alkebulan #2 Land Usage Rights." In all material respects, the Alkebulan #2 Land Usage Rights offered functionally the same rights, obligations, limitations, and practical implications (except for geography) as Alkebulan #1 Land Usage Rights did. Under Senegalese law, the council's authority did not extend to authorizing private ownership. The Managers, having been regularly advised by legal counsel during both the Alkebulan #1 and #2 Eras, knew the circumstances described in this paragraph.

326.    In addition, neither MIA nor the Offshore Affiliate ever received resources or authorization, from the Alkebulan #2 Local Government Partner or otherwise, to develop a "special economic zone" in Ngogom, at least one recognized under Senegalese law.

*Alkebulan #2 Land Fraud*

*Scheme as one part of the business:*

327.    On or around March 1, 2022, in contemplation of the above-described public-private partnership in Ngogom, the Managers met for a conversation, either by phone or by protocol allowing real-time, peer-to-peer audiovisual exchange. During this meeting, the Managers knowingly and willfully devised a scheme to defraud Americans, or to obtain their money or property by means of false pretenses, representations, or promises (the "Alkebulan #2 Land Fraud Scheme").

328.    During their discussion, the Managers agreed that the Alkebulan #2 Land Fraud Scheme would be identical in all material respects—intentions, assumptions, premises, rationale, tactics and influence operations, individual roles and agency duties—to the Alkebulan #1 Land Fraud Scheme.

329.    During the Alkebulan #2 Era, the Shadow Bank, MIA, and the Offshore Affiliate

continued to perform their regular business operations. These included activities both related and unrelated to Alkebulan #2 Land.

330.    In addition, though, the Managers began executing the Alkebulan #2 Land Fraud Scheme on or around May 1, 2022, consistent with their planning.

331.    The Managers used the alkebulan.city site to promote Alkebulan #2 Land and accept applications to purchase its plots. On information and belief, Aliyah posted this website content pursuant to the "Alkebulan #2 Land Fraud Agency," which was identical in all material respects to the Alkebulan #1 Land Fraud Agency (except for geography). The site retained the "APPLY NOW" button(s) and links, but it changed the "Our Projects" page to reflect Alkebulan #2 Land. *See, e.g.,* Alkebulan Development Group, *Our Main Development Projects* (archived May 22, 2022), alkebulan.city/our-projects [https://web.archive.org/web/20220522075339/https://alkebulan.city/our-projects].

332.    During the Alkebulan #2 Era, to expand the reach of the Alkebulan #2 Land Fraud Scheme, the Managers, acting pursuant to their agreed-upon roles and capacities, further used social media to promote and "sell" American victims plots of Alkebulan #2 Land. In this regard, they designed and promoted simulations of various "zones" that Alkebulan #2 would have, including residential, industrial, and agricultural zones. Furthermore, they emphasized that Americans could "buy & flip" their Alkebulan #2 properties.

[SPACE INTENTIONALLY LEFT BLANK. PARAGRAPH #333 BEGINS ON NEXT PAGE.]

Illustrative Alkebulan #2 Land promotion on social media



333.    During the Alkebulan #2 Era, numerous Americans who had "purchased" Alkebulan #1 Land complained to the Managers that they had acquired (purported) rights in an abandoned city project. RJ offered to swap or exchange their plots for those in Alkebulan #2 Land, knowing this suggestion was wholly detached from the facts, law, and practical realities of the situation. However, the "swap" ploy temporarily calmed the disgruntled Alkebulan #1 Land purchasers.

334.    Throughout the Alkebulan #2 Era, the Offshore Affiliate continued creating the appearance that the TRP was viable and developing successfully. To this end, it promoted the project through social media and the alekbulan.city site as well as through RJ's public appearances.

*Launch of Alkebulan #2 coinciding with RJ's attempted bribe:*

335.    On information and belief,[33] in or around the first week of November of 2022, RJ knowingly and willfully decided to commit "URB Scheme #2."

336.    In this regard, RJ decided that the URB Scheme #2 would be identical in its planned

---

[33] Based on, among other things, the contemporaneous "launch" of the city; the nature of the Alkebulan #2 Land Fraud; RJ's adherence to earlier patterns of conduct; the unwarranted and false content in Alkebulan #2 Land promotions; the events surrounding the city's "launch"; and the inevitable fallout and detection absent an arrangement.

actions and demands, in all material respects, to the URB Scheme except that (a) the target would be Mayor Ngom, a member of the Alkebulan #2 Rural Council, or an intermediary to one of the foregoing; (b) the land usage rights would concern territorial-zone Alkebulan #2 Land; (c) he would act unilaterally; and (d) the payor(s) of the bribe would be a combination of MIA and the Offshore Affiliate (i.e., the Shadow Bank would be excluded).

337.     Regarding the URB Scheme #2, RJ once again believed that, by acquiring these rights, he could mitigate or conceal the absence of title conveyed to American victims (now, under the Alkebulan #2 Land Fraud Scheme), such as by avoiding local land disputes. And, once again, he knew that Senegalese law did not authorize the contemplated payment(s) in exchange for usage rights designated according to his instructions. Thus, RJ, knowing the URB Scheme #2 would be improper and wrongful, intended that the applicable foreign official(s) circumvent legal criteria and guidelines for land allocations and misuse their power. RJ's intended business purposes, which affected MIA, the Offshore Affiliate, and even the Shadow Bank, were the same as he held for the URB Scheme in all material respects (except for the geography).

338.     On information and belief, on or around November 12, 2022, RJ knowingly attended an event marking the "launch" of this new Alkebulan City.

339.     Shortly before or after the event, acting on behalf of both MIA and the Offshore Affiliate, RJ physically approached Mayor Ngom, a member of the Alkebulan #2 Rural Council, or an intermediary to one of the foregoing. On information and belief, RJ knowingly communicated the offer to pay for Alkebulan #2 Land usage rights, specifying the payor(s), form, means, and timing of the payment(s). If the person with whom RJ spoke was an intermediary, RJ instructed the intermediary to communicate his message to Mayor Ngom or a member of the Alkebulan #2 Rural Council. Also, in this "intermediary" alternative, RJ held a firm belief, at the

time of his communications to him/her, that the intermediary's compliance with the instructions was substantially certain to occur.

340.    Plaintiff lacks information and belief on the result of the URB Scheme #2.

341.    But, on or around November 1, 2022, *another* Alkebulan-specific business was announced. On information and belief, it was a partnership or other unincorporated business. It was named one or more of the following: the Alkebulan Agency, the Alkebulan Agency MP West Africa, or the Alkebulan Agency MP. This business may be referred to as the "Alkebulan #2 Manager." On information and belief, RJ held an interest of 50% of the profits/loss, capital, distributions, and management rights of the Alkebulan #2 Manager as of November 30, 2022.

342.    On information and belief,[34] the Alkebulan #2 Manager's purpose was to service current *and future* residents of, and businesses operating on, Alkebulan #2 Land and the surrounding areas. Upon formation, the Alkebulan #2 Manager undertook consulting and advertising engagements for various real-estate development projects. Often, it relied on the internet to advertise its services, perform its engagements remotely (when possible), and transmit its deliverables, including for clients in the United States. Also, the Alkebulan #2 Manager reviewed and issued recommendations for a city-project plan relating to Alkebulan #2 Land. In this unamended Complaint, the Alkebulan #2 Manager was not delegated any governmental authority or functions from the Alkebulan #2 Local Government Partner.

g.    **Americans have questions, RJ is jailed twice, Aliyah bails on MIA, RJ hides:**

343.    The Managers performed their agreed-upon roles under the Alkebulan #2 Land Fraud Scheme continuously through the end of the Alkebulan #2 Era (around January 31, 2023).

344.    Around December of 2022, though, MIA ceased substantially all on-the-ground

---

[34] Including inferences from vaguely worded promotional material on social-media accounts controlled wholly or partially by RJ.

operations in Senegal. MIA reestablished its principal place of business in Akron, Ohio, at the Flanders Avenue Residence.

345.     In December of 2022 and January of 2023, the Offshore Affiliate and the Shadow Bank performed the overwhelming bulk of Alkebulan #2-specific work without MIA.

346.     Around December of 2022 and January of 2023, the Obadare Family became worried about the apparent changes in MIA and Offshore Affiliate activities. They unsuccessfully attempted to contact RJ repeatedly during this period.  On the few occasions in which RJ returned messages, he assured them that the TRP remained viable and had investor support, although more was needed.

347.     On or around January 5, 2023, RJ, acting on behalf of the Offshore Affiliate, prepared and issued an annual letter for the TRP investors (Plaintiff being the sole investor). In the letter, RJ applauded "swift progress" on the TRP. He also cited construction tasks as being completed that he knew had not been. RJ issued the letter to conceal material facts relating to his wrongdoing and delay detection that the Transitional Property Representations were false. Plaintiff relied on this letter and thus, in January of 2023, did not yet fully investigate the Transitional Property Representations.

348.     In or around January of 2023, Americans began voicing concerns that MIA, the Offshore Affiliate, and RJ Mahdi were engaged in fraudulent practices. However, few acted.

349.     At this time, Aliyah decided to distance herself, at least in the public eye, from her "husband," RJ.

350.     Thus, around this time, three related events occurred marking the end of the MIA Partnership: (1) Aliyah dissociated from MIA by expressing her will to withdraw; (2) MIA

dissolved;[35] (3) RJ reestablished the Made in Africa Project as his sole proprietorship, relocating the principal place of business back to Senegal.

351.    At the end of the Alkebulan #2 Era, on or around January 31, 2023, Aliyah ceased participating in activities promoting Alkebulan #2 activities.

352.    But the Offshore Affiliate and the Alkebulan # 2 Manager were not ready to give up. Acting for the latter, RJ created a new YouTube account called "Alkebulan City Senegal" on March 15, 2023. That day, he posted three videos: (a) one in which he stood beside Mayor Ngom, over a map comprising (apparent) parcels in Alkebulan #2 Land, while they discussed land development. Text reading "Signed & Stamped by the Mayor and local administration" hovered over the map; (b) one of simulations relating to a "3D rendering of the 1000 hectare space under development in Senegal[, in the] city named Alkebulan . . . including residential, commercial, agricultural and industrial."; and (c) one in which he was speaking to "local supporters and government officials addressing the meaning and intention behind our 2500 acre city project entitled Alkebulan Senegal."

353.    RJ was arrested in April of 2023 by Senegalese authorities based on allegations of fraud. He was released in May of 2023 and was not charged.

354.    The Obadare Family, upon learning of such arrest in or around April of 2023, began engaging Senegalese professionals to investigate facts about the status of the TRP Investment. In or around July of 2023, as a result of their due diligence and expenditures made in connection therewith (as alleged later), Plaintiff and Ade discovered, among other things, that the Transitional Property Representations were false because of the specific reasons set forth previously.

355.    On or around June 1, 2023, the Made in Africa Project ceased performing certain

---

[35] This is not intended to imply that MIA also conducted a bona fide "winding up" of its assets upon dissolution.

repatriation-assistance services. Similarly, the Shadow Bank, which was still operating, ceased accepting *new* members for "Exodus Club 2.0."

356.    On June 24, 2023, facing mounting calls for accountability, RJ, on an interview with African Diaspora News Channel, (a) denied ever committing acts of fraud; (b) attempted to degrade Dr. Julius Garvey and the Marcus Garvey Institute for Human Development (they would not associate with RJ or his tactics); and (c) explained his desire to prioritize other initiatives. *See* Fraud Denial Video. His defiant appearance caused much of the public scrutiny to subside.

357.    In or around June of 2023, the Obadare Family accused RJ and the Offshore Affiliate of fraud and demanded a refund of the money Plaintiff had invested in the TRP. RJ and the Offshore Affiliate refused.

358.    RJ dissolved the Offshore Affiliate on or around September 1, 2023.

359.    In or around September of 2023, RJ was arrested by local police in Dakar, Senegal, upon complaint filed by the Obadare Family by and through their Senegalese attorney. RJ was released with instructions to return for questioning in a few days. When RJ returned and complied, he was released without charges.

360.    On November 12, 2023, RJ emailed the Obadare Family, offering to "transfer" the TRP to them. His proposed agreement, a copy of which is attached at **Exhibit G**, required that Plaintiff and Ade make *additional* payments, except this time to Mr. Ndao, who was identified as the "property owner." Payments to Mr. Ndao, who held political aspirations, were required to be paid to Solutions Sociales.[36] In fact, Mr. Ndao was not the property owner because, on information and belief, the underlying land was in territorial zone(s) falling within Senegal's national domain. RJ also stated the following in the email:

---

[36] The Complaint lacks information and belief regarding the ownership of the designated account in the proposed agreement and whether Mr. Ndao even knew about the agreement at all.

In lieu of the investigation you launched on me, our other intended investors have declined to invest the proposed $900,000 needed to complete the Pink Lake project. They have decided the working partnership between you and I has been tainted and therefore they are not interested in coming onboard. Additionally, since you have taken to the internet to reach out to my other members and investors in efforts to defame me, essentially making it more difficult to achieve our goal, I will no longer be working to secure new investors for this project.

361.    The Obadare Family disregarded the email and the "transfer agreement."

362.    In or around January of 2024, federal law enforcement in Senegal issued an arrest warrant for RJ.

363.    RJ, since learning of this most recent warrant, has generally remained (a) in hiding; (b) in de facto "legal sanctuaries" (including those within Senegal); and/or (c) in jurisdictions outside of Senegal. During the past year, on information and belief, RJ has travelled between Ohio and Africa, in the latter part staying mostly in Medina Baye, Senegal and in parts of Nigeria. During this time, RJ has scrubbed the alkebulan.city site of content.

364.    However, he has appeared in isolated and choreographed pictures, which he has caused to be posted on social media.

**h.      Plaintiff, the Enterprise and its components**

*The Managers as Defendants:*

365.    Plaintiff, being an individual, is a person under 18 U.S.C § 1961(3).

*The Managers as Defendants:*

366.    The Managers, being individuals, are persons under 18 U.S.C § 1961(3).

*The Enterprises:*

367.    During the Alkebulan #1 and #2 Eras, the Shadow Bank, Offshore Affiliate, and MIA (i.e., the previously defined Alkebulan Enterprise) were associated in fact and constituted an "enterprise" under 18 U.S.C. § 1961(4). However, upon legal holding or factual findings (a) that

the Managers were indistinct from MIA; and (B) as a result, they were indistinct from the Alkebulan Enterprise, then the Alkebulan Enterprise shall exclude MIA.[37] Each of the above members, in these alternatives, may be referred to as an "AE Member."

368.    Consistent with the above allegations, the Alkebulan Enterprise's structure was well defined during the Alkebulan #1 and #2 Eras. In this regard, its purpose was to finance, advise, facilitate, and promote an agenda of mass repatriation from the United States to Africa, particularly to Senegal, in order to advance Senegalese governmental interests and to maximize profit from the same. As previously described, the organization and relationships among the AE Members were developed to capitalize on the complementary business models for the above purposes. The result was that operations of the members were a systematically integrated, coordinated, and economically interdependent. Furthermore, the Managers knew about the above structure at all times. Indeed, they largely designed it.

369.    Because of its above-noted purposes and the services performed to advance them, the Alkebulan Enterprise was engaged in interstate and foreign commerce during such eras.

370.    As described in prior sections, during the Alkebulan #1 and #2 Eras, the Managers exercised managerial roles in the Alkebulan Enterprise's affairs. Regarding all actions undertaken within their applicable roles and capacities described in the Complaint, the Managers either made the underlying decisions to act on behalf of the Alkebulan Enterprise or, in certain instances, at least knowingly carried out such decisions.

371.    During the Alkebulan #1 and #2 Eras, within their applicable roles and capacities described in the Complaint, the Managers directed such affairs, both for the lawful and unlawful activities of the enterprise. At all times, the Managers were aware of (a) how their managerial roles

---

[37] For instance, depending on how the Court applies or extends the reasoning of *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493–94 (6th Cir. 2013), along with similar authorities.

influenced the enterprise's conduct; and (b) how their sustained and unwavering cooperation, through multiple organizations presenting a unified message and employing specialized functions, allowed the enterprise to commit acts otherwise impossible. Such collective acts included, counterintuitively, those requiring the use of AE Members' legally distinct organizations and their geographic dispersion.

372.    On information and belief, throughout the period beginning on November 1, 2022 and ending at the close of October 31, 2024, both dates being approximate and inclusive, the Alkebulan #2 Manager was a partnership and an "enterprise" under 18 U.S.C. § 1961(4). It was formed for the purposes previously described, and it carried out business during the above-noted period in Ngogom, Senegal for such purposes.

373.    On information and belief, the Alkebulan #2 Manager necessarily required, in its city-planning and consulting functions, regular use of cross-border communications, transport, funds transfers, and delivery of goods. Interested clients also required transportation between the United States and Ngogom, Senegal. Thus, it was engaged in, or its activities affected, interstate or foreign commerce.

**i.     Enterprise transactions: internal and external**

374.    In this Complaint, "External Payments" and "External Income" are payments and net income, respectively, that derive from persons *other than* AE Members. For this purpose, net income assumes the same basis of accounting (including expense allocation and apportionment) that the AE Members regularly used to prepare their books and records during the Alkebulan #1 and #2 Eras. As a result, it comprised both lawful and unlawful sources.

*External - forms and means for all AE Members*:

375.    On information and belief, during the Alkebulan #1 and #2 Eras, each of the AE

Members made and received External Payments through a range of means and in numerous forms. These included, among others, the following: (a) money transferred by common mobile and electronic-payment applications (e.g., Zelle, Cash App); (b) funds sent by domestic and international wire transfers, particularly in the case of the Offshore Affiliate; (c) physical delivery of property or foreign currency; (d) AKL Lumi transactions; (e); cryptocurrency transactions, particularly in the case of MIA; (f) PayDunya payments; and (g) bartering goods and services.[38]

*Aliyah's Account*:

376.    During the Alkebulan #1 and #2 Eras, MIA deposited a portion of its gross receipts (e.g., investor-club membership fees, proceeds from "sales" of land rights for non-Alkebulan property, fees for tourist and consulting services, etc.) into bank account(s) located in the United States. In these instances, MIA did so substantially, if not exclusively, into an account Aliyah individually maintained.

377.    In this regard, throughout the Performance Years, Aliyah maintained at least one deposit account in the United States ("Aliyah's Account").

378.    Aliyah's account was a checking account that she opened in or around Akron, Ohio around 2013 to 2014. This timing coincided closing with Aliyah's claimed repatriation to Africa.

379.    During an oral exchange in or around January of 2021, RJ Mahdi informed Ade that Aliyah's account was "our [i.e., the Managers'] only remaining tie to the United States."

380.    On information and belief, Aliyah's account comprised personal funds commingled with various "Mahdi" business receipts, especially those for the MIA Partnership.

---

[38] Information and belief for the paragraph is based on open-source investigation and the Managers' public-facing payment accounts; inferences from statements made by or attributable to RJ, including during Exodus Radio episodes, with respect to his businesses, his dissatisfaction with "Western" payment systems and the U.S. dollar,  his near-term commitments to adopt new payment methods, and his form of requests for contributions and donations solicited during the relevant timeframe; among other circumstances.

381.    On information and belief, Aliyah's account was maintained solely in Aliyah's name. Aliyah retained the exclusive rights under account agreement(s) to transact in it.

382.    But, as a business partner, RJ also exercised influence over Aliyah's use of the account, including over the nature, amount, timing, and form of MIA expenditures.

383.    During the Alkebulan #1 and #2 Eras, MIA also deposited a portion of its gross receipts into bank account(s) outside the United States, including in Senegal. In these instances, MIA frequently did so through accounts in which RJ individually maintained a financial interest and over which he held authority.

*The Managers' disguised, reciprocal interests*:

384.    Upon information and belief, Aliyah held a disguised interest, founded on arrangements with RJ, in the Offshore Affiliate during the Alkebulan #1 and #2 Eras.[39] The interest generally provided Aliyah, in Ohio, a share of the Offshore Affiliate's External Income approximately equal to RJ's interest in the same.

385.    Upon information and belief, RJ held a disguised interest, founded on arrangements with Aliyah, in the Shadow Bank during the Alkebulan #1 and #2 Eras. The interest generally provided RJ, in Senegal, a share of the Shadow Bank's External Income approximately equal to Aliyah's interest in the same.

386.    Upon information and belief, on or around January 1, 2020, the Managers, knowingly and willfully, conspired and agreed to record false events ("Settlement Events") in the official books and records of the Shadow Bank and the Offshore Affiliate. (The Offshore Affiliate

---

[39] Information and belief is based on, among other circumstances, the complementary nature of the Managers' affiliated entities and their business relationships; the Managers' pattern of dividing profits from their business activities close to equally; and Aliyah's public appearances with RJ as his "wife" for Offshore Affiliate activities with foreign-government officials. Although there is at least one instance archived in which Aliyah apparently described herself as a "Founding Member" of the Offshore Affiliate, the Complaint does not rely on this isolated reference.

was in a pre-formation, planning phase at this time.) The Managers intended that the books and records, in turn, be used in tax reporting (subject to book-to-tax conversions, etc.) and for other uses potentially subject to external inspection or oversight. In tandem, the Managers further intended and agreed to coordinate and effect financial transactions among AE Members that would coincide with, and appear to arise from, the Settlement Events. As support, the Managers agreed to substantiate the Settlement Events by preparing false invoices and other source documents. The agreement in this paragraph may be referred to as the "SBML Conspiracy." This SBML Conspiracy was carried out, as planned, throughout the Alkebulan #1 and #2 Eras.

387.    Through the SBML Conspiracy, the Managers intended to disguise the ownership and control of the Settlement-Event funds, particularly those ultimately intended for Aliyah's benefit. The Managers knew that a substantial share of proceeds received by the Offshore Affiliate would constitute misappropriations from sham land sales and other sources, including, as subsequently alleged, proceeds from services performed as unregistered foreign agents. However, the Offshore Affiliate's distribution to one or more of its owners, for instance, of misappropriated gross proceeds could be incriminating, particularly if there were no contemporaneous expenditures traceable to designated purposes (e.g., a transfer of land-sale proceeds to a "purchaser" or rural-council member). But, pursuant to the SBML Conspiracy, the Managers intended to combine their disguised interests and Settlement Events to complicate the paper trail and allow flexibility for later explanation, at least for some transfers.

388.    On information and belief, the Managers ordinarily measured their disguised interests through due-to/from accounts (the "DTDF Accounts"). Pursuant to the SBML Conspiracy, such accounts would be kept in ledgers apart from the entities' official books and records.

389.     On information and belief, the DTDF Accounts allowed a share of each entity's External Income items (i.e., items figuring into this calculation), to be set aside and effectively allocated to the disguised interest.

390.     Upon information and belief, the DTDF Account(s) representing Aliyah's interest in the Offshore Affiliate routinely accumulated larger balances than the DTDF Account(s) representing RJ's interest in the Shadow Bank. During the Alkebulan #1 and #2 Eras, this imbalance arose because the Offshore Affiliate earned substantially more than the Shadow Bank.

391.     Upon information and belief, based on their liquidity needs, the Managers routinely required that the entities net DTDF Accounts and "settle" during the Alkebulan #1 and #2 Eras. By settling, the entity with the resulting credit balance in its DTDF Account would, pursuant to the SBML Conspiracy, pay at the direction of the Manager owed the balance.

392.      Upon information and belief, settling normally required the Offshore Affiliate to pay down the (net) credit balance in its DTDF Account.

*Settlement Events*:

393.     Because the DTDF Accounts were not maintained in the entities' official books and records, the Offshore Affiliate and the Shadow Bank, acting through RJ and Aliyah, respectively, required pretexts to effect settlement. These were the above-mentioned Settlement Events.

394.     On information and belief, the Offshore Affiliate typically needed a suitable "debit" for Settlement Events. Its choice was often to debit an expense for services it did not receive. In this regard, Aliyah often directed that RJ, through the Offshore Affiliate, pay on sham invoices issued by the Shadow Bank. For instance, because the Shadow Bank's Other Investment Advisor function was vague and broad, the Managers agreed, pursuant to the SBML Conspiracy, that Aliyah would prepare invoices or statements on its behalf that were related, in some respect, to

contemporaneous work of the Offshore Affiliate. The invoiced *service* constituted a Settlement Event.

395.    After the Alkebulan #2 Era, Aliyah, through the Shadow Bank, significantly increased the public visibility of the SBML Front. Among other actions, she registered TFG Official's domain (tfgofficial.com) under the Shadow Bank, in Akron, Ohio, in 2023. On information and belief, Aliyah became increasingly concerned about ongoing (American) public and Senegalese law-enforcement scrutiny of her and RJ's actions. On information and belief, this timing also coincided closely with the dissolution of the Offshore Affiliate and/or with its mass liquidation and distribution of substantially all its assets. Ultimately, the risk that Settlement Events would be detected or flagged as suspicious by 2023 had increased. She believed the SBML Front, particularly TFG Capital (seemingly handing out loans and unregulated investment advice regarding securities on demand), provided a new, superficially more credible pretext.

*Offshore Affiliate transfers – the dilemma*:

396.    On the other hand, during the Alkebulan #1 and #2 Eras, RJ confronted similar challenges, including how to divert the Offshore Affiliate's earnings, particularly those derived from unlawful gains, to himself and to his Alkebulan #2 agenda. For instance, his immediate withdrawal or distribution of Alkebulan #1 "land-sale" proceeds to himself, without more, would render him vulnerable in a later investigation. Thus, he needed to complicate the paper trail, ideally through pretextual business uses for the funds. For this purpose, RJ designed numerous transaction sequences, but on information and belief, he relied overwhelmingly on two.

*Transfer Channel 1: designated non-financial businesses and professions*

397.    During the Alkebulan #1 and #2 Eras, the Offshore Affiliate maintained an extensive network of close business and professional ties in Senegal. These included real estate

agents, lawyers, accountants, and, on information and belief, gold dealers. Collectively, they are referred to as the "DNFBPs."

398.    During the Alkebulan #1 and #2 Eras,[40] many of the DNFBPs lacked reasonable supervisory oversight or guidelines with respect to carrying out Senegal's national anti-money laundering objectives.[41] On information and belief, RJ, through the Offshore Affiliate, regularly paid DNFBPs during this period on the condition that, in exchange for a fee for their "services," they would (a) contract with MIA or Solutions Sociales (for nonexistent services); (b) contract with a personal vendor of RJ, for RJ's benefit; or (c) refund the payment, at the direction of the Offshore Affiliate, to RJ in a form he specified. The various sequences described in this paragraph are referred to as "Transfer Channel 1." When RJ used Transfer Channel 1 to divert proceeds through MIA or Solutions Sociales, he ensured the recipient account or other asset class receiving the inflow was one in which he could access. Then, he would appropriate the proceeds for himself or contract with another intended recipient, such as the Alkebulan #2 Manager. Alternatively, Transfer Channel 1 provided an alternative path to direct proceeds to the Shadow Bank, avoiding the appearance that the Offshore Affiliate conducted a suspicious number of service-based transactions with its U.S. affiliate.

*Transfer Channel 2: kill the paper trail, recreate new one based on fake receipts*

399.    In "Transfer Channel 2," RJ directly withdrew CFA francs from bank account(s) in

---

[40] But not necessarily subsequent to this period, particularly under Senegal's current administration.

[41] *See, e.g., "*Recommendation 34" at FATF, *International Standards On Combating Money Laundering and The Financing of Terrorism & Proliferation the FATF Recommendations* (updated Nov. 2023), Available online at: https://www.fatf-gafi.org/content/dam/fatf-gafi/recommendations/FATF%20Recommendations%202012.pdf.coredownload.inline.pdf (Last visited November 6, 2024). *See also "*Recommendation 34" evaluation at GIABA, *Senegal 3rd Enhanced Follow-up Report & Technical Compliance Re-Rating* (June 2022), Available online at: https://www.giaba.org/Frame/pdfviewer%7C%7C23f992d23aa1462590d8632df77fb7eea33ce70f6cda031d877ac97562cb5774%7C%7CENG%20-%20SENEGAL%20-%203rd%20FUR%20for%20Publication%20dev62022.pdf (Last visited November 6, 2024).

the name of the Offshore Affiliate. Then, on information and belief, RJ alternated between the following: (a) conducting the same types of pretextual transfers as in Transfer Channel 1 (except using foreign currency); or (b) preparing sham invoices and other source documents for goods and services not actually purchased. Either way, RJ used Transfer Channel 2 to divert "land-sale" and other proceeds to himself or his desired recipients. On information and belief, RJ predominantly used an account with NSIA Banque in the Offshore Affiliate's name when effecting Transfer Channel 2 withdrawals. This approach allowed a diversity of techniques while taking advantage of cash-intensive local economies, which in turn provided RJ an excuse for the initial withdrawals.

400.    On information and belief,[42] RJ frequently added another layer of protection to Transfer Channels #1 and #2, by (a) notifying victims that source documents were uploaded to a shared folder or drive; (b) uploading the purported invoices (or a document so titled), etc. for a trivial length of time; (c) removing the documents from the shared folder or drive; and (d) blaming the victim's internet service or other technical issues for the inability to thereafter retrieve them.

**j.    Willful Failures to Register under FARA**

401.    The below allegations concern predicate violations for acts of money laundering, which in turn provide predicate offenses for the overriding RICO claims in the Complaint.

402.    During the Alkebulan #1 Era and the portion of the Alkebulan #2 Era before December of 2022, MIA was a "foreign principal" under 22 U.S.C. § 611(b)(3) because it had its principal place of business in Senegal.

403.    During its existence, the Alkebulan #2 Manager was a "foreign principal" under 22 U.S.C. § 611(b)(3) because it had its principal place of business in, and it was organized under the laws of, Senegal.

---

[42] Based on, among other information, observations obtained from third-party media account(s).

404.    During the Alkebulan #1 and #2 Eras, RJ was a "foreign principal" under  22 U.S.C. § 611(b)(2) because he was an individual (a) outside the U.S. who was (b) domiciled in Senegal.

405.    During the Alkebulan #1 and #2 Eras, the Alkebulan #1 Local Government Partner, the Senegalese Agency for the Promotion of Tourism (the "SAPT"), and the Alkebulan #2 Local Government Partner were "foreign principals" under  22 U.S.C. § 611(b)(1) because each was a government of a foreign country under 22 U.S.C. § 611(e). Specifically, each exercised "sovereign de facto or de jure political jurisdiction" over a part of Senegal or was a subdivision of a group exercising such jurisdiction. Alternatively, each was a "group or agency to which such sovereign de facto or de jure authority or functions [we]re directly or indirectly delegated."

_Key relationships_:

406.    During the Alkebulan #1 and #2 Eras, Aliyah agreed to and did, in fact, act as an agent for MIA, in her role as a partner. Thus, this relationship even extended to the Exodus-Planning USTB and over receipts deposited in Aliyah's Account (in the United States).

407.    During the Alkebulan #1 and #2 Eras, Aliyah agreed to and did, in fact, act as an agent or representative for, acted at the order or command of, and/or acted under the direction and control of each of the following additional foreign principals: (a) the Offshore Affiliate; and (b) RJ. These relationships are referred to, individually and collectively, as the "Control over Aliyah."

408.    On information and belief, the Control over Aliyah resulted from personal, reputational, and financial leverage that RJ, in his individual and Offshore Affiliate capacities, exercised over Aliyah (i.e., not merely through financial "support"). Regarding financial leverage, the overwhelming share of cash receipts and other property received by Managers' businesses was received in Africa.[43] When Aliyah requested funds transfers or other access to assets from Africa,

---

[43] This is so notwithstanding the substantial loan-interest income, alone, the Shadow Bank has received in the U.S. on its (purported) $22,000,000,000 of loans issued since its 2019 inception.

as she routinely did to cover personal expenses, she required that pretextual transfer(s) be coordinated, as previously alleged. Holding possession and control of the assets, RJ then exploited his position by threatening to withhold payment unless Aliyah strictly complied with the relevant duties and assignments. In his varying capacities, RJ thus possessed and exercised power to determine Aliyah's policies or activities. *See* 28 C.F.R. § 5.100(b).

409.    The Shadow Bank similarly agreed to and did, in fact, act as an agent or representative for, acted at the order or command of, and/or acted under the direct and control of the Offshore Affiliate, with respect to assigned promotional appearances and other marketing tasks during the Alkebulan #1 and #2 Eras. This control (the "Control over the Shadow Bank") stemmed from the same circumstances at noted for Aliyah, who was owner-manager of the Shadow Bank.

410.    During the Alkebulan #1 and #2 Eras, RJ agreed to and did, in fact, act as partner/owner-manager for MIA and the Offshore Affiliate, and he was thus an agent of both.

411.    For the parts of the Alkebulan #1 Era following the previously referenced "convention" with the Alkebulan #1 Local Government Partner through the URB Scheme Window, RJ agreed to and did, in fact, act as agent and representative for Alkebulan #1 Local Government Partner.

412.    During the Alkebulan #2 Manager's existence, RJ was a partner and agent.

413.    On information and belief, during Alkebulan #1 and #2 Eras, MIA agreed to and did, in fact, act as representative and agent on behalf of the SAPT for certain promotional functions. As noted by RJ, MIA maintained a partnership with this governmental subdivision, which authorized the agency relationship based on MIA's track record in mobilizing "exodus" from the United States.

*Aliyah's political activities*:

414.     In actions noted throughout the Complaint, Aliyah engaged in "political activities" under 22 U.S.C. § 611(o) as an agent for MIA. During the Alkebulan #1 and #2 Era, these included, among others, her promotions on behalf of the Exodus-Planning USTB and the Exodus Club.[44] Aliyah believed that these exodus-themed activities would, and she intended them to, influence the African Diaspora residing in the United States with reference to "political or public interests, policies, or relations of" the Senegalese government and its subdivisions.[45] Furthermore, these activities "directly promote[d] the public or political interests of a foreign government" because they promoted the expatriation—indeed, the unconditional "exodus" of Americans and their assets—from the United States to Africa, particularly to Senegal. *See* 28 C.F.R. § 5.304(c).

415.     In the alternative, Aliyah engaged in the same "political activities" described in the preceding paragraph, for purposes of 22 U.S.C. § 611(o), except under RJ's Control over Aliyah.

416.     Aliyah, acting individually and through the Shadow Bank, also engaged in such "political activities" under the Offshore Affiliate's Control over Aliyah and its Control over the Shadow Bank. In this regard, the Complaint has alleged her activities for this foreign principal to directly advance U.S.-exodus and related agendas. Aliyah believed that these activities would, and she intended them to, influence the African Diaspora residing in the United States with reference to "the political or public interests, policies, or relations of" the Senegalese government and its subdivisions. Once again, the activities "directly promote[d] the public or political interests of a foreign government" because they attempted to induce abandonment of the U.S. in favor of another

---

[44] The Complaint forgoes allegations based on Aliyah's and RJ's actions as publicity-agents under FARA, and the allegations do not extend to repatriation financing or the solicitation of donations within the U.S. for exodus themes.

[45] Regarding the U.S. Department of Justice's characterization of the Diaspora as a section of the public for FARA purposes, *see, e.g.,* Advisory Opinion, U.S. Department of Justice, FARA Registration Unit (October 24, 2021). Available online at:
https://www.justice.gov/d9/pages/attachments/2022/02/07/10.24.2021_advisory_opinion_agency_0.pdf (Last visited November 14, 2024).

country.

*RJ's political activities*:

417.    In actions noted throughout this Complaint, RJ engaged in "political activities" under 22 U.S.C. § 611(o) as an agent for the Offshore Affiliate through its exodus-theme promotions and targeting of Americans, through the internet, during the Alkebulan #1 and #2 Eras.

418.    Additionally, during the Alkebulan #1 and #2 Eras, RJ engaged in "political activities" under 22 U.S.C. § 611(o) as an agent for MIA by, among other things, promoting the (exodus-themed) touring department, which partnered with the SAPT, to Americans through the internet.

419.    Also, for the part of the Alkebulan #1 Era after the previously referenced "convention" (with the Alkebulan #1 Local Government Partner) through the URB Scheme Window, RJ engaged in "political activities" under 22 U.S.C. § 611(o) as an agent and representative for Alkebulan #1 Local Government Partner to generally promote development in Alkebulan #1. (This agency or representation did not extend to the Alkebulan #1 Land Scheme.)

*MIA's political activities*:

420.    During the Alkebulan #1 and #2 Eras, MIA engaged in "political activities" under 22 U.S.C. § 611(o) as an agent and representative of the SAPT. Acting through the agreed-upon agency and "partnership," MIA promoted its (exodus-themed) touring department to Americans on behalf of the governmental subdivision. MIA acted by and through its Managers. The allegations in this paragraph are on information and belief, including based on previously cited statements of RJ with respect to the SAPT.

*Such political activities occurring "within the United States"*:

421.    During the Alkebulan #1 and #2 Eras, Aliyah's "political activities," under

22 U.S.C. § 611(o), were "within the United States" to the extent they targeted Americans residing in the U.S. through online platforms, websites, social media, virtual-livestream appearances, and emails that were accessed "within the United States." Regardless, except as noted in the Complaint, Aliyah's actions occurred while she was physically present in the United States.

422.    During the Alkebulan #1 and #2 Eras, RJ's "political activities," under 22 U.S.C. § 611(o), were "within the United States" to the extent they targeted Americans residing in the U.S. through online platforms, websites, social media, and emails that were accessed "within the United States." Also, RJ performed many of his "political activities," as attributed to him previously, during his short-term Ohio stays.

423.    During the Alkebulan #1 and #2 Eras, MIA's "political activities," under 22 U.S.C. § 611(o), were "within the United States" to the extent they targeted Americans residing in the U.S. through online platforms, websites, social media, and emails that were accessed "within the United States." These instances included events hosted within the United States in which RJ and/or Aliyah appeared, on behalf of MIA, to discuss Alkebulan #1 Land.[46] To an extent, the activities were also performed by Manager(s) while physically "within the United States."

*With their army of lawyers advising them, their failure to register under FARA was willful*:

424.    During the Alkebulan #1 and #2 Eras, Aliyah, an agent of a foreign principal, was required to complete a registration statement under 22 U.S.C. § 612(a). Throughout this period, Aliyah, being fully apprised of her obligation to file such statement based on advice of counsel, knowingly and willfully failed to file such statement. *See* 22 U.S.C. § 618(a)(1).

425.    During the Alkebulan #1 and #2 Eras, RJ, an agent of a foreign principal, was required to complete a registration statement under 22 U.S.C. § 612(a). Throughout this period,

---

[46] *See, e.g.,* Broward County Library, *Expatriates, Business Interests, and Relocating to Africa* (May 27, 2021), available at http://broward.libnet.info/event/5115517 (last visited Nov. 14, 2024).

RJ, being fully apprised of his obligation to file such statement based on advice of counsel, knowingly and willfully failed to file such statement. *See* 22 U.S.C. § 618(a)(1).

426.    During the Alkebulan #1 and #2 Eras, MIA, an agent of a foreign principal, was required to complete a registration statement under 22 U.S.C. § 612(a). Throughout this period MIA, through its agents being fully apprised of the obligation to file such statement based on advice of counsel, knowingly and willfully failed to file such statement. *See* 22 U.S.C. § 618(a)(1).

**k.    Pattern of racketeering activity**

427.    For purposes of RICO claims in this Complaint, this section addresses two types of predicate offenses: (1) violations of the Travel Act (the "Travel Act"), 18 U.S.C. § 1952 that are founded on violations of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd–1 *et seq.*; and (2) acts of money-laundering under 18 U.S.C. § 1956. But, in one or more counts pled, the Complaint also alleges, as a RICO predicate, wire fraud under 18 U.S.C. § 1343, taking the position that the TRP Investment Contract did not meet the requirements for a security under Section 10(b) of the Exchange Act. This section thus further incorporates wire fraud into an alleged pattern of racketeering activity for purposes of these alternative counts.

*The Travel Act violations: URB Scheme and URB Scheme #2*

428.    As previously alleged, prior to the URB Scheme and the URB Scheme #2, the Manager(s) used social media, online platforms, websites, and other means through the internet to offer nonexistent title to specific Alkebulan plots and to accept cross-border payments for the same (i.e., in connection with the Alkebulan #1 Land Fraud Scheme and Alkebulan #2 Land Fraud Scheme). These acts promoted and managed (or facilitated the promotion and management of) the applicable URB scheme by (a) carefully defining the scheme's territorial-zone plots, whose information was largely inaccessible to Americans conducting due diligence, thereby improving

the likelihood of the scheme's success; and (b) generating funds required to effect the intended bribe(s). Also, foreign travel and other facts bearing on the interstate and foreign commerce components were noted previously.

429.    The attempted URB Scheme and URB Scheme #2 were prohibited acts under the FCPA committed by Aliyah and RJ, acting on behalf of the Shadow Bank and MIA.

430.    Based on prior allegations concerning the URB Scheme, under 18 U.S.C. § 1952, the Managers, acting on behalf of the Shadow Bank and MIA, knowingly and willfully "travel[ed] in interstate or foreign commerce or use[d] . . . any facility in interstate or foreign commerce," intending to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of" acts of bribery prohibited by the FCPA. On information and belief, they thereafter attempted to commit such acts when they unsuccessfully attempted the URB Scheme. *See* 18 U.S.C. § 1952(a).

431.    Regarding the URB Scheme #2, based on prior allegations, RJ knowingly and willfully "travel[ed] in interstate or foreign commerce or use[d] . . . any facility in interstate or foreign commerce," intending to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of" acts of bribery prohibited by the FCPA. On information and belief, RJ thereafter attempted to commit such acts when he unsuccessfully attempted the URB Scheme #2. *See* 18 U.S.C. § 1952(a).

432.    The above noted violations of 18 U.S.C. § 1952 may be referred to as the "Travel Act Predicates."

433.    All conduct relevant to the "focus" of 18 U.S.C. § 1952 occurred in the United States with respect to the first of the two Travel Act Predicates: (a) Aliyah's planning and designing the first violation from Ohio, in conferring with RJ through the means alleged previously; (b)

Aliyah's foreign travel from the United States (Ohio) to join RJ, a U.S. citizen and unregistered foreign agent; (c) Aliyah's holding the requisite intent at the time of foreign travel from the United States; (d) the Managers' representing U.S. entities (formed and/or operating in the U.S.) and designating and maintaining assets in the United States, among others, for purposes of carrying out the intended bribe; (e) the scheme's purpose to secure land rights for expatriating Americans in the United States (without their knowledge and to conceal the title defects); and (f) the origin of the scheme (i.e., Alkebulan land promoting and selling efforts) as well as its target occurring/being within the United States.

434.    All conduct relevant to the "focus" of 18 U.S.C. § 1952 occurred in the United States with respect to the second of the two Travel Act Predicates because of the same reasons as the preceding paragraph, exclusive of Aliyah's participation.

435.    Alternatively, 18 U.S.C. § 1952 should apply extraterritorially to the extent that its own "predicate offenses" apply extraterritorially. In this regard, its "unlawful activity" definition under subsection (b) should be instructive. *Cf. RJR Nabisco v. European Cmty.*, 579 U.S. 325, 339 (2016) (holding that "Congress's incorporation of . . . extraterritorial predicates . . . gives a clear, affirmative indication that [the statute] applies to foreign . . .  activity—but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially."). On these facts, the permissible application of the FCPA would control.

*Money laundering under 18 U.S.C. § 1956*

436.    The gross receipts of AE Members resulting from the above-noted political activities of RJ, Aliyah, and MIA, in the context of their willful and knowing failures to register under 22 U.S.C. § 612, were "proceeds" under 18 U.S.C. § 1956(c)(9). In this regard, they were "derived from or obtained or retained, directly or indirectly, through" the performance of the

political activities at a time when the Managers knew of but willfully disregarded their obligation to register under the Foreign Agents Registration Act ("FARA"), contrary to 22 U.S.C. § 618(a)(1). These proceeds, including all applicable fees, commissions, and other forms of payment, are referred to as the "Foreign-Agent Proceeds." Proceeds from the Alkebulan #1 and #2 Land Fraud Schemes also constituted Foreign-Agent Proceeds because they arose from exodus-themed promotional work carried out by the Managers on behalf of foreign principals.

437.    Through the SBML Conspiracy and false Settlement Events, Aliyah and RJ, residing in U.S. and Senegal, respectively, intended to transfer Foreign-Agent Proceeds from Senegal to the United States (and vice versa) throughout the Alkebulan #1 and #2 Eras, knowing the funds involved in the transfer would represent Foreign-Agent Proceeds and knowing the transfer was designed in whole or in part to conceal or disguise the ownership or control of the Foreign-Agent Proceeds.[47]

438.    Under 18 U.S.C. § 1956(h), the previously alleged SBML Conspiracy, which lasted through the Alkebulan #1 and #2 Eras, was indictable under 18 U.S.C. § 1956, based on subsection (h) thereof, and was thus a RICO predicate offense 18 U.S.C. § 1961. This is so even if no "overt act" was identified. *See Whitfield v. United States*, 543 U.S. 209, 209 (2005) (holding "conspiracy to commit money laundering, in violation of § 1956(h), does not require proof of an overt act.").

439.    On information and belief, throughout the Alkebulan #1 and #2 Eras, and pursuant to the SBML Conspiracy, RJ, under the pretext of Settlement Events, transported, transmitted, or transferred, or attempted to transport, transmit, or transfer monetary instruments or funds to a place

---

[47] Of note, a substantial share of the Foreign-Agent Proceeds were also proceeds from Alkebulan #1 and #2 Land Fraud Schemes. The dual characterization would be appropriate to the extent land-fraud proceeds were also derived from exodus-themed promotional work (carried out by the Managers on behalf of foreign principals). The unamended Complaint, however, has forgone reliance on wire fraud as a predicate, including its Fed. R. Civ. P. 9(b) requirements, relative to numerous American victims. In addition, the Complaint does not rely on 18 U.S.C. § 1962(d). Conspiracy to commit wire fraud is also not a separately available RICO predicate.

in the United States from or through Senegal, with the intent to promote the carrying on of specified unlawful activity: a felony violation of FARA, contrary to 18 U.S.C. § 1956(a)(2). On information and belief,[48] the transactions in this paragraph comprised payments made upon Settlement Events, which occurred approximately each month during Alkebulan #1 and #2 Eras and which totaled approximately $5,000,000, once converted to USD.

440.    Alternatively to the preceding paragraph, throughout the Alkebulan #1 and #2 Eras, and pursuant to the SBML Conspiracy, RJ, under the pretext of Settlement Events, transported, transmitted, or transferred, or attempted to transport, transmit, or transfer Foreign-Agent Proceeds to a place in the United States from or through Senegal, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represented Foreign-Agent Proceeds and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the ownership or control of the Foreign-Agent Proceeds. On information and belief, the transactions in this paragraph comprised payments made upon Settlement Events, which occurred approximately each month during Alkebulan #1 and #2 Eras and which totaled approximately $5,000,000, once converted to USD. Such transactions were contrary to 18 U.S.C. § 1956(a)(2).

441.    Also, on information and belief,[49] throughout the Alkebulan #1 and #2 Eras, Aliyah habitually conducted a specific type of transaction on behalf of the Shadow Bank (the "Extraction Transfers"). Each Extraction Transfer (a) affected interstate or foreign commerce; (b) involved the movement of funds by wire or other means; (c) involved one or more monetary instruments; and/or

---

[48] Including based on inferences from RJ's statements of the scope and scale of the Enterprise operations, among other circumstances.

[49] Including based on the relationships of the AE Members, the Shadow Bank's unique business model and willingness to advertise $400,000 unsecured loans, and the lack of accountability for U.S. victim funds, among other circumstances.

(d) was a transaction involving the use of a financial institution which was engaged in, or the activities of which affected, interstate or foreign commerce. *See* 18 U.S.C. § 1956(c)(4).

442.    For each Extraction Transfer, Aliyah knew that the property involved represented the proceeds of some form of unlawful activity, including Foreign-Agent Proceeds that substantially overlapped with proceeds derived from the Alkebulan land fraud schemes.

443.    Each Extraction Transfer, in fact, transferred property that represented the proceeds from activity described in the preceding paragraph.

444.    To the extent that Aliyah sought to claim and access her "share" of such property, Aliyah knew that the Shadow Bank's immediate distribution, in mass, of land-fraud and Foreign-Agent Proceeds to her (an Akron small-business owner operating from a residence) presented significant risks of detection regarding underlying activities and her benefits therefrom.

445.    On information and belief, the majority of Extraction Transfers were attributable and traceable to property the Shadow Bank had received, at the direction of Aliyah, from the Offshore Affiliate pursuant to Settlement Events.

446.    The Shadow Bank, a small business operating from a residence in Akron, has purported to offer clients repatriation-assistance and other financing, including $400,000 unsecured loans.

447.    On information and belief, in effecting the Extraction Transfers, Aliyah intended the following:

> (a) To conceal and disguise the ownership or control of the proceeds through sham unsecured loans, under the Shadow Bank's loan program, to the following: separate accounts associated with the SBML Front; family members and/or their controlled entities; and/or other recipients under circumstances in which Aliyah expected to derive substantially all of the transferred property's value. In these circumstances, Aliyah did not intend any bona fide debtor-creditor relationship, and the "loans" were not enforced.

> (b) To promote the carrying on of political activities, without registration under

22 U.S.C. § 612(a), giving rise to her above-noted violation(s) of 22 U.S.C. § 618(a)(1).

448.    On information and belief,[50] Aliyah carried out Extraction Transfers approximately once per month, and such transfers totaled approximately $5,000,000.

449.    In this Complaint, the above-noted conspiracy under 18 U.S.C. § 1956(h), the above-noted Settlement-Event transfers violating 18 U.S.C. § 1956(a)(2), and the above-noted Extraction Transfers are collectively referred to as the "Laundering Predicates."

450.    The previously defined Control over Aliyah and the Shadow Bank, including the financial leverage associated with it, does not alter the application of 18 U.S.C. § 1956 to the SBML Conspiracy or the actions performed pursuant to it.

*Wire fraud under 18 U.S.C. § 1343*:

451.    For purposes of counts alleging, as a RICO offense, wire fraud under 18 U.S.C. § 1343 (the "Wire Fraud Predicate"), the alleged acts constituting such offense generally include the Managers' scheme to make the Transitional Property Representations to Plaintiff, with the Managers' knowledge of their falsity and intent to deceive Plaintiff, along with Plaintiff's reliance on such representations and resulting damages therefrom, as later pled.

452.    Collectively, the Travel Act Predicates, the  Laundering Predicates, and in the case of the above-noted alternative counts also the Wire Fraud Predicate, are referred to as the "RICO Predicates."

*Pattern of the RICO Predicates – "Continuity Plus Relationship"*:

453.    The RICO Predicates are related because of the following, among other

---

[50] Including based on the substantial ($22 billion) value of loans purportedly issued, the approximate size of the repatriation finance market (exclusive of Aliyah and her related parties), the relationships of AE Members, the Shadow Bank's unique business model and willingness to advertise $400,000 unsecured loans, and the lack of accountability for U.S. victim funds, among other circumstances.

characteristics: (a) in each, the participants were the Managers; (b) in each, the victims were members of the African Diaspora, particularly those within the United States, who entrusted the Alkebulan Enterprise with their assets for specified African-development projects; (c) in each, the Managers exploited information asymmetry arising from dual operations in the U.S. and Africa; (d) in each, the purposes (initially successful), even if miscalculated, included stimulating a cycle of exodus and U.S. divestment that would self-propagate, thereby advancing foreign-principal agendas; (e) in each, the methods of commission relied on inducing relocation and divestment of the U.S. African Diaspora (and disguising the transfer of funds received from these activities), through misrepresentations, sham instruments, false imagery, Settlement Events, etc.; and (f) in each, the Managers coordinated specific roles according to their own geographic dispersion and that of victim assets.

454.    In addition, the RICO Predicates are related to the Alkebulan Enterprise as a whole because the Mangers were enabled to commit each of the RICO Predicates solely because of their positions within the AE Members, including through (a) their negotiating positions and AE Member-specific capacities (Travel Act Violations); (b) their control over the enterprise's assets, including victim-sourced assets, and over the enterprise's means to create pretextual source documents (Laundering Predicates); and, as applicable (c) their control over the enterprise's marketing and promotional materials (Wire Fraud Predicate).

455.    Furthermore, the RICO Predicates are related to the Alkebulan Enterprise as a whole because the offenses are inherently linked to (a) the enterprise's goods and (exodus-themed) services; and (b) the enterprise's agency-specific purposes and activities on behalf of foreign principals. Indeed, the Shadow Bank, having issued **"$22 billion"** in loans since its formation in 2019, as well as the Offshore Affiliate with its foreign-government connections, were optimally

situated to enable the RICO Predicates.

456.    Equally important, the RICO Predicates "extend[ed] over a substantial period of time" and met the standard for close-ended continuity, under *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989).

457.    As alleged, the RICO Predicates spanned a period of over three years, corresponding to the Alkebulan #1 and #2 Eras. The RICO Predicates included a variety schemes and predicate types: (a) Travel Act violations targeting different government officials; (b) an early conspiracy to launder Foreign-Agent Proceeds (including, incidentally, those received from defrauding hundreds of American victims); (c) the systematic movement of these funds upon Settlement Events, over the full period (according to the specialized roles within the affiliated AE members); and, (d) as applicable, acts of wire fraud targeting the African Diaspora.[51]

458.    The RICO-Predicate victims, including the Obadare Family and those "influenced" into entrusting the Alkebulan Enterprise with their assets (e.g., as a result of unregistered agents conducting political activities on behalf of foreign principals), were injured numerous ways. These included the loss of money transferred that was concealed through Laundering Predicates; the loss of investment value resulting from misguided bribery efforts; etc.

l.      **Damages Sustained, conditions precedent to action, and attorney's fees**

459.    Initially, Plaintiff's damages in this Complaint comprise the TRP Contractual Sum and the Additional TRP Contractual Payment. Alternatively, Plaintiff's initial damages arise from the impairment and complete loss of all value in the Full TRP Investment. Secondly, as a direct and proximate result of Defendants' schemes, evasiveness, Laundering Predicates, and

---

[51] For this purpose, this unamended Complaint emphasizes that it is not pleading, with particularity, acts of *wire fraud* for the numerous American victims; it is for Plaintiff in specific counts, though. It need not plead all individual accounts because the resulting proceeds, regardless, fell within the scope of Foreign-Agent Proceeds.

concealment, Plaintiff incurred damages from various expenses, primarily during 2023, that totaled approximately another $25,000. Such expenses were a substantial and foreseeable cause of the above-noted conduct. They included (a) investigative costs for Senegalese professionals for the purpose of tracing and accounting for the TRP property, issuing statements responding to inquiries from Senegalese law enforcement (relating to RJ's national arrest warrant), and preparing correspondence to the U.S. Embassy in Dakar, Senegal; and (b) all necessary travel expenses incurred in connection therewith.

460.    Plaintiff has engaged the undersigned attorney(s) and has agreed to pay him/them a reasonable fee for services in bringing this lawsuit in the U.S. and for the reasonable costs and filing fees incurred in connection therewith.

461.    All conditions precedent to the institution and maintenance of this action and the granting of relief sought have occurred, been satisfied, or been waived.

**Count I - 18 U.S.C. § 1962(c) claims against Defendants Rashad J. Grant and Leah A. Christian: conducting affairs of Alkebulan Enterprise through a pattern of racketeering; Ohio Rev. Code § 2923.32(A)(1) claim against Leah A. Christian: conducting affairs of Alkebulan Enterprise through a pattern of corrupt activity**
**(alternative causal sequence to Counts II thr. IV)**

462.    Allegations of paragraphs 1 through 461 are incorporated in this count by reference.

463.    During the Alkebulan #1 and #2 Eras, the Managers were employed by or associated with the Alkebulan Enterprise, which was engaged in and whose activities affected interstate and foreign commerce during this period.

464.    In this count, for purposes of Ohio Rev. Code § 2923.32, references to "racketeering activity" shall be understood to include "corrupt activity."

465.    During the Alkebulan #1 and #2 Eras, the Managers agreed to and did conduct and participate in the conduct of the Alkebulan Enterprise's affairs through a pattern of racketeering

activity consisting of the Laundering Predicates and Travel Act Predicates, in violation of 18 U.S.C. § 1962(c).

466.    As a direct and proximate result of the Managers' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business or property, including in his loss of all value in the Full TRP Investment (i.e., Plaintiff having been the sole investor).

467.    Absent the failed URB Scheme, Plaintiff's injury would not have occurred.

468.    The failed URB Scheme immediately and directly, without any intervening factor, caused the value of the TRP, including Plaintiff's Full TRP Investment, to decline to nothing. That is, as a direct result of the Target's response to the URB Scheme offer, the prospects for Alkebulan #1, the TRP, and the Dakar Exterior, whose fortunes were inextricably linked, precipitously declined. This result was guaranteed by the inseparable ties among the projects. All of them depended on the viability of each other and on cooperation and support from the Alkebulan #1 Local Government Partner. Investors in these projects were the primary and direct victims of the racketeering conduct because the instant effect of the failed bribe was a loss of any and all support from the Alkebulan #1 Local Government Partner. No one is better situated to sue than Plaintiff. By irreparably poisoning the Alkebulan Enterprise's relationships, the Managers impaired the value of TRP assets to such an extent that no realistic probability of project success remained. Also, no salvageable value for the project's assets remained.

**WHEREFORE**, Plaintiff requests the following:

(1) for claims under 18 U.S.C. § 1962(c), that this Court enter judgment in favor of Plaintiff against Defendants Rashad J. Grant and Leah A. Christian for threefold the actual damages sustained plus costs, prejudgment interest, statutorily authorized attorney fees under 18 U.S.C. § 1964, and such other relief as this Court determines

just and proper.

(2) for claims under Ohio Rev. Code § 2923.34, that this Court enter judgment in favor of Plaintiff against Leah A. Christian for threefold the actual damages sustained plus costs, prejudgment interest, statutorily authorized attorney fees under Ohio Rev. Code § 2923.34, and such other relief as this Court determines just and proper.

### Count II - 18 U.S.C. § 1962(c) claim against Defendant Rashad J. Grant: conducting Alkebulan Enterprise's affairs through a pattern of racketeering activity (alternative causal sequence to Counts I, III and IV)

469.    Allegations of paragraphs 1 through 461 are incorporated in this count by reference.

470.    This Count II pleads in the alternative to Counts I, III, and IV. Specifically, it pleads the below claim to the extent that, after the failed URB Scheme, RJ transferred the unspent proceeds that the Offshore Affiliate had received from Plaintiff to the Shadow Bank pursuant to a series of Settlement Events (such proceeds referred to in this count as the "Project Funds").

471.    This count maintains that, under the circumstances of his investment, Plaintiff did not have a legally recognized interest in the TRP, under Senegalese law, separate and apart from his claim to TRP assets, which were in the possession and control of the Offshore Affiliate.

472.    During the Alkebulan #1 and #2 Eras, the Managers were employed by or associated with the Alkebulan Enterprise, which was engaged in and whose activities affected interstate and foreign commerce during this period.

473.    During the Alkebulan #1 and #2 Eras, RJ conducted and participated in the conduct of the Alkebulan Enterprise's affairs through a pattern of racketeering comprising the Laundering Predicates and Travel Act Predicates, in violation of 18 U.S.C. § 1962(c).

474.    On information and belief, all events making up the URB Scheme occurred between February 15, 2022 and February 28, 2022. On information and belief, as a result of the failed URB

Scheme and the absence of prospects for the TRP, RJ, knowing these realities, decided to apply the Project Funds to the DTDF Account representing Aliyah's balance in the Offshore Affiliate.

475.    On information and belief, after the failed URB Scheme, RJ thus effected a series of transfers of all Project Funds to the Shadow Bank, under the pretexts of Settlement Events. On information and belief, RJ initiated the transfers from the Offshore Affiliate's bank account at NSIA Banque, where the Project Funds were initially received.

476.    On information and belief,[52] this series of transfers occurred between March 1, 2022, and September 1, 2022, both dates being approximate and inclusive,

477.    As a direct and proximate result of RJ's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business or property, including by the loss of the Project Funds.

478.    If RJ had not made the above-referenced transfers of Project Funds, premised on Settlement Events, Plaintiff's injury would not have occurred.

479.    In making such transfers, RJ immediately and directly, without any intervening factor, caused the Project Funds to be converted from their intended TRP use to the Managers' benefit. As a result of the Settlement Events, the diverted funds also could not be readily detected by Senegalese law enforcement or staff at Senegalese financial institutions. Plaintiff was the primary and "direct victim" of the racketeering conduct. No one is better situated to sue for this conduct than Plaintiff.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff against Defendant Rashad J. Grant for threefold the actual damages sustained plus costs, prejudgment interest, statutorily authorized attorney fees under 18 U.S.C. § 1964, and such other

---

[52] Based on, among other circumstances, an assertion in the 2022 "investors letter" sent to Plaintiff stating that "halfway through the year [2022] we reached the extent of our current investment."

relief as this Court determines just and proper.

<u>**Count III - 18 U.S.C. § 1962(c) claims against Defendants Rashad J. Grant and Leah A.**</u>
<u>**Christian: conducting affairs of Alkebulan Enterprise through a pattern of racketeering**</u>
**(alternative cause to Counts I, II, and IV)**

480.    Allegations of paragraphs 1 through 461 are incorporated in this count by reference.

481.    This Count III pleads in the alternative to Counts I, II, and IV.

482.    Specifically, it pleads that, based on the contract terms and surrounding circumstances, Plaintiff's purchased interests in the TRP, governed by the TRP Investment Contract, were not securities under 15 U.S.C. § 78c(a)(10). As a result, the limitation imposed by 18 U.S.C. § 1964(c) does not apply because securities fraud is not "actionable" without a security.

483.    The funds that Plaintiff paid for the Full TRP Investment were not pooled with any other investors funds. Thus, the absence horizontal commonality caused the common-enterprise requirement for an "investment contract" to fail.

484.    Alternatively, Plaintiff was not led to an expectation of profit based on the aggregate effect of the following: (a) the economic realities of the TRP; (b) the totality of the TRP Investment Contract and TRP Presentations; and (c) the mix of explicit and implicit assertions bearing on revenue and expense allocations (or lack thereof) in the Transitional Property Representations.

**General RICO allegations**:

485.    During the Alkebulan #1 and #2 Eras, the Managers were employed by or associated with the Alkebulan Enterprise, which was engaged in and whose activities affected interstate and foreign commerce during this period.

486.    During the Alkebulan #1 and #2 Eras, the Managers, in violation of 18 U.S.C. § 1962(c), agreed to and did conduct and participate in the conduct of the Alkebulan Enterprise's

affairs through a pattern of racketeering consisting of the Laundering Predicates, the Travel Act Predicates, and the Wire Fraud Predicate.

**Injury to business or property by reason of Wire Fraud Predicate under 18 U.S.C. § 1343:**

*Material misrepresentations in connection with purchases*

487.    As detailed and previously alleged, RJ and Aliyah each made specific Transitional Property Representations.

488.    As detailed and previously alleged, when the Transitional Property Representations were made to Plaintiff, they were false. To the extent forward looking, they were grossly inaccurate and lacked any remotely objective, let alone reasonable, basis in fact, or any plausible assumptions in their support. The Managers knew the circumstances described in this paragraph at the time.

489.    As detailed and previously alleged, the Transitional Property Representations were material based on the economic interdependence of the Offshore Affiliate's projects and the other circumstances described, including those fundamentally affecting investor expectations for return on investment. Thus, they had a natural tendency to influence Plaintiff's decision-making.

490.    The Transitional Property Representations were specifically made in connection with Plaintiff's purchases of TRP interests. As stated elsewhere, they were material to the decision to purchase, they concerned contemporaneous events (or fabricated events), and they were closely linked in subject matter. They addressed the TRP directly: the specific return of investment for the purchase; the "exodus" levels and "wait list" consistent with full-capacity operations; the number of other investors in the TRP; the ownership, control, and benefits of property integral to TRP (i.e., Alkebulan #1 Land and the Dakar Exterior); the TRP support from African Union; revenue and expense representations for the TRP; and international donor support for the TRP.

*Managers' overarching scheme to defraud Plaintiff*:

491. Throughout the first half of 2021, Aliyah and RJ repeatedly conversed regarding affairs of the Shadow Bank, MIA, and the Offshore Affiliate, including through WhatsApp Messenger, phone, online platforms, the internet (including social media), and email. During these conversations, on information and belief, the Managers, having identified the TRP for possible development near the end of 2020, devised a scheme to induce Mahdi Followers with sufficient assets (identified through RJ's investor-screening activities) to invest in the project based on misrepresentations.

492. During these discussion throughout the first half of 2021, the Managers identified Plaintiff as a TRP candidate because RJ had properly screened Plaintiff and his potential assets. In this regard, RJ had specifically inquired of Plaintiff regarding the Obadare Family's net worth and liquid assets.

493. The Managers knew the property was largely unproductive farmland. But RJ and Aliyah, with their marketing backgrounds, also believed if they could deceive investors to fund preliminary work on the TRP, the optics would spur more "exodus" activity, thus boosting the collective interest in Alkebulan #1 and the Dakar Exterior. With the apparent success of all projects, they believed they could create a self-propelling cycle of enthusiastic investors and professionals from the U.S., leading to large-scale development in the three key properties, which in turn would accelerate further exodus. And cycle repeat. They believed that, ultimately, if they could they fund "good optics," the rest would follow. To this end, the vibrancy of Alkebulan #1 and the Dakar Exterior would lift the prospects of the TRP, in their thinking, but regardless the Managers would be idolized to such an extent that the misrepresentations would not matter in the long run. Indeed, the Managers even justified the Alkebulan land fraud schemes in a similar

fashion, believing that, irrespective of land-title defects (and the acts of misappropriation against Americans), the success of their movement would be unstoppable and take on a life of its own.

494.     Accordingly, in this count, the Managers' primary motive in making the Transitional Property Representations was to create a choreographed "success" they could market. This is so notwithstanding their subsequent change of intentions for how to best use TRP funds.

495.     The Managers had the opportunity to commit the acts of fraud in this count because they controlled the Alkebulan Enterprise, which in turn managed and controlled the TRP's agenda.

496.     In addition, the Transitional Property Representations were self-evidently so important and consequential to the TRP, and their false and inaccurate nature was so easily detectable with the information *available to the Managers*, there is no plausible inference that intent to deceive was lacking. The scheme was reasonably calculated to deceive persons exercising high levels of prudence and comprehension, such as Plaintiff.

497.     The Managers, knowing the Transitional Property Representations were materially false when they were made to Plaintiff, nonetheless carried out the scheme and made such representations to Plaintiff, as previously alleged. In doing so, the Managers acted with intent to deceive Plaintiff in connection with his purchases.

498.     In furtherance of such scheme, RJ, acting for the Offshore Affiliate, transmitted or caused to be transmitted messages by means of wire that were received by Plaintiff and the Obadare Family in Maryland. Such wires transmitted the original offer, the TRP Presentations, and proposed contract drafts. In addition, RJ, acting for the Offshore Affiliate, sent wires to the Obadare Family after Plaintiff's purchases for the purpose of lulling Plaintiff into a false sense of security. The wires in this paragraph, the use of which was reasonably foreseeable based on the requirements for the scheme, were transmitted through WhatsApp and phone.

499.     Similarly, in furtherance of such scheme, Aliyah, transmitted or caused to be transmitted messages by means of wire, which originated in Ohio, to RJ. Consistent with previous allegations, such transmissions furthered the scheme because they relayed or otherwise concerned content of the  Transitional Property Representations. The wires in this paragraph, the use of which was reasonably foreseeable based on the requirements for the scheme, were transmitted through WhatsApp, the phone, and email.

500.     The domestic nature of the above-noted wire transmissions, being the essential conduct and focus of 18 U.S.C. § 1343,  rendered the statute's application as permissibly domestic.

*Reliance, transaction causation, and loss causation*:

501.     Plaintiff considered and reviewed each Transitional Property Representation in deciding whether to purchase his Full TRP Investment. He discussed each with Ade and performed research and due diligence on areas that he and Ade identified for further inquiry. Plaintiff, however, encountered opaqueness and the lack of verifiability for many claims, based on the absence of remote land-record systems in Senegal and similar issues. But he reviewed the Offshore Affiliate's promotional materials at length. Ultimately, he accepted and relied on the Transitional Property Representations.

502.     But for each Transitional Property Representation, and but for the Transitional Property Representations collectively, Plaintiff would not have purchased any interest in the TRP because his perception of the TRP's viability would have been significantly different. Thus, absent the Wire Fraud Predicate, Plaintiff's injury would not have occurred.

503.     Regarding each of the ROI Statement, 4,000-Application Representation, and Wait-List Representation, the inaccuracy of these metrics and assertions (or in the case of the ROI Statement, inaccuracy of the demand assumptions underlying it) concealed the lower degree of

interest in the TRP among actual and potential repatriates. This lesser interest and the associated lack of cash flows from operating activities, including from prepaid rents, directly and proximately caused the Full TRP Investment to lose all value or, alternatively, Plaintiff's deprivation of his money expended for the interest.

504.    As for the Rental Income Representations and the Cost Representations, the inaccuracy of these representations presented an overly simplistic business model and masked the complexities associated with the many distinct operations that would take place on the property. The disregarded costs, land-ownership challenges, absence of staff, etc. that were cast aside (all of which were excluded for the purpose of presenting a deceptively simple, question-free operation to amass profits) directly and proximately caused the Full TRP Investment to lose all value or, alternatively, Plaintiff's deprivation of his money expended for the interest.

505.    And with respect to the Related-Property Appeal with African-Union Support Representation, the Other Investor Representation, and the ESP Representation, the falsity of these representations concealed the absence of partnership equity and external funding possibilities, among other things. The shortfall in capital directly and proximately caused the TRP, whose lack of funding prevented its construction, to fail and the Full TRP Investment to lose all value or, alternatively, Plaintiff's deprivation of his money expended for the interest.

506.    As a direct and proximate result of the Wire Fraud Predicate, which was defined previously and specifically pled in this count, Plaintiff has thus been injured in his business or property, including by the loss of all value in the Full TRP Investment.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff against Defendants Rashad J. Grant and Leah A. Christian for threefold the actual damages sustained plus costs, prejudgment interest, statutorily authorized attorney fees under 18 U.S.C. §

1964, and such other relief as this Court determines just and proper.

### Count IV - 18 U.S.C. § 1962(a) claim against Defendant Rashad J. Grant: investing income derived from a pattern of racketeering activity into the Alkebulan #2 Manager Enterprise
### (alternative causal sequence to Counts I thr. III)

507.     Allegations of paragraphs 1 through 461 are incorporated in this count by reference.

508.     This Count IV pleads in the alternative to Counts I through III.

509.     On information and belief, throughout the period beginning on November 1, 2022 and ending at the close of October 31, 2024, both dates being approximate and inclusive, the Alkebulan #2 Manager was and is an enterprise engaged in and whose activities affected interstate and foreign commerce.

### Count IV Income:

510.     During the Alkebulan #1 and #2 Eras, the Offshore Affiliate derived income (the "Count IV Income") from a pattern of racketeering activity through the Alkebulan Enterprise, which was also engaged in and whose activities affected interstate and foreign commerce.

*Count IV Income includes payments derived from Wire Fraud*:

511.     On or around November 1, 2022, RJ falsely represented to Plaintiff that Mr. Ndao and/or Solutions Sociales were "owners" of the land, and Offshore Affiliate was thus required to pay Solutions Sociales in order to acquire "title" to the TRP, as part of the project cost. However, neither Mr. Ndao nor Solutions Sociales was a bona fide owner. And, in any event, RJ intended that the funds the Offshore Affiliate paid to Solutions Sociales would then be transferred to the Alkebulan #2 Manager. That is, RJ intended to misappropriate investor-designated funds held by the Offshore Affiliate and then invest them in the Alkebulan #2 Manager, through Solutions Sociales as an intermediary, all under the pretext that RJ was paying an "owner" for title to the TRP land.

- 116 -

512.    On information and belief, RJ, a U.S. citizen, made a series of payments to Solutions Sociales for this purpose between November 1, 2022 and November 30, 2022, both dates being approximate and inclusive. This series of related payments involved a value exceeding $10,000, and the payments were effected by a combination of check, payment of withdrawn CFA Francs, and/or electronic funds transfers.

513.    In conducting these transactions, RJ knew that property involved represented Foreign-Agent Proceeds (in this case, that were also derived from wire fraud). RJ conducted the transactions, which did in fact involve such property, with the intent of concealing or disguising the ownership and control of the proceeds. Specifically, RJ intended to disguise his intended purpose—transfers to the Alkebulan #2 Manager—by designing the transaction to appear as TRP project costs.

514.    The unspent portion of Plaintiff's payments to the Offshore Affiliate (in connection with Plaintiff's Full TRP Investment) became an unlawful gain and Count IV Income to RJ between November 1, 2022 and November 30, 2022, both dates being approximate and inclusive. This is the approximate timeframe during which RJ diverted the funds' use, and he exercised unfettered dominion and control over the funds, by applying them for his own intended purposes. At least for 18 U.S.C. § 1962(a), the **"indirect"** source of the income, arising from the Wire Fraud Predicate, renders such income derived from a pattern of racketeering.

515.    Alternatively, RJ was only able to assume control and effectuate the misappropriation(s), giving rise to the unlawful gain, through an entirely separate sequence of violations of 18 U.S.C.§ 1956(a), as described above with respect to Solutions Sociales. In this alternative, the unlawful gains were thus similarly derived from a pattern of racketeering activity, at least for 18 U.S.C. § 1962(a). Regardless, the misappropriation income relating to the investor-

designated funds were Count IV Income.

*Wire Fraud allegations (TRP investment ≠ security)*:

516.     As detailed and previously alleged, RJ and Aliyah each made specific Transitional Property Representations.

517.     Throughout the first half of 2021, Aliyah and RJ repeatedly conversed regarding affairs of the Shadow Bank, MIA, and the Offshore Affiliate, including through WhatsApp Messenger, phone, online platforms, the internet (including social media), and email. During these conversations, on information and belief, the Managers, having identified the TRP for possible development near the end of 2020, devised a scheme to induce Mahdi Followers with sufficient assets (identified through RJ's investor-screening activities) to invest in the project based on misrepresentations.

518.     During these discussion throughout the first half of 2021, the Managers identified Plaintiff as a TRP candidate because RJ had properly screened Plaintiff and his potential assets. In this regard, RJ had specifically inquired of Plaintiff regarding the Obadare Family's net worth and liquid assets.

519.     The Managers knew the property was largely unproductive farmland. But RJ and Aliyah, with their marketing backgrounds, also believed if they could deceive investors to fund preliminary work on the TRP, the optics would spur more "exodus" activity, thus boosting the collective interest in Alkebulan #1 and the Dakar Exterior. With the apparent success of all projects, they believed they could create a self-propelling cycle of enthusiastic investors and professionals from the U.S., leading to large-scale development in the three key properties, which in turn would accelerate further exodus. And cycle repeat. They believed that, ultimately, if they could they fund "good optics," the rest would follow. To this end, the vibrancy of Alkebulan #1

and the Dakar Exterior would lift the prospects of the TRP, in their thinking, but regardless the Managers would be idolized to such an extent that the misrepresentations would not matter in the long run. Indeed, the Managers even justified the Alkebulan land fraud schemes in a similar fashion, believing that, irrespective of land-title defects (and the acts of misappropriation against Americans), the success of their movement would be unstoppable and take on a life of its own. They just needed to market and *"influence"* the city to success.

520.     Accordingly, in this count, the Managers' primary motive in making the Transitional Property Representations was to create a choreographed "success" they could market. This is so notwithstanding their subsequent change of intentions for how to best use TRP funds.

521.     The Managers had the opportunity to commit the acts of fraud in this count because they controlled the Enterprise, which in turn managed and controlled the TRP's agenda.

522.     In addition, the Transitional Property Representations were self-evidently so important and consequential to the TRP, and their false and inaccurate nature was so easily detectable with the information *available to the Managers*, there is no plausible inference that intent to deceive was lacking. The scheme was reasonably calculated to deceive persons exercising high levels of prudence and comprehension, such as Plaintiff.

523.     The Managers, knowing the Transitional Property Representations were materially false when they were made to Plaintiff, nonetheless carried out the scheme and made such representations to Plaintiff, as previously alleged. In doing so, the Managers acted with intent to deceive Plaintiff in connection with his purchases.

524.     In furtherance of such scheme, RJ, acting for the Offshore Affiliate, transmitted or caused to be transmitted messages by means of wire that were received by Plaintiff and the Obadare Family in Maryland. Such wires transmitted the original offer, the TRP Presentations,

and proposed contract drafts. In addition, RJ, acting for the Offshore Affiliate, sent wires to the Obadare Family after Plaintiff's purchases for the purpose of lulling Plaintiff into a false sense of security. The wires in this paragraph, the use of which was reasonably foreseeable based on the requirements for the scheme, were transmitted through WhatsApp and phone.

525.    Similarly, in furtherance of such scheme, Aliyah, transmitted or caused to be transmitted messages by means of wire, which originated in Ohio, to RJ. Consistent with previous allegations, such transmissions furthered the scheme because they relayed or otherwise concerned content of the Transitional Property Representations. The wires in this paragraph, the use of which was reasonably foreseeable based on the requirements for the scheme, were transmitted through WhatsApp, the phone, and email.

526.    Plaintiff considered and reviewed each Transitional Property Representation in deciding whether to purchase his Full TRP Investment. He discussed each with Ade and performed research and due diligence on areas that he and Ade identified for further inquiry. Plaintiff, however, encountered opaqueness and the lack of verifiability for many claims, based on the absence of remote land-record systems in Senegal and similar issues. But he reviewed the Offshore Affiliate's promotional materials at length. Ultimately, he accepted and relied on the Transitional Property Representations.

527.    But for each Transitional Property Representation, and but for the Transitional Property Representations collectively, Plaintiff would not have purchased any interest in the TRP because his perception of the TRP's viability would have been significantly different. Thus, absent the Wire Fraud Predicate, Plaintiff's injury would not have occurred.

*Portion otherwise derived from Laundering Predicates*

528.    Count IV Income is also  "derived from," among other sources, the false Settlement

Events, which corresponded to the cumulative effect(s) of adjustments to the DTDF Accounts. For instance, upon Settlement Events, even when the Offshore Affiliate was required to pay the Shadow Bank (at the direction of Aliyah), RJ's share of the *Shadow Bank's* income, including that attributable to Foreign-Agent Proceeds, necessarily offset any payment owed by the *Offshore Affiliate* (i.e., generally attributable to Aliyah's profit share of the Offshore Affiliate). Thus, the system of value transfer permitted RJ, through the Offshore Affiliate, to derive income and retain proceeds, within the meaning of 18 U.S.C. § 1962(a), upon the occurrence of Settlement Events. Although the Shadow Bank's underlying income might normally be considered "derived" from American victims, and RJ might be understood as receiving a distribution (or deemed distribution) of his share of such income, this should not bear on the source of income on these facts. Because RJ's disguised share only materialized and provided him economic value and control upon the Laundering Predicate Acts, that is sufficient to render the associated income as derived, "directly or indirectly," from such acts under 18 U.S.C. § 1962(a). RJ, being a disguised owner, could not simply receive distributions in the same manner that other owners could. Given the intent and aims of 18 U.S.C. § 1962(a), coupled with its emphasis on *receiving* income, RJ should not be able to benefit from the disguised interest, which required the intervening Laundering Predicates for him to claim his share of profits.

529.    Beginning on or around November 1, 2022, RJ, acting on behalf of the Offshore Affiliate, knowingly and willfully used and invested substantially all retained Count IV Income in the acquisition of any interest in, or the establishment or operation of, Alkebulan #2 Manager.

530.    On information and belief, RJ's series of uses and investments occurred between November 1, 2022 and November 30, 2022, both dates being approximate and inclusive.

*Causation of the "investment injury"*:

531.    As a direct and proximate result of RJ's violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in his business or property, including by the loss of all value attributable to the Full TRP Investment.

532.    Absent the Alkebulan #2 Manager investment, Plaintiff would not have sustained injury from the Full TRP Investment's collapse in value.

533.    In this count, RJ's *investment* in the Alkebulan #2 Manager directly and proximately caused the TRP's failure and the loss of all value attributable to the Full TRP Investment. Alkebulan #2 was a competitor to the interrelated projects associated with Alkebulan #1 (i.e., the main site, the Dakar Exterior, and the TRP). As a practical matter, the two Alkebulan concepts were mutually exclusive and could not both survive. Furthermore, there were no other plausible candidates as far as expatriate-city projects, outside of these alternatives. Expatriates planning to reside and invest in Alkebulan #2 would not be long-term residents of the Dakar Exterior or Alkebulan #1, and they would not be short-term residents of the TRP. By directing the Count IV income to a competitor, RJ effectively wrote off his first generation of city projects for his new city. He allowed the competitor to thrive and control its financial destiny while leaving the original projects to wither in response to the new competitive threat. Plaintiff was left with a valueless TRP interest.

*Foreign use of the "investment injury"*:

534.    In good faith, this Complaint pleads that an "investment injury" that concerns foreign uses of the proceeds is permissible under 18 U.S.C. § 1962(a) under the following circumstances: (a) the underlying RICO predicates do not require an impermissibly extraterritorial application; AND (b) the source of the "income" invested is from the United States, in this case being from American victims. The Supreme Court of the United States, while observing the

"thorny" quality of this issue, has not issued precedent. *See RJR Nabisco v. European Cmty.*, 579 U.S. 325, 341 (2016). Nor is there otherwise binding precedent on this issue for the Court.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff against Defendant Rashad J. Grant for threefold the actual damages sustained plus costs, prejudgment interest, statutorily authorized attorney fees under 18 U.S.C. § 1964, and such other relief as this Court determines just and proper.

### Count V - 15 U.S.C. 78j(b), 17 C.F.R §240.10b-5 federal securities fraud claim against Defendants Rashad J. Grant and Leah A. Christian:
### (alternative to RICO claims)

535. Allegations of paragraphs 1 through 461 are incorporated in this count by reference.

536. The TRP Investment Contract established the rights and obligations for the Full TRP Investment.

537. In connection with the acts, transactions, and conduct alleged and incorporated into this count, the Managers directly or indirectly used means and instrumentalities of interstate commerce, including phone, internet (e.g., social media), WhatsApp Messenger, and email.

*Plaintiff's purchase of securities, as governed by the TRP Investment Contract*:

538. Based on the contract terms and surrounding circumstances, Plaintiff's purchases of interests in the TRP, governed by the TRP Investment Contract, were securities:

539. <u>Investment of money</u>: In paying cash consideration, Plaintiff invested the TRP Contractual Sum and the Additional TRP Contractual Payment in the TRP in order to generate income and profit from the TRP.

540. <u>Common enterprise</u>: Under the TRP Investment Contract, the TRP contemplated pooling $900,000 (or equivalent value when converted to CFA francs) at the outset. In connection with his purchase of the TRP Investment Contract and of the later-acquired interest, Plaintiffs

believed, based on the Other Investor Representation, that his Full TRP Investment would be pooled with other investors' interests, whose fortunes in the TRP were interrelated.

541.     Expectation of profits: The TRP Contract was represented as providing, and it expressly called for, investors to earn profits from the TRP's operations. Plaintiff was led to expect such profits, which were the principal motivation in purchasing the Full TRP Investment. Although the TRP Investment Contract lacked clarity, it provided Plaintiff a profit interest. Based on the totality of the TRP Presentations and the TRP Full Project Plan, this interest provided annual allocations of specified sources of revenue and expense, both from the core TRP operations and the ancillary activities.

542.     Through the efforts of others: Plaintiff, a Maryland resident, held no management rights under the TRP Investment Contract. According the TRP Full Project Plan, the TRP Presentations, and the TRP Investment Contract, the Offshore Affiliate managed all functions associated with the investment.

*Material misrepresentations in connection with purchases*

543.     As detailed and previously alleged, RJ and Aliyah each made specific Transitional Property Representations by exercising ultimate authority over them.

544.     As detailed and previously alleged, when the Transitional Property Representations were made to Plaintiff, they were false. To the extent forward looking, they were grossly inaccurate and lacked any remotely objective, let alone reasonable, basis in fact, or any plausible assumptions in their support. The Managers knew the circumstances described in this paragraph at the time.

545.     As detailed and previously alleged, the Transitional Property Representations were material based on the economic interdependence of the Offshore Affiliate's projects and the other circumstances described, including those fundamentally affecting investor expectations for return

on investment.

546.    The Transitional Property Representations were specifically made in connection with Plaintiff's purchases of TRP interests. As stated elsewhere, they were material to the decision to purchase, they concerned contemporaneous events (or fabricated events), and they were closely linked in subject matter. They addressed the TRP directly: the specific return of investment for the purchase; the "exodus" levels and "wait list" consistent with full-capacity operations; the number of other investors in the TRP; the ownership, control, and benefits of property integral to TRP (i.e., Alkebulan #1 Land and the Dakar Exterior); the TRP support from African Union; revenue and expense representations for the TRP; and international donor support for the TRP.

*Managers' actions carried out with scienter*

547.    Each Manager, knowing the Transitional Property Representations were materially false when they were made to Plaintiff, acted with scienter in connection with Plaintiff's purchases.

548.    Throughout the first half of 2021, Aliyah and RJ repeatedly conversed regarding affairs of the Shadow Bank, MIA, and the Offshore Affiliate, including through WhatsApp Messenger, phone, online platforms, the internet (including social media), and email. During these conversations, on information and belief, the Managers, having identified the TRP for possible development near the end of 2020, devised a scheme to induce Mahdi Followers with sufficient assets (identified through RJ's investor-screening activities) to invest in the project based on misrepresentations.

549.    During these discussion throughout the first half of 2021, the Managers identified Plaintiff as a TRP candidate because RJ had properly screened Plaintiff and his potential assets. In this regard, RJ had specifically inquired of Plaintiff regarding the Obadare Family's net worth and liquid assets.

550.    The Managers knew the property was largely unproductive farmland. But RJ and Aliyah, with their marketing backgrounds, also believed if they could deceive investors to fund preliminary work on the TRP, the optics would spur more "exodus" activity, thus boosting the collective interest in Alkebulan #1 and the Dakar Exterior. With the apparent success of all projects, they believed they could create a self-propelling cycle of enthusiastic investors and professionals from the U.S., leading to large-scale development in the three key properties, which in turn would accelerate further exodus. And cycle repeat. They believed that, ultimately, if they could they fund "good optics," the rest would follow. To this end, the vibrancy of Alkebulan #1 and the Dakar Exterior would lift the prospects of the TRP, in their thinking, but regardless the Managers would be idolized to such an extent that the misrepresentations would not matter in the long run. Indeed, the Managers even justified the Alkebulan land fraud schemes in a similar fashion, believing that, irrespective of land-title defects (and the acts of misappropriation against Americans), the success of their movement would be unstoppable and take on a life of its own. They just needed to market and *"influence"* the city to success.

551.    Accordingly, in this count, the Managers' primary motive in making the Transitional Property Representations was to create a choreographed "success" they could market. This is so notwithstanding their subsequent change of intentions for how to best use TRP funds.

552.    The Managers had the opportunity to commit the acts of fraud in this count because they controlled the Enterprise, which in turn managed and controlled the TRP's agenda.

553.    In addition, the Transitional Property Representations were self-evidently so important and consequential to the TRP, and their false and inaccurate nature was so easily detectable with the information *available to the Managers*, there is no plausible inference that scienter was lacking. The scheme was reasonably calculated to deceive persons exercising high

levels of prudence and comprehension, such as Plaintiff.

*Reliance, transaction causation, and loss causation*:

554.    Plaintiff considered and reviewed each Transitional Property Representation in deciding whether to purchase his Full TRP Investment. He discussed each with Ade and performed research and due diligence on areas that he and Ade identified for further inquiry. Plaintiff, however, encountered opaqueness and the lack of verifiability for many claims, based on the absence of remote land-record systems in Senegal and similar issues. But he reviewed the Offshore Affiliate's promotional materials at length. Ultimately, he accepted and relied on the Transitional Property Representations.

555.    But for each Transitional Property Representation, and but for the Transitional Property Representations collectively, Plaintiff would not have purchased any interest in the TRP because his perception of the TRP's viability would have been significantly different. Thus, absent the Wire Fraud Predicate, Plaintiff's injury would not have occurred.

556.    Regarding each of the ROI Statement, 4,000-Application Representation, and Wait-List Representation, the inaccuracy of these metrics and assertions (or in the case of the ROI Statement, inaccuracy of the demand assumptions underlying it) concealed the lower degree of interest in the TRP among actual and potential repatriates. This lesser interest and the associated lack of cash flows from operating activities, including from prepaid rents, directly and proximately caused the Full TRP Investment to lose all value or, alternatively, Plaintiff's deprivation of his money expended for the interest.

557.    As for the Rental Income Representations and the Cost Representations, the inaccuracy of these representations presented an overly simplistic business model and masked the complexities associated with the many distinct operations that would take place on the property.

The disregarded costs, land-ownership challenges, absence of staff, etc. that were cast aside (all of which were excluded for the purpose of presenting a deceptively simple, question-free operation to amass profits) directly and proximately caused the Full TRP Investment to lose all value or, alternatively, Plaintiff's deprivation of his money expended for the interest.

558.    And with respect to the Related-Property Appeal with African-Union Support Representation, the Other Investor Representation, and the ESP Representation, the falsity of these representations concealed the absence of partnership equity and external funding possibilities, among other things. The shortfall in capital directly and proximately caused the TRP, whose lack of funding prevented its construction, to fail and the Full TRP Investment to lose all value or, alternatively, Plaintiff's deprivation of his money expended for the interest.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff against Defendants Rashad J. Grant and Leah A. Christian for compensatory damages sustained plus costs, prejudgment interest, and such other relief as this Court determines just and proper.

## Count VI - Ohio Rev. Code § 2307.60 claims against Leah A. Christian and Alkebulan Development Fund, Ltd regarding damages for criminal acts

559.    Allegations of paragraphs 1 through 461 are incorporated in this count by reference.

560.    As previously alleged, Aliyah acted under her authority as an agent and manager of the Shadow Bank in carrying out her role for the URB Scheme. Also, on information and belief, Aliyah, acting in this capacity, specified the availability of assets held by the Shadow Bank (along with MIA assets) when communicating the URB Scheme offer to the Target or intermediary.

561.    As a direct and proximate result of Aliyah's participation in the URB Scheme, which was a criminal act and Travel Act violation, Plaintiff has been injured in his property through the impairment to, and resulting loss of all value in, his investment in the TRP.

562.    Absent Aliyah's participation in the failed URB Scheme (a criminal act and Travel

Act violation), Plaintiff's injury would not have occurred.

563.    Such participation included, among other things, Aliyah's designing, planning, and coordinating her role in the scheme from Akron, Ohio, before departing from Akron and completing the Travel Act violation in Senegal.

564.    Aliyah's acts in this regard immediately and directly, without any intervening factor, caused the value of the TRP project, including Plaintiff's investment, to decline to nothing. That is, as a direct result of the Target's response to the URB Scheme offer, the prospects for Alkebulan #1, the TRP, and the Dakar Exterior, whose fortunes were inextricably linked, precipitously declined. This result was guaranteed by the inseparable ties among the projects. All of them depended on the viability of each other and on cooperation and support from the Alkebulan #1 Local Government Partner. The instant effect of the failed bribe was a loss of any and all support from the Alkebulan #1 Local Government Partner. By irreparably poisoning the Alkebulan Enterprise's relationships, Aliyah impaired the value of TRP assets to such an extent that no realistic probability of project success remained. Also, no salvageable value for the project's assets remained.

565.    Through the above facts and Travel Act violation, Aliyah's actions have met the standard set forth in Ohio Rev. Code § 2315.21(C)(1) for punitive damages.

**WHEREFORE**, Plaintiff requests that this Court enter judgment in favor of Plaintiff against Defendants Leah A. Christian and Alkebulan Development Fund, Ltd for full damages, costs, prejudgment interest, statutorily authorized attorney fees under Ohio Rev. Code § 2307.60(A)(1), punitive damages, and such other relief as this Court determines just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a jury trial on all issues so triable against Defendants.

RESPECTFULLY submitted this 15th day of November, 2024.

s/ Trey M. Bruce

Trey M. Bruce, Esq.
Bar number.: FL84053
Bruce Law and Fraud Examination, PLLC
8407 Main St
Ellicott City, MD 21043
Phone: (240) 232-5482
Primary Email: tbruce@swflfraudatty.law
Secondary Email: admin@swflfraudatty.law
Attorney for Plaintiff and Obadare Family